# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ARECONT VISION HOLDINGS, LLC, *et al.*,[1] | ) | Case No. 18-11142 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

**Objection Deadline: June 1, 2018 at 4:00 p.m. (ET)**
**Hearing Date: June 8, 2018 at 2:00 p.m. (ET)**

**MOTION FOR ENTRY OF AN ORDER (I) (A) AUTHORIZING
ENTRY INTO THE ASSET PURCHASE AGREEMENT WITH RESPECT
TO THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS,
(B) APPROVING BID PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL
OF THE DEBTORS' ASSETS, (C) SCHEDULING AN AUCTION AND HEARING TO
CONSIDER THE SALE AND APPROVE THE FORM AND MANNER OF
NOTICES RELATED THERETO, (D) ESTABLISHING PROCEDURES RELATING
TO THE ASSUMPTION AND ASSIGNMENT OF CERTAIN CONTRACTS AND
LEASES, INCLUDING NOTICE OF PROPOSED CURE AMOUNTS, (E) APPROVING
CERTAIN BREAKUP FEE AND EXPENSE REIMBURSEMENT PROVISIONS;
(II) AUTHORIZING AND APPROVING (A) THE SALE OF CERTAIN ASSETS FREE
AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES, AND OTHER
INTERESTS, AND (B) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN
CONTRACTS AND LEASES; AND (III) GRANTING RELATED RELIEF**

Arecont Vision Holdings, LLC, a Delaware limited liability company

("Holdings"), and its affiliated debtors and debtors-in-possession, Arecont Vision, LLC

("Arecont Vision") and Arecont Vision IC DISC ("Vision IC" and, together with Holdings and

Arecont Vision, the "Debtors" or the "Company"), file this motion (the "Motion") for the entry

of an order pursuant to sections 105(a), 363, 365 and 503 of title 11 of the United States Code

(the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9007, and 9014 of the Federal Rules of

---

[1] The Debtors and the last four digits of their U.S. tax identification number are Arecont Vision Holdings, LLC (9187), Arecont Vision, LLC (1410), and Arecont Vision IC DISC (5376). The Debtors' noticing address in these chapter 11 cases is 425 Colorado Street, Suite 700, Glendale, CA 91205.

Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and Rules 2002-1 and 6004-1 of the Local

Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the

District of Delaware (the "<u>Local Rules</u>") for: (i) an order substantially in the proposed form

attached hereto as **Exhibit A** (the "<u>Bid Procedures Order</u>"): (a) approving certain sale and bid

procedures attached as **Exhibit 1** to the Bid Procedures Order (the "<u>Bid Procedures</u>") in

connection with the sale (the "<u>Sale</u>") of the Debtors' right, title and interest in substantially all of

the assets and properties used in connection with the operation of the Debtors' business, as set

forth in the Purchase Agreement (defined below); (b) scheduling both an auction and hearing to

consider approval of such Sale; (c) approving procedures related to the assumption and

assignment of certain executory contracts and unexpired leases related to the Sale; (d) approving

the form and manner of the notices of the Bid Procedures attached as **Exhibit 2**, **Exhibit 3** and

**Exhibit 4** to the Bid Procedures Order; and (e) approving the proposed breakup fee and expense

reimbursement in favor of the Stalking Horse Purchaser (defined below); and (ii) an order,

substantially in the proposed form attached hereto as **Exhibit B** (the "<u>Sale Order</u>")

(a) authorizing Arecont Vision's entry into an *Asset Purchase Agreement* with Arecont

Technologies LLC, an affiliate of Turnspire Capital Partners, LLC (the "<u>Stalking Horse</u>

<u>Purchaser</u>") substantially in the form attached as **Exhibit C** hereto (without schedules) (the

"<u>Purchase Agreement</u>") with the Stalking Horse Purchaser or with the successful bidder at the

auction (if other than the Stalking Horse Purchaser); (b) authorizing the Sale of such assets free

and clear of, liens, claims, encumbrances ("<u>Liens, Claims and Encumbrances</u>"), and other

interests, except as provided in the Purchase Agreement; and (c) approving the assumption and

assignment of certain of the Debtors' executory contracts and unexpired leases related to the Sale; and (iii) granting relief related.  In support of this Motion, the Debtors respectfully state the following:

## Jurisdiction and Venue

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicates for the relief sought herein are sections 105, 363, 365, 503, 1107 and 1108 of chapter 11 of the Bankruptcy Code, Bankruptcy Rules 2002(a)(2), 6004, 6006 and 9014 and Local Rules 2002-1(b), 6004-1 and 9006-1.

## Background

4.      On May 14, 2018 (the "Petition Date"), the Debtors filed with this Court voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      The factual background regarding the Debtors, including their historical business operations and the events precipitating the chapter 11 filings, is set forth in detail in the *Declaration of Scott Avila, Chief Restructuring Officer, in Support of First Day Motions* (the "First Day Declaration") filed on the Petition Date and fully incorporated herein by reference.[2]

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the First Day Declaration.

3

## The Debtors' Operations and Assets to Be Sold

6.      The Debtors are in the business of designing, manufacturing, distributing and selling IP-based megapixel cameras for use in video surveillance applications globally, serving a broad range of industries.  The Debtors offer seven megapixel product families ranging from MegaVideo® single-sensor cameras from 1 to 10 megapixels and SurroundVideo® multi-sensor cameras from 8 to 40 megapixels at various price points.  The Debtors differentiate themselves from their competitors with in-house technology development capabilities, with 18 issued patents.  Due to a strong focus on innovation, the Debtors were the first to market with 2, 3, 5 and 10 megapixel IP cameras as well as the first H.264 megapixel cameras and multi-sensor 180 and 360 degree panoramic cameras.

7.      Arecont Vision is the Debtors' principal operating entity.  The company was founded in 2003 by Michael Kaplinsky, Ph.D. and Vladimir Berezin, Ph.D. who remain the current Chief Executive Officer and President, respectively, of Holdings.  As part of the ongoing reorganization of the Debtors, Messrs. Kaplinsky and Berezin, among other things, resigned from their officer positions at Arecont Vision and Vision IC.  Most of the day-to-day operations of Arecont Vision are now handled by Raul Calderon, as Chief Operating Officer and General Manager.

8.      The Debtors are headquartered in Glendale, California, where they lease a 40,800 square foot facility.  The Debtors' headquarters include administration, engineering, testing, quality assurance, development, sales and marketing, customer service, operations and logistics.  As of the Petition Date, Arecont Vision has approximately 90 employees, most of whom are based in California.  The Debtors are not party to any collective bargaining agreements and none of their employees are unionized.  The Debtors assemble all products in

4

Glendale and use third parties for their manufacturing process, creating a scalable, flexible manufacturing platform where manufacturing labor comprises a modest proportion of production costs.

9.    The Debtors are able to sell products to all industries including data centers, government, retail, financial, sports stadiums and healthcare. The Debtors' end-user customer base includes blue-chip customers such as Wells Fargo, Apple, Google, Facebook, Microsoft, Citibank, Hilton Hotels, Coca Cola, Starbucks, IKEA, CVS, and FedEx. The Debtors have relationships with over 100 distributors and over 1,000 systems integrators, which enables them to sell their products around the globe. Over twenty percent (20%) of the Debtors' revenues are generated outside the United States and Canada. Prior to an abrupt revenue decline in 2017 (described below), the Debtors had grown revenue and EBITDA at a compound annual growth rate of approximately 24% during 2007 through 2016. In 2016, the Debtors' annual revenue was approximately $72.7 million. In 2017, the Debtors' annual revenue dropped to approximately $41.7 million.

### The Debtors' Marketing Process

10.    The Debtors' sale efforts initially commenced in November 2015 with the hiring of Imperial Capital ("Imperial") as investment bankers. An extensive marketing process followed and ultimately culminated, on March 3, 2017, in the execution of a share purchase agreement for the interests in Arecont Vision with NetPosa Technologies, Ltd. ("NetPosa"), a publicly traded Chinese company. Following execution of the purchase agreement, a regulatory review process began with U.S. authorities. During such review process,

the Debtors' performance began to decline due to, among other factors described below,
increased competition from Chinese competitors. This decline ultimately led to NetPosa
terminating the purchase agreement in early September 2017, which it was not permitted to do
under the terms of its agreement with the Debtors, thereby forcing the Debtors to urgently
explore strategic alternatives and commence litigation against NetPosa.

11.    Imperial continued to act as the Debtors' investment bankers to
undertake the marketing process for the Debtors' assets and has continued in that capacity post-
petition. Beginning on or about April 4, 2018, Imperial commenced a further marketing process
by contacting a broad universe of potential strategic and financial buyers with a "teaser"
describing the Debtors' business and assets and providing potential buyers with a non-disclosure
agreement (an "NDA"). Imperial also created an electronic data room for prospective buyers
containing information and documents relating to the Debtors. In total, Imperial contacted 41
potential strategic buyers (U.S.-based and foreign) and 70 potential financial buyers
(predominantly U.S.-based private equity firms focused on middle market special
situations/turnarounds). Of these 111 parties, 27 entities (four strategic and 23 financial)
executed NDAs and received confidential information memoranda and data room access, and
five (three strategic and two financial) held meetings and/or teleconferences with management to
conduct further due diligence. In light of a target Petition Date of May 14, 2018, Imperial set a
deadline of May 4, 2018, at 5:00 pm PDT for non-binding indications of interest ("IoIs"), with
the intention of using the week of May 7, 2018, to select a single bidder to finalize diligence and

6

an asset purchase agreement to have a "stalking horse" in place by the Petition Date.  By the

May 4 deadline, Imperial received IoIs from five parties (three strategic and two financial).

12.        Following multiple discussions among the Debtors, the Prepetition

Lenders, and their respective professionals, and following the clarification by Imperial of certain

questions regarding the IoIs, Turnspire Capital, LLC ("Turnspire") submitted a Letter of Intent

and was selected as the lead bidder, based upon the valuation and terms proposed in its Letter of

Intent, the level of diligence and work that Turnspire had conducted in preparing its Letter of

Intent, and Imperial's assessment of the Turnspire's ability to reach a fully negotiated asset

purchase agreement.

13.        Following the Petition Date, the Debtors entered into the Purchase

Agreement with the Stalking Horse Purchaser, which is an affiliate of Turnspire.  The Purchase

Agreement contemplates the sale of substantially all of the Debtors' assets in exchange for cash

consideration in the amount of $10,000,000, subject to a working capital adjustment plus the

assumption of certain liabilities.  The Debtors hereby seek Court approval to consummate the

transaction, subject to overbid at an auction pursuant to certain proposed overbid procedures and

protections.  Following entry by the Court of the Bidding Procedures Order providing for the

Break-Up Fee and the Expense Reimbursement for the Stalking Horse Purchaser, Imperial will

continue its marketing efforts with potential bidders, which will include "blast" electronic

communications informing potentially interested parties of the Debtors' chapter 11 filing and

their ongoing sales effort.  The Debtors believe that this marketing and sale process will preserve

going concern value and maximize recoveries for all stakeholders.

7

14.      The Debtors now seek to sell their assets, which generally consist of their IP megapixel camera technology for video surveillance applications and substantially all of the Debtors' other business assets and property associated with that technology (the "Assets").

### The Purchase Agreement

15.      The following are the material terms of the proposed Purchase Agreement:[3]

| | |
|---|---|
| Purchase Price | $10,000,000 in cash, subject to a working capital adjustment as described in section 1.6 of the Purchase Agreement plus the assumption of the Assumed Liabilities, the cash portion of the Purchase Price shall be payable as follows: (a) the Stalking Horse Purchaser shall deposit into escrow within forty-eight (48) hours following the execution of the Purchase Agreement the sum of $1,000,000; and (b) the balance to be paid by the Stalking Horse Purchaser at closing, as set forth in section 1.4 of the Purchase Agreement. |
| Purchased Assets | The Debtors' right, title and interest in substantially all of the assets heretofore used exclusively in connection with or arising out of the operation of the Debtors' business as further set forth in section 1.1 of the Purchase Agreement and schedules thereto, including certain personal property, intangible property, governmental permits and licenses to the extent transferrable, inventory, vendor related items and claims, including a certain promissory note dated May 2, 2014, executed by Raul Calderon, the Debtors' Chief Operating Officer, in favor of Holdings (which note was assigned to Arecont Vision) in the current principal amount of $390,000.00, which note will be sold to the Stalking Horse Purchaser and then waived. |
| Excluded Assets | Avoidance actions (other than those relating to or enforceable against any existing customer or vendor of the Debtors as of the Closing Date), litigation styled as "Arecont Vision Holdings, LLC v. Wonder Vision Inc., et al.", cash deposits, tax refunds, accounts receivable, among other assets as further set forth in section 1.2 of the Purchase Agreement. |

---

[3] The following is only a summary of certain of the terms and provisions of the Purchase Agreement. In the event of any conflict between the summary set forth in this Motion and the Purchase Agreement, the terms and provisions of the Purchase Agreement control.

DOCS_LA:313942.8 05062/001

| Assumed Liabilities | Liabilities and cure costs under assumed contracts and various other specified obligations as further set forth in section 1.3 of the Purchase Agreement. |
| --- | --- |
| Breakup Fee and Expense Reimbursement | In the event Purchaser terminates the Purchase Agreement, (i) reimbursement of all reasonable out-of-pocket third party costs and expenses actually incurred in connection with and relating to the execution of the Purchase Agreement and consummation of the transactions contemplated thereby, including, without limitation, reasonable attorney's fees and expenses, in an aggregate amount not to exceed , including, without limitation, attorney's fees, diligence fees and costs and expenses incurred in connection with the capital structure of Purchaser, in an aggregate amount not to exceed $400,000, and (ii) $500,000 in cash as a breakup fee. |
| Closing Deadline | Closing shall be held upon the third (3rd) business day following satisfaction of the conditions set forth in sections 5 and 6 of the Purchase Agreement, and in any event no later than July 13, 2018, subject to the parties' mutual agreement to extend. <br><br> The deadline for entry of the Bid Procedures Order is June 8, 2018, and the deadline for the Sale Hearing to take place is July 6, 2018. |
| Representations and Warranties | Customary for transactions of this kind.  Except as specifically set forth in the Purchase Agreement, the Stalking Horse Purchaser will accept the Property at the Closing "AS-IS," "WHERE-IS," and "WITH ALL FAULTS." |
| Termination Rights | Customary for transactions of this kind. |

## **Relief Requested**[4]

16.     Pursuant to this Motion, the Debtors request that the Court enter the

proposed Bid Procedures Order:

(a)     approving the proposed Bid Procedures annexed as **Exhibit 1** to

the proposed Bid Procedures Order, including the overbid provisions, Breakup Fee and Expense

Reimbursement provisions, subject to the terms of the Purchase Agreement and Bid Procedures

Order;

---

[4] In compliance with Local Rule 6004-1 and for the convenience of the reader, the salient terms of the Purchase Agreement have been summarized and are attached hereto as **Exhibit D**.

(b)      approving the procedures set forth herein (the "Cure Procedures")

for the assumption and assignment of certain executory contracts and unexpired leases in

connection with the Sale (the "Assumed Executory Contracts");

(c)      establishing a date for holding the auction (the "Auction") to occur

approximately two days prior to Sale Hearing and approving certain procedures in connection

therewith;

(d)      scheduling the hearing (the "Sale Hearing") to approve any sale

transaction(s) to either the Stalking Horse Bidder or the highest or best bidder for the Assets

determined at the Auction (the "Successful Bidder") and establishing deadlines for objections

and responses to the relief requested in the Motion with respect to the proposed Sale and Sale

Hearing; and

(e)      approving the form and manner of notice to be served upon certain

parties, including:  (i) the form of notice, substantially in the form attached to the Bid Procedures

Order as **Exhibit 2** (the "Sale and Bid Procedures Notice"), to be served on the Bid Procedures

Notice Parties (as defined below); (ii) the form of notice, substantially in the form attached to the

Bid Procedures Order as **Exhibit 3**, to be served on all known creditors of the Debtors (the

"Creditor Notice"); and (iii) the form of notice to parties holding Assumed Executory Contracts

in conjunction with the proposed sale, in substantially the form attached to the Bid Procedures

Order as **Exhibit 4** (the "Cure Notice").

10

17.     The Debtors further request that the Court enter the Sale Order:

(a)     approving the Sale of the Assets to the Stalking Horse Purchaser or other Successful Bidder, free and clear of all Liens, Claims and Encumbrances, and other interests, except as provided in the Purchase Agreement or competing purchase agreement (with all Liens, Claims and Encumbrances, and other interests to attach to the Sale proceeds with the same validity and in the same order of priority as they attached to the Assets prior to the Sale);

(b)     authorizing the assumption and assignment to the Stalking Horse Purchaser or other Successful Bidder of the Assumed Executory Contracts; and

(c)     authorizing the Debtors to consummate the Sale and all documents, agreements, and contracts executed in conjunction therewith.

### Proposed Bid Procedures[5]

18.     The Bid Procedures are summarized as follows:

*Competing Agreement*

19.     Prospective bidders should submit a proposed asset purchase agreement (a "Competing Agreement"), similar in form and substance, as modified, to the Purchase Agreement.  Subject to the approval of the Court, the highest or best bidder at the auction will purchase the Assets, and assume certain executory contracts and unexpired leases of the Debtors, free and clear of any Liens, Claims and Encumbrances, and other interests.  The transaction contemplated is subject to competitive bidding as set forth herein, and approval by the

---

[5]  The following is a summary of the Bid Procedures.  In the event of any conflict between the procedures summarized in this Motion and the Bid Procedures attached as **Exhibit 1** to the Bid Procedures Order, the latter shall control.  Unless otherwise noted, capitalized terms used in this section describing the proposed Bid Procedures shall have the meanings ascribed thereto in the Purchase Agreement.

Bankruptcy Court pursuant to Bankruptcy Code sections 363 and 365.

*Assets for Sale*

20.    The Debtors are offering for sale the Assets, which generally consist of their IP megapixel camera technology for video surveillance applications and associated business, substantially all of the Debtors' other business assets and property associated with that technology.  Except as otherwise provided in the Purchase Agreement, all of the Debtors' right, title and interest in and to the Assets subject thereto shall be sold free and clear of any Liens, Claims and Encumbrances, and other interests (other than Permitted Liens, Claims and Encumbrances and/or except as otherwise provided in the Competing Agreement) to the maximum extent permitted by section 363 of the Bankruptcy Code, with such Liens, Claims and Encumbrances, and other interests to attach to the net proceeds of the sale of the Assets with the same validity and priority as such Liens, Claims and Encumbrances, and other interests applied against the Assets.

*Participation Requirements*

21.    In order to participate in the bidding process and to otherwise be considered for any purpose hereunder, a person interested in all or portions of the Assets (a "Potential Bidder") must first deliver (unless previously delivered) to the Debtors and their counsel, not later than five (5) business days before the Bid Deadline (defined below), unless otherwise modified by the Debtors in their reasonable discretion (subject to the requirements of section 4.7(a) of the Purchase Agreement):

(a) <u>Non-Disclosure Agreement</u>. An executed non-disclosure agreement substantially in the form of the NDA included in Imperial's electronic data room;

(b) <u>Identification of Potential Bidder</u>. Concurrently with its Bid (as defined herein), identification of the Potential Bidder, its principals, and the representatives thereof who are authorized to appear and act on their behalf for all purposes regarding the contemplated transaction;

(c) <u>Corporate Authority</u>. Concurrently with its Bid, written evidence satisfactory to Debtors of the Potential Bidder's chief executive officer or other appropriate senior executive's approval of the contemplated transaction;

(d) <u>Disclosure</u>. Written disclosure of any connections or agreements with the Debtors, the Stalking Horse Purchaser, any other known Potential Bidder or Qualified Bidder (as defined below), and/or any officer, director or direct or indirect equity security holder of the Debtors; and

(e) <u>Proof of Financial Ability to Perform</u>. Prior to or at the time of presentation of a Bid, written evidence that demonstrates the Potential Bidder has the necessary financial ability to close the contemplated transaction and provide adequate assurance of future performance under all contracts to be assumed in such contemplated transaction. Such information should include, *inter alia*, the following:

(1) the Potential Bidder's current financial statements (audited if they exist);

(2) contact names and numbers for verification of financing sources;

(3) evidence of the Potential Bidder's internal resources and proof of any debt or equity funding commitments that are needed to close the contemplated transaction; and

(4) any such other form of financial disclosure of credit-quality support information or enhancement acceptable to the Debtors demonstrating that such Potential Bidder has the ability to close the contemplated transaction.

DOCS_LA:313942.8 05062/001

***Designation as Qualified Bidder***

22.      A "Qualified Bidder" is a Potential Bidder (or combination of Potential Bidders whose bids for the Assets of the Debtors do not overlap and who shall also be referred to herein as a single Qualified Bidder) that delivers the documents described above and otherwise satisfies the requirements of the Bid Procedures Order and the procedures set forth herein, and that the Debtors, in their discretion (in consultation with any Official Committee of Unsecured Creditors that may be appointed (the "Committee") and AIG Investment Management (U.S.), LLC ("AIG")), determines is reasonably likely to submit a *bona fide* offer for the Assets and to be able to consummate a sale if selected as a Successful Bidder.

23.      The Debtors, in their sole discretion and in consultation with the Committee and AIG, shall determine and notify the Potential Bidder with respect to whether such Potential Bidder is a Qualified Bidder.

24.      The Stalking Horse Purchaser is hereby deemed to be a Qualified Bidder.

***Access to Due Diligence Materials***

25.      Only Potential Bidders that execute and deliver a confidentiality agreement satisfactory to the Debtors, in their sole discretion, are eligible to receive due diligence access or access to additional non-public information.  The Debtors shall not be required to provide confidential or proprietary information to a Potential Bidder if the Debtors believe that such disclosure would be detrimental to the interests of the Debtors. If the Debtors determine that a Potential Bidder that has satisfied all requirements to become a Qualified Bidder and yet does not constitute a Qualified Bidder, then such Potential Bidder's right to receive due

14

diligence access or access to additional non-public information shall terminate. The Debtors will designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from Qualified Bidders. The Debtors shall not be obligated to furnish any due diligence information after the Bid Deadline. The Debtors are not responsible for, and will bear no liability with respect to, any information obtained by Qualified Bidders in connection with the sale of the Assets.

***Due Diligence From Bidders***

26.     Each Potential Bidder and Qualified Bidder (each, a "Bidder") (and, collectively, "Bidders") shall comply with all requests for additional information and due diligence access by the Debtors or their advisors regarding such Bidder and its contemplated transaction. Failure by a Potential Bidder to comply with requests for additional information and due diligence access will be a basis for the Debtors to determine that the Potential Bidder is not a Qualified Bidder. Failure by a Qualified Bidder to comply with such requests for additional information and due diligence access will be a basis for the Debtors to determine that a bid made by a Qualified Bidder is not a Qualified Bid (as defined herein).

## **Bidding Process**

27.     The Debtors and their advisors, shall (in consultation with Committee and AIG): (i) determine whether a Potential Bidder is a Qualified Bidder; (ii) coordinate the efforts of Bidders in conducting their due diligence investigations, as permitted by the provisions hereof; (iii) receive offers from Qualified Bidders; and (iv) negotiate any offers made to purchase the Assets. The Debtors (in consultation with the Committee and AIG) shall have the right to

adopt such other rules for the bidding process that are not inconsistent with the Bid Procedures Order that will better promote the goals of such process.

**_Bid Deadline_**

28.    On or before the Bid Deadline, a Qualified Bidder that desires to make an offer, solicitation or proposal (a "<u>Bid</u>") shall deliver written and electronic copies of its Bid to Arecont Vision, LLC, 425 Colorado St., Suite 700, Glendale, CA, Attn:  T. Scott Avila, and savila@armorystrategic.com, with copies to Imperial Capital, 277 Park Avenue, 48th Floor, New York, NY  10172, Attn:  David E. Burns, and dburns@imperialcapital.com and counsel for the Debtors, Pachulski Stang Ziehl & Jones LLP, 919 N. Market St., 17th Floor, Wilmington, Delaware 19801, Attn: Ira D. Kharasch, Esq. and James E. O'Neill, Esq., not later than 4:00 p.m. (prevailing Eastern time) on June 29, 2018 (the "<u>Bid Deadline</u>").  The Debtors shall promptly provide copies of all Bids to counsel for the Committee and AIG.

29.    A Bid received after the Bid Deadline shall not constitute a Qualified Bid.

**_Bid Requirements_**

30.    To be eligible to participate in the Auction, each Bid and each Qualified Bidder submitting such a Bid must be determined by the Debtors (in consultation with the Committee and AIG) to satisfy each of the following, unless otherwise modified by the Debtors in their reasonable discretion (subject to the requirements of section 4.7(a) of the Purchase Agreement):

    (1)    <u>Good Faith Deposit</u>.  Each Bid must be accompanied by a deposit (the "<u>Good Faith Deposit</u>") in the form of a certified check or cash payable to the order of Arecont Vision, LLC in an amount to be determined by the Debtors, but in any event no less than 10% of the Bidder's offer.

DOCS_LA:313942.8 05062/001

(2)    Purchase Price.  The consideration proposed by the Bid may include only cash and/or other consideration acceptable to the Debtors (in consultation with the Committee and AIG) (the cash component must be no less than an amount necessary to satisfy the Breakup Fee and Expense Reimbursement).  The Bid must clearly set forth the purchase price and identify any non-cash components including, without limitation, which liabilities of the Debtors the bidder is agreeing to assume (the "Purchase Price").  The aggregate consideration must exceed the value of the consideration under the Purchase Agreement by an incremental amount that is not less than $250,000 (*after* taking into account the Breakup Fee and Expense Reimbursement) (the "Initial Minimum Overbid").

(3)    Irrevocable.  The Bids of the Successful Bidder and the Back-up Bidder (defined below) must be irrevocable until the earlier of (a) the closing of the transaction with the Successful Bidder, or (b) the date the Sale Order has become final and non-appealable (the earliest of these dates being the "Termination Date"), *provided* that in the event that the Successful Bid is submitted by a party other than the Stalking Horse Purchaser, and the Stalking Horse Purchaser's Bid (or as amended by the Stalking Horse Purchaser at the Auction in response to competitive bidding) is declared to be the Back-Up Bid, then the Stalking Horse Purchaser's Bid must only be irrevocable for fifteen (15) calendar days from the conclusion of the Sale Hearing.

(4)    Principal Terms.  A Bid must include an executed agreement pursuant to which the Qualified Bidder proposes to effectuate the contemplated transaction (the "Contemplated Transaction Documents") and a black-lined copy of the Competing Agreement marked against the Purchase Agreement to show all changes requested by the Qualified Bidder, including specification of the proposed purchase price and any changes to any exhibits or schedules to the Competing Agreement.  The terms and conditions of the Contemplated Transaction Documents must be, in the aggregate, not materially more burdensome to Debtors that the provisions contained in the Purchase Agreement.  A Bid must identify with particularity each and every condition to closing and all executory contracts and unexpired leases to be assumed and assigned pursuant to the Contemplated Transaction Documents.  The Contemplated Transaction Documents must include a commitment to close by no later than the closing date set forth in section 1.6 of the Purchase Agreement.  A Bid should propose a contemplated transaction involving all or substantially all of the Assets, provided, however, that the Debtors in their sole discretion (in consultation with the Committee and AIG) may consider proposals for less than substantially all the Assets if such proposals or combination of proposals maximizes the value of the Debtors' estates.

17

(5)    <u>Contingencies</u>.  A Bid may not be conditioned on obtaining financing or any internal approval or on the outcome or review of due diligence, but may be subject to the accuracy in all material respects at the closing of specified representations and warranties at or before closing or the satisfaction in all material respects at the closing of specified conditions.  A Bid must disclose any governmental approvals identified by the Qualified Bidder other than as set forth in the Competing Agreement that may impact the evaluation of such Bid.

(6)    <u>Authorization to Bid and Identity of Bidder</u>.  A Bid must include evidence of authorization and approval from such Qualified Bidder's board of directors (or comparable governing body, or a statement as to why such approval is unnecessary) with respect to the submission, execution, delivery and closing of the Contemplated Transaction Documents.  A Bid must also fully disclose the identity of such entity that is submitting the Bid, including the identity of each equity holder or other financial backer of the bidder if such bidder is formed for the purpose of submitting the bid.

(7)    <u>Financing Sources</u>.  A Bid must contain written evidence of a commitment for financing or other evidence of the ability to consummate the sale satisfactory to the Debtors (in consultation with the Committee and AIG) with appropriate contact information for such financing sources.

(8)    <u>No Fees Payable to Qualified Bidder</u>.  A Bid may not request or entitle the Qualified Bidder to any breakup fee, termination fee, expense reimbursement or similar type of payment.  Moreover, by submitting a Bid, a Bidder shall be deemed to waive the right to pursue a substantial contribution claim under Bankruptcy Code § 503 related in any way to the submission of its Bid or the Bid Procedures.

(9)    <u>Immediate Payment of the Breakup Fee</u>.  A Bid must allow for the immediate payment of the Breakup Fee and Expense Reimbursement to the Stalking Horse Purchaser from the first proceeds of the cash portion of the purchase price of such Bid.

(10)    <u>Non-Reliance</u>.  A Bid must include an acknowledgement and representation of the Qualified Bidder that it has had an opportunity to conduct any and all due diligence regarding the Assets and Assumed Liabilities prior to making its bid, that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its Bid, and that it did not rely upon any written or oral statements, representations, warranties, or guaranties, express, implied, statutory or otherwise, regarding the Assets, the financial performance of the Assets or the physical condition of the Assets, the Assumed Liabilities, or the completeness of any information provided

18

in connection therewith or the Auction, except as expressly stated in the Contemplated Transaction Documents.

31.    A Bid received from a Qualified Bidder before the Bid Deadline that meets the above requirements and that satisfies the Bid Deadline requirement above shall constitute a "Qualified Bid," if the Debtors believe, in their sole discretion (in consultation with the Committee and AIG), that such Bid would be consummated if selected as the Successful Bid. The Debtors shall have the right to reject any and all Bids that they believe, in their sole discretion (in consultation with the Committee and AIG), do not comply with the Bid Procedures.  In the event that any Potential Bidder is determined by the Debtors not to be a Qualified Bidder, the Potential Bidder shall be refunded its Good Faith Deposit.

***Breakup Fee***

32.    Recognizing the Stalking Horse Purchaser's expenditure of time, energy and resources, and that the Stalking Horse Purchaser provides a floor bid with respect to the Assets that it offers to purchase, the Debtors are authorized (pursuant to the Bid Procedures Order) to provide the following bidding protections to the Stalking Horse Purchaser.

(a)    The Debtors have agreed to pay the Stalking Horse Purchaser (i) a Breakup Fee in the amount of $500,000 as a breakup fee and (ii) Expense Reimbursement of up to $400,000, in each case pursuant to and in accordance with terms of the Purchase Agreement and Bid Procedures Order.

(b)    Any Bid submitted on the Bid Deadline by a party or parties other than the Stalking Horse Purchaser must be in an amount that is sufficient to pay the Breakup Fee and Expense Reimbursement and result in additional consideration to the Debtors' estates in the amount of at least $250,000 (as compared to the Purchase Price offered by such Stalking Horse Purchaser), after payment of the Breakup Fee and Expense Reimbursement.

**Auction**

33.    If the Debtors receive at least two Qualified Bids (inclusive of the Qualified Bid from the Stalking Horse Purchaser) prior to the Bid Deadline, then the Debtors shall notify the Stalking Horse Purchaser and each other Qualified Bidder that the Debtors intend to conduct an auction (the "Auction") to consider all Qualified Bids and to determine the highest or otherwise best bid with respect to the Assets.  The Debtors shall provide the Stalking Horse Purchaser, all Qualified Bidders and the Committee with copies of all Qualified Bids not less than forty-eight (48) hours in advance of the Auction, but may exclude any confidential financial information, as reasonably designated by the applicable Qualified Bidder.  Unless otherwise designated by the Debtors, the Debtors anticipate that the Auction will commence no later than July 5, 2018 at 10:00 a.m (prevailing Eastern Time) at the offices of Pachulski Stang Ziehl & Jones LLP, 919 N. Market St., 17th Floor, Wilmington, DE 19899, or such other place determined by the Debtors and in no event later than July 5, 2018.

34.    Not less than forty-eight (48) hours in advance of the Auction, the Debtors will notify all Qualified Bidders in writing of (i) the highest or otherwise best Qualified Bid, as determined by the Debtors in their discretion (the "Baseline Bid") and (ii) the time and place of the Auction.

35.    If the Debtors do not receive at least two Qualified Bids from Qualified Bidders (inclusive of the Qualified Bid from the Stalking Horse Purchaser), then no Auction shall be scheduled or conducted, and the Court at the Sale Hearing shall proceed to solely consider the approval of the proposed sale to the Stalking Horse Purchaser as set forth in the

DOCS_LA:313942.8 05062/001

Purchase Agreement and shall not consider any competing or alternative offers or proposals to purchase the Assets.

36.     If the Auction is necessary, such Auction shall be conducted according to the following procedures:

**(a)     Participation at the Auction**

37.     Only the Stalking Horse Purchaser and Qualified Bidders that have submitted Qualified Bids are eligible to participate at the Auction.  Only the authorized representatives and professional advisors of each of the Qualified Bidders, the Debtors, the Committee, AIG, and the U.S. Trustee shall be permitted to attend the Auction.

38.     Except as otherwise set forth herein, the Debtors (in consultation with the Committee and AIG) may conduct the Auction in the manner they determine will result in the highest or best offer for the Assets in accordance with the Bid Procedures.

39.     In the Debtors' sole discretion, after the conclusion of the Auction, the Debtors may resume an auction for the sale of discrete assets and/or discrete groups of assets, if any, which are not included in the Successful Bid, on such bidding procedures as may be implemented by the Debtors in their discretion.

**(b)     The Debtors Shall Conduct the Auction**

40.     The Debtors and their professionals shall direct and preside over the Auction.  At the start of the Auction, the Debtors shall describe the terms of the Baseline Bid. The determination of which Qualified Bid constitutes the Baseline Bid shall be made by the Debtors in their discretion (in consultation with the Committee and AIG), and may take into

DOCS_LA:313942.8 05062/001

account any factors the Debtors reasonably deem relevant to the value of the Qualified Bid to the estates (the "Bid Assessment Criteria"). All Bids made thereafter shall be Overbids (as defined below) and shall be made and received on an open basis, and all material terms of each Bid shall be fully disclosed to all other Qualified Bidders. The Debtors reserve the right to conduct the Auction in the manner designed to maximize value based upon the nature and extent of the Qualified Bids received in a manner not inconsistent with the Bid Procedures. The Debtors shall maintain a transcript of all Bids made and announced at the Auction, including the Baseline Bid, all Overbids and the Successful Bid. Pursuant to Local Rule 6004-1, each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the Bid Procedures, the Auction or the proposed transaction.

### (c)  Terms of Overbids

41.     An "Overbid" is any bid made at the Auction subsequent to the Debtors' announcement of the Baseline Bid. To submit an Overbid for purposes of this Auction, a Qualified Bidder must comply with the following conditions:

### (d)  Minimum Overbid Increment

42.     During the Auction, bidding shall begin initially with the Baseline Bid. Any Overbid after the Baseline Bid shall be made in increments of at least $100,000 in cash or other consideration acceptable to the Debtors; *provided, however*, that any Overbid by the Stalking Horse Purchaser thereafter shall only be required to be equal to the sum of (1) the then existing lead Bid plus (2) the $100,000 Overbid less (3) $900,000 (*i.e.*, the amount of the Breakup Fee and Expense Reimbursement).

22

43.     Any Overbid made by a Qualified Bidder must remain open and binding on the Qualified Bidder until and unless the Debtors (in consultation with the Committee and AIG) accept a higher Qualified Bid as an Overbid.

### (e)    Consideration of Overbids

44.     The Debtors reserve the right, in their reasonable business judgment, to make one or more adjournments in the Auction to, among other things:  facilitate discussions between the Debtors and individual Qualified Bidders; allow individual Qualified Bidders to consider how they wish to proceed; and give Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their reasonable business judgment, may require, that the Qualified Bidder has sufficient internal resources, or has received sufficient non-contingent debt and/or equity funding commitments, to consummate the proposed transaction at the prevailing Overbid amount.

### (f)    Additional Procedures

45.     The Debtors may adopt rules for the Auction at or prior to the Auction that, in their reasonable discretion (in consultation with the Committee and AIG), will better promote the goals of the Auction and that are not inconsistent with any of the provisions of the Bid Procedures Order or the Bankruptcy Code.  All such rules will provide that all Bids shall be made and received in one room, on an open basis, and all other Qualified Bidders shall be entitled to be present for all bidding with the understanding that the true identity of each Qualified Bidder (*i.e.*, the principals submitting the Bid) shall be fully disclosed to all other Qualified Bidders and that all material terms of each Qualified Bid will be fully disclosed to all

23

other Qualified Bidders throughout the entire Auction.

46.     The Debtors (in consultation with the Committee and AIG) may (a) determine which Qualified Bid, if any, is the highest and best offer and (b) reject at any time before entry of an order of the Bankruptcy Court approving the sale of the Assets pursuant to a Qualified Bid, any Bid that is (i) inadequate or insufficient; (ii) not in conformity with the requirements of the Bankruptcy Code or these Bid Procedures; or (iii) contrary to the best interest of the Debtors, their estates and their creditors.

(g)     **Consent to Jurisdiction as Condition to Bidding**

47.     All Qualified Bidders at the Auction shall be deemed to have consented to the core jurisdiction of the Bankruptcy Court and waived any right to a jury trial in connection with any disputes relating to the Auction, and the construction and enforcement of each Qualified Bidder's Contemplated Transaction Documents, as applicable.

(h)     **Closing the Auction**

48.     Upon conclusion of the bidding, the Auction shall be closed, and the Debtors (in consultation with the Committee and AIG) shall immediately identify the highest or best offer for the Assets (which may be an aggregate of bids for less than all of the Assets) (the "Successful Bid" or the "Successful Bidder APA") and the entity submitting such Successful Bid (the "Successful Bidder"), which highest or best offer will provide the greatest amount of net value to the Debtors, and the next highest or best offers after the Successful Bid (the "Back-up Bid") and the entity or entities submitting the Back-up Bid (the "Back-up Bidder"), and advise the Qualified Bidders of such determination.  Upon three (3) days' prior notice by the Debtors,

24

the Back-up Bidder selected by the Debtors must immediately proceed with the closing of the

transaction contemplated under the Back-up Bid in the event that the transaction with the

Successful Bidder is not consummated for any reason.

49.     As stated above, the Bids of the Successful Bidder and the Back-up Bidder

must be irrevocable until the Termination Date, *provided* that in the event that the Successful Bid

is submitted by a party other than the Stalking Horse Purchaser, and the Stalking Horse

Purchaser's Bid (or as amended by the Stalking Horse Purchaser at the Auction in response to

competitive bidding) is declared to be the Back-Up Bid, then the Stalking Horse Purchaser's Bid

must only be irrevocable for fifteen (15) calendar days from the conclusion of the Sale Hearing.

### Acceptance of Successful Bid

50.     The Debtors shall sell the Assets to the Successful Bidder upon the

approval of the Successful Bid by the Bankruptcy Court after the Sale Hearing.  The Debtors'

presentation of a particular Qualified Bid to the Bankruptcy Court for approval does not

constitute the Debtors' acceptance of such Qualified Bid.  The Debtors will be deemed to have

accepted a Qualified Bid only when the Qualified Bid has been approved by the Bankruptcy

Court at the Sale Hearing.

### "As Is, Where Is"

51.     The sale of the Assets shall be on an "as is, where is" basis and without

representations or warranties of any kind, nature, or description by the Debtors, their agents or

their estates except to the extent set forth in the Successful Bidder APA.  Each Qualified Bidder

shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and

DOCS_LA:313942.8 05062/001

all due diligence regarding the Assets prior to making its offer, that it has relied solely upon its

own independent review, investigation and/or inspection of any documents and/or the Assets in

making its bid, and that it did not rely upon any written or oral statements, representations,

promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or

otherwise, regarding the Assets, or the completeness of any information provided in connection

therewith or the Auction, except as expressly stated in these Bid Procedures or the Successful

Bidder APA.

## **Free of Any and All Interests**

52.    Except as otherwise provided in the Successful Bidder APA and subject to

the approval of the Bankruptcy Court, all of Debtors' right, title and interest in and to the Assets

subject thereto shall be sold free and clear of any Liens, Claims and Encumbrances, and other

interests to the maximum extent permitted by section 363 of the Bankruptcy Code, with such

Liens, Claims and Encumbrances, and other interests to attach to the net proceeds of the sale of

the Assets with the same validity and priority as such Liens, Claims and Encumbrances, and

other interests applied against the Assets.

## **Sale Hearing**

53.    The Debtors have requested that the Sale Hearing occur on or about July

6, 2018, or on such other date as may be established by the Bankruptcy Court.

54.    If the Successful Bidder fails to consummate an approved sale in

accordance with the applicable asset purchase agreement or such agreement is terminated, the

Debtors shall be authorized, but not required, to deem the Back-up Bid, as disclosed at the Sale

Hearing, the Successful Bid, and the Debtors shall be authorized, but not required, to consummate the sale with the Qualified Bidder submitting the next highest such Bid without further order of the Bankruptcy Court.

### **Return of Good Faith Deposit**

55.    The Good Faith Deposit of the Successful Bidder (or the Back-up Bidder that becomes a Successful Bidder) shall be applied to the purchase price of such transaction at Closing.  The Debtors will hold the Good Faith Deposits of the Successful Bidder and the next highest Qualified Bidder in a segregated account until the closing of the sale with the Successful Bidder; Good Faith Deposits of all other Qualified Bidders shall be held in a segregated account, and thereafter returned to the respective bidders following the conclusion of the Auction.  If a Successful Bidder (including any Back-up Bidder that has become the Successful Bidder) fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Debtors shall be entitled to retain the Successful Bidder's Good Faith Deposit as part of the Debtors' damages resulting from such Successful Bidder's breach or failure to perform.

### **Notice of Sale Hearing**

56.    As noted above, the Debtors request that the Court: (1) schedule the Sale Hearing on or about July 6, 2018; (2) fix on or about June 29, 2018, 4:00 p.m., prevailing Eastern Time as the Bid Deadline; and (2) fix no later than July 5, 2018, at 10:00 a.m. prevailing Eastern Time for the commencement of the Auction, if necessary.  The Debtors propose that objections, if any, to the Sale be filed and properly served on the Sale and Bid Procedures Notice Parties (as

defined herein) by 4:00 p.m. prevailing Eastern Time on the date seven (7) days prior to the Sale Hearing.

57.     The Debtors request that the Court approve the manner of notice of this Motion, the Bid Procedures, the Auction, and the Sale Hearing, substantially in the form attached to the Sale and Bid Procedures Notice, which the Debtors will serve on the following parties:

(a)     the U.S. Trustee;

(b)     counsel to the Committee;

(c)     all parties known to assert a lien, claim or encumbrance on any of the Assets, including, but not limited to, AIG and the Prepetition Lenders;

(d)     all known counterparties to the Assumed Executory Contracts;

(e)     all entities known to have expressed an interest in bidding on the Assets;

(f)     the United States Attorney's office;

(g)     all state attorney generals in states in which the Debtors' Assets are located;

(h)     state taxing authorities in the states in which the Debtors' assets are located; and the Internal Revenue Service;

(i)     environmental and other applicable authorities in the states or applicable jurisdictions in which the Debtors' Assets are located;

(j)     the Stalking Horse Purchaser and its counsel; and

(k)      all other parties that have filed a notice of appearance and demand

for service of papers in these bankruptcy cases under Bankruptcy Rule 9010(b) as of the

date of entry of the Bid Procedures Order (the parties listed in (a)-(k) above are

collectively referred to as the "Sale and Bid Procedures Notice Parties").

58.      Additionally, the Debtors propose to serve the Creditor Notice

substantially in the form attached to the Bid Procedures Order as **Exhibit 3** on all known

creditors of the Debtors.

59.      The Debtors propose to serve the Sale and Bid Procedures Notice and the

Creditor Notice within two (2) business days from the date of entry of the Bid Procedures Order,

by first-class mail, postage prepaid, on the appropriate parties as described above.  Both the Sale

and Bid Procedures Notice and the Creditor Notice will provide that any party that has not

received a copy of the Bid Procedures Order that wishes to obtain a copy of such document may

make such a request, in writing, to Pachulski Stang Ziehl & Jones LLP, 919 North Market Street,

17th Floor, P.O. Box, 8705, Wilmington, Delaware, 19899-8705 (Courier 19801), Attn: Ira D.

Kharasch, Esq. and James E. O'Neill, Esq., ikharasch@pszjlaw.com and joneill@pszjlaw.com.

60.      The Debtors submit that the foregoing notices comply fully with

Bankruptcy Rule 2002 and are reasonably calculated to provide timely and adequate notice of the

Bid Procedures, Auction, and Sale Hearing to the Debtors' creditors and other parties in interest

as well as to those who have expressed an interest or are likely to express an interest in bidding

on the Assets.  Based on the foregoing, the Debtors respectfully request that this Court approve

these proposed notice procedures.

## Sale Hearing

61.     At the Sale Hearing, the Debtors will seek Bankruptcy Court approval of the sale of the Assets to the Stalking Horse Purchaser or other Successful Bidder, free and clear of all Liens, Claims and Encumbrances, and other interests pursuant to section 363(f) of the Bankruptcy Code with all such Liens, Claims and Encumbrances, and other interests to attach to the proceeds of the sale, except as otherwise provided with the same validity and in the same order of priority as they attached to the Assets prior to the sale, including the assumption by the Debtors and assignment to the Successful Bidder of the Assumed Executory Contracts pursuant to section 365 of the Bankruptcy Code.  The Debtors will submit and present additional evidence, as necessary, at the Sale Hearing demonstrating that the Sale is fair, reasonable, and in the best interest of the Debtors' estates and all interested parties, and satisfies the standards necessary to approve a sale of substantially all of a debtor's assets articulated by the Court of Appeals for the Third Circuit in *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986).

## Closing

62.     The closing shall take place in accordance with the terms of the Successful Bidder APA, approved by the Bankruptcy Court at the Sale Hearing.

DOCS_LA:313942.8 05062/001

**Procedures for the Assumption and Assignment of Assumed Executory Contracts**

63.     As noted above, the Debtors will seek to assume and assign the Assumed Executory Contracts to be identified on schedules to the Purchase Agreement, or alternatively, identified pursuant the Successful Bidder's asset purchase agreement

64.     The Assumed Executory Contracts will be those Contracts and Leases pursuant to which the Debtors serve a Cure Notice. However, the Stalking Horse Purchaser may choose to add or delete certain Assumed Executory Contracts. If the Stalking Horse Purchaser chooses to add or delete an Assumed Executory Contract, then notice of that addition or deletion shall be provided to the affected counterparty by the Debtors approximately five (5) days prior to the Auction or, if no Auction is required, five (5) days prior to the Sale Hearing. Only those Assumed Executory Contracts assumed as of the closing of the Sale will be required to be cured.

65.     The Debtors will file with the Court and serve the form of the Cure Notice, substantially in the form of **Exhibit 4** to the Bid Procedures Order, (along with a copy of this Motion) upon each Counterparty to the Assumed Executory Contracts by no later than two business days after the entry of the Bid Procedures Order. The Cure Notice will state the date, time and place of the Sale Hearing as well as the date by which any objection to the assumption and assignment of Assumed Executory Contracts (including the Cure Amount (defined below)) must be filed and served. The Cure Notice also will identify the amounts, if any, that the Debtors believe are owed to each Counterparty to an Assumed Executory Contract in order to cure any defaults that exist under such contract (the "Cure Amounts"). This Motion constitutes a

31

separate motion to assume and assign the Assumed Executory Contracts pursuant to section 365 of the Bankruptcy Code.

66.    The inclusion of a contract, lease, or other agreement on the Cure Notice shall not constitute or be deemed a determination or admission by the Debtors and their estates or any other party in interest that such contract, lease, or other agreement is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code, and any and all rights with respect thereto are hereby reserved.

67.    If an Assumed Executory Contract is assumed and assigned pursuant to Court Order, then unless the applicable counterparties to the Assumed Executory Contract (each a "Counterparty" and collectively, the "Counterparties") properly files and serves an objection to the Cure Amount contained in the Cure Notice by the Assumption Objection Deadline (defined below), subject to the assumption and assignment of its contract at the Closing, the Counterparty will receive, at the time of the closing of the Sale (or as soon as reasonably practicable thereafter), the Cure Amount as set forth in the Cure Notice, if any.  If an objection is filed by a Counterparty to an Assumed Executory Contract, the Debtors propose that such objection must set forth a specific default in the executory contract or unexpired lease, claim a specific monetary amount that differs from the Cure Amount, if any, specified by the Debtors in the Cure Notice, along with such documentation supporting this amount, and set forth any reason why the Counterparty believes the executory contract or unexpired lease cannot be assumed and assigned to the Successful Bidder.

DOCS_LA:313942.8 05062/001

68.    If any Counterparty objects for any reason to the assumption and assignment of an Assumed Executory Contract (including an objection to a proposed Cure Amount) (an "Assumption Objection"), the Debtors propose that the Counterparty must file the objection and serve it so as to be actually received on or before the Assumption Objection Deadline (defined below), upon the Debtors and the other notice parties identified in the Cure Notice by no later than (i) 4:00 p.m. (prevailing Eastern Time) on the date that is seven days prior to the Sale Hearing; or (ii) the date otherwise specified in the Cure Notice (or, alternatively, the date set forth in the motion to assume such Assumed Executory Contract if such contract is to be assumed and assigned after the Auction) (the "Assumption Objection Deadline"), provided, however, as to any Successful Bidder who is not the Stalking Horse Purchaser, any Counterparty may raise at the Sale Hearing an objection to the assumption and assignment of the Assumed Executory Contract solely with respect to the Successful Bidder's ability to provide adequate assurance of future performance under the Assumed Executory Contract. After receipt of an Assumption Objection, the Debtors will attempt to reconcile any differences in the Cure Amount or otherwise resolve the objection with the objecting Counterparty. In the event that the Debtors and the Counterparty cannot resolve an Assumption Objection, and the Court does not otherwise make a determination at the Sale Hearing regarding an Assumption Objection related to a Cure Amount, the Successful Bidder must either (i) fund the amount in escrow or similar arrangement to pay any disputed Cure Amounts pending the resolution of any such Cure Amount disputes by the Court or mutual agreement of the parties, (ii) remove the Assumed Executory Contract from assumption and assignment to it pursuant to the Purchase Agreement.

69.     The Successful Bidder(s) shall be responsible for satisfying any requirements regarding adequate assurance of future performance that may be imposed under section 365(b) of the Bankruptcy Code in connection with the proposed assignment of any Assumed Executory Contract, and the failure to provide adequate assurance of future performance to any Counterparty to any Assumed Executory Contracts shall not excuse the Successful Bidder(s) from performance of any and all of its obligations pursuant to the Successful Bidder APA.  The Debtors propose that the Court make its determinations concerning adequate assurance of future performance under the Assumed Executory Contracts pursuant to section 365(b) of the Bankruptcy Code at the Sale Hearing if the Successful Bidder is the Stalking Horse Purchaser or, at such time as ordered by the Court if the Successful Bidder is a party other than the Stalking Horse Purchaser.  Disputed Cure Amounts will be resolved by the Court at the Sale Hearing or such later date as may be agreed to or ordered by the Court.

70.     The Debtors and the Debtors' estates shall be relieved of all liability accruing or arising after the assumption and assignment of the Assumed Executory Contracts, pursuant to Section 365(k) of the Bankruptcy Code.

### Basis for Relief Requested

**A.     The Sale of the Assets is Authorized by Section 363 as a Sound Exercise of the Debtors' Business Judgment**

71.     In accordance with Bankruptcy Rule 6004, sales of property rights outside the ordinary course of business may be by private sale or public auction.  The Debtors have determined that the Sale of the Assets by public auction will enable them to obtain the highest and best offer for these Assets (thereby maximizing the value of the estate) and is in the best

34

interests of the Debtors' creditors.  In particular, a Sale pursuant to the terms of the Purchase

Agreement, subject to higher or otherwise better offers at the Auction, will provide a greater

recovery for the Debtors' creditors than would be provided by any other existing alternative.

72.    Section 363 of the Bankruptcy Code provides that a trustee, "after notice

and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of

the estate." 11 U.S.C. § 363(b).  Although section 363 of the Bankruptcy Code does not specify

a standard for determining when it is appropriate for a court to authorize the use, sale or lease of

property of the estate, a sale of a debtor's assets should be authorized if a sound business purpose

exists for doing so.  *See, e.g.*, *Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996);

*In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (2d Cir. 1986); *In re Titusville Country

Club*, 128 B.R. 396 (W.D. Pa. 1991); *In re Delaware & Hudson Ry. Co.*, 124 BR. 169, 176 D.

Del. 1991); *see also Official Committee of Unsecured Creditors v. The LTV Corp. (In re

Chateaugay Corp.)*, 973 F.2d 141, 143 (2d Cir. 1992); *Committee of Equity Sec. Holders v.

Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *Committee of Asbestos-

Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60

B.R. 612, 616 (Bankr. S.D.N.Y. 1986).

73.    The paramount goal in any proposed sale of property of the estate is to

maximize the proceeds received by the estate.  *See, e.g., In re Food Barn Stores, Inc.*, 107 F.3d

558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to

enhance the value of the estate at hand"); *Integrated Resources*, 147 B.R. at 659 ("It is a well-

established principle of bankruptcy law that the. . . [trustee's] duty with respect to such sales is to

obtain the highest price or greatest overall benefit possible for the estate.") (quoting *In re Atlanta Packaging Prods.*, Inc., 99 BR. 124, 130 (Bankr. N.D. Ga. 1988)).  As long as the sale appears to enhance a debtor's estate, court approval of a trustee's decision to sell should only be withheld if the trustee's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code.  *GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd.*, 331 B.R. 251, 255 (N.D. Tex. 2005); *In re Lajijani*, 325 B.R. 282, 289 (9th Cir. B.A.P. 2005); *In re WPRV-TV, Inc.*, 143 B.R. 315, 319 (D.P.R. 1991) ("The trustee has ample discretion to administer the estate, including authority to conduct public or private sales of estate property.  Courts have much discretion on whether to approve proposed sales, but the trustee's business judgment is subject to great judicial deference.").

74.    Applying section 363 of the Bankruptcy Code, the proposed Sale of the Assets should be approved.  As set forth above, the Debtors have determined that the best method of maximizing the recovery of the Debtors' creditors would be through the Sale of the Assets.  Further, the Debtors believe that the value their estates (and, thus, the value for the Debtors' creditors) will receive from the Sale of the Assets exceeds any value the Debtors' estates could obtain for the Assets if the Debtors are required to liquidate their assets piecemeal.  As assurance of value, bids will be tested through the Auction consistent with the requirements of the Bankruptcy Code, the Bankruptcy Rules, and pursuant to the Bid Procedures approved by the Court.  Consequently, the fairness and reasonableness of the consideration to be paid by the Successful Bidder ultimately will be demonstrated by adequate "market exposure" and an open

36

and fair auction process—the best means, under the circumstances, for establishing whether a fair and reasonable price is being paid.

**B.     The Bid Procedures Are Appropriate and
        Will Maximize the Value Received for the Assets.**

75.     As noted above, the paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales.  *See, e.g., In re Financial News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

76.     Procedures to dispose of assets, similar to the proposed Bid Procedures, have been approved in other bankruptcy cases.  *See, e.g., In re IMRIS, Inc.*, Case No. 15-11133 (CSS) (Bankr. D. Del. June 16, 2015); *In re Velti Inc.*, Case No. 13-12878(PJW) (Bankr. D. Del. Nov. 20, 2013); *In re Orchard Supply Hardware Stores Corp.*, Case No.  13-11565 (CSS) (Bankr. D. Del. Jul. 8, 2013); *In re Conex Holdings LLC*, Case No. 11-10501(CSS) (Bankr. D. Del. Sept. 14, 2011); *In re Barnes Bay Dev. Ltd.*, Case No. 11-10792 (PJW) (Bankr. D. Del. May 19, 2011); *In re East West Resort Dev. V, L.P., L.L.L.P.*, Case No. 10-10452 (BLS) (Bankr. D. Del. March 31, 2010); *In re Dana Corp.*, Case No. 06-10354 (Bankr. S.D.N.Y. Oct. 19, 2006); *In re Delphi Corp.*, Case No. 05-44481 (Bankr. S.D.N.Y. June 22, 2006); *In re Oxford Automotive,*

*Inc.*, Case No. 04-74377 (Bankr. E.D. Mich. Jan. 24, 2005); *see also In re Calpine Corp.*, Case No. 05-60200 (Bankr. S.D.N.Y. Dec. 6, 2006).

77.    The Debtors believe that the Bid Procedures will establish the parameters under which the value of the Assets may be tested at an auction and through the ensuing Sale Hearing.  Such procedures will increase the likelihood that the Debtors' creditors will receive the greatest possible consideration for the Debtors' Assets because they will ensure a competitive and fair bidding process.  They also allow the Debtors to undertake an auction in as expeditious and efficient manner as possible, which the Debtors believe is essential to maximizing the value of the Debtors' estates for their creditors.

78.    The Debtors also believe that the proposed Bid Procedures will promote active bidding from seriously interested parties and will dispel any doubt as to the best and highest offer reasonably available for the Debtors' Assets.  In particular, the proposed Bid Procedures will allow the Debtors to conduct an auction in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a transaction.  Further, the Bid Procedures provide the Debtors with the opportunity to consider all Qualified Bids and to select, in their reasonable business judgment, and after consultation with its professionals and the Committee, the highest and best offer(s) for the Assets.

79.    In sum, the Debtors believe that the Bid Procedures will encourage bidding for the Assets and are consistent with the relevant standards governing auction

proceedings and bidding incentives in bankruptcy proceedings.  Accordingly, the proposed Bid

Procedures are reasonable, appropriate, and within the Debtors' sound business judgment.

**C.    The Sale of the Assets Free and Clear of Liens, Claims and Encumbrances and Other Interests is Authorized by Section 363(f) of the Bankruptcy Code**

80.    The Debtors further submit that it is appropriate to sell the Assets free and

clear of Liens, Claims and Encumbrances, and other interests  pursuant to section 363(f) of the

Bankruptcy Code, with any such Liens, Claims and Encumbrances, and other interests  attaching

to the Sale Proceeds of the Assets to the extent applicable.  Section 363(f) of the Bankruptcy

Code authorizes a trustee to sell assets free and clear of Liens, Claims and Encumbrances, and

other interests if:

(1)    applicable nonbankruptcy law permits the sale of such property free and clear of such interests;

(2)    such entity consents;

(3)    such interest is a lien and the price at which such property is to be sold is greater than the value of all Liens, Claims and Encumbrances, and other interests  on such property;

(4)    such interest is in bona fide dispute; or

(5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.  11 U.S.C. § 363(f).

81.    This provision is supplemented by Section 105(a) of the Bankruptcy Code,

which provides that "[t]he Court may issue any order, process or judgment that is necessary or

appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).

82.    Because Section 363(f) of the Bankruptcy Code is drafted in the

disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the

Assets "free and clear" of Liens, Claims and Encumbrances, and other interests.  *In re Dundee*

*Equity Corp.*, 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. March 6, 1992) ("Section 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met."); *In re Bygaph, Inc.*, 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same); *Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that Bankruptcy Code section 363(f) is written in the disjunctive; holding that the court may approve the sale "free and clear" provided at least one of the subsections of Bankruptcy Code section 363(f) is met).

83.    The Debtors believe that at least one of the tests of Section 363(f) is satisfied with respect to the transfer of the Assets pursuant to the Purchase Agreement.  In particular, the Debtors believe that at least section 363(f)(2) will be met in connection with the transactions proposed under the Purchase Agreement because each of the parties holding Liens, Claims and Encumbrances, and other interests on the Assets will consent or, absent any objection to this Motion, will be deemed to have consented to the Sale.  Any lienholder also will be adequately protected by having their Liens, Claims and Encumbrances, and other interests, if any, in each instance against the Debtors or their estates, attach to the Sale proceeds ultimately attributable to the Assets in which such creditor alleges an interest, in the same order of priority, with the same validity, force and effect that such creditor had prior to the Sale, subject to any claims and defenses the Debtors may possess with respect thereto.  Accordingly, Section 363(f) authorizes the transfer and conveyance of the Debtors' Assets free and clear of any such claims, interests, liabilities, or Liens, Claims and Encumbrances, and other interests .

84.     Although Section 363(f) of the Bankruptcy Code provides for the sale of assets "free and clear of any interests," the term "any interest" is not defined anywhere in the Bankruptcy Code. *Folger Adam Security v. DeMatteis/MacGregor JV*, 209 F.3d 252, 257 (3d Cir. 2000).  In the case of *In re Trans World Airlines, Inc.*, 322 F.3d 283, 288-89 (3d Cir. 2003), the Third Circuit specifically addressed the scope of the term "any interest."  The Third Circuit observed that while some courts have "narrowly interpreted that phrase to mean only in rem interests in property," the trend in modern cases is towards "a more expansive reading of 'interests in property' which 'encompasses other obligations that may flow from ownership of the property.'" *Id.* at 289 (citing 3 *Collier on Bankruptcy* 15th Ed. Rev., ¶ 363.06[1] (L. King, 15th rev. ed. 1988)).  As determined by the Fourth Circuit in *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 581-582 (4th Cir. 1996), a case cited with approval and extensively by the Third Circuit in *Folger, supra*, the scope of Section 363(f) is not limited to in rem interests.  Thus, the Third Circuit in *Folger* stated that *Leckie* held that the debtor "could sell their assets under § 363(f) free and clear of successor liability that otherwise would have arisen under federal statute." *Folger*, 209 F.3d at 258 (citing *Leckie*, 99 F.3d at 582).

85.     Courts have consistently held that a buyer of a debtor's assets pursuant to section 363 of the Bankruptcy Code takes such assets free from successor liability resulting from pre-existing claims. *See The Ninth Avenue Remedial Group v. Allis-Chalmers Corp.*, 195 B.R. 716, 732 (Bankr. N.D. Ind. 1996) (stating that a bankruptcy court has the power to sell assets free and clear of any interest that could be brought against the bankruptcy estate during the bankruptcy); *MacArthur Company v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 837

41

F.2d 89, 93-94 (2d Cir. 1988) (channeling of claims to proceeds consistent with intent of sale free and clear under section 363(f) of the Bankruptcy Code); *In re New England Fish Co.*, 19 B.R. 323, 329 (Bankr. W.D. Wash. 1982) (transfer of property in free and clear sale included free and clear of Title VII employment discrimination and civil rights claims of debtor's employees); *In re Hoffman*, 53 B.R. 874, 876 (Bankr. D.R.I. 1985) (transfer of liquor license free and clear of any interest permissible even though the estate had unpaid taxes); *American Living Systems v. Bonapfel (In re All Am. of Ashburn, Inc.)*, 56 B.R. 186, 190 (Bankr. N.D. Ga. 1986) (product liability claims based on successor doctrine precluded after sale of assets free and clear); *WBO P'ship v. Virginia Dept. of Medical Assistance Servs. (In re WBO P'ship)*, 189 B.R. 97, 104-05 (Bankr. E.D. Va. 1995) (Commonwealth of Virginia's right to recapture depreciation is an "interest" as used in section 363(f)).[6] The purpose of an order purporting to authorize the transfer of assets free and clear of all "interests" would be frustrated if claimants could thereafter use the transfer as a basis to assert claims against the purchaser arising from the Debtors' pre-sale conduct. Under section 363(f) of the Bankruptcy Code, the purchaser is entitled to know that the Debtors' assets are not infected with latent claims that will be asserted against the purchaser after the proposed transaction is completed. Accordingly, consistent with the above-cited case law, the order approving the Sale should state that the Successful Bidder is not liable

---

[6] Some courts, concluding that Section 363(f) of the Bankruptcy Code does not empower them to convey assets free and clear of claims, have nevertheless found that Section 105(a) of the Bankruptcy Code provides such authority. *See, e.g., Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) (stating that the absence of specific authority to sell assets free and clear of claims poses no impediment to such a sale, as such authority is implicit in the court's equitable powers when necessary to carry out the provisions of title 11).

as a successor under any theory of successor liability, for claims that encumber or relate to the Assets.

**D.      The Proposed Notice of Bid Procedures, Auction, and Sale Is Appropriate**

86.      The Debtors believe that they will obtain the maximum recovery for creditors of the Debtors' estates if the Assets are sold through the proposed Bid Procedures.  As explained in detail above, the Debtors have already taken significant steps to identify potential purchasers.

87.      Under Bankruptcy Rules 2002(a) and (c), the Debtors are required to notify creditors of the proposed sale of the Debtors' Assets, including a disclosure of the time and place of an auction, the terms and conditions of a sale, and the deadline for filing any objections.  The Debtors submit that the notice procedures herein comply fully with Bankruptcy Rule 2002 and are reasonably calculated to provide timely and adequate notice of the sale by auction to the Debtors' creditors and other interested parties, as well as to those parties who have expressed an interest, or may express an interest, in bidding on the Assets.  The proposed time frame between the filing of this Motion, the commencement of the bidding process and the Auction will provide interested purchasers sufficient time to participate in the Auction.

**E.      The Breakup Fee and Expense Reimbursement are Appropriate Under the Circumstances**

88.      The Debtors submit that the Breakup Fee and Expense Reimbursement are a normal and oftentimes necessary component of sales outside the ordinary course of business under Section 363 of the Bankruptcy Code.  In particular, such protections encourage a potential purchaser to invest the requisite time, money, and effort to conduct due diligence and sale

43

negotiations with a debtor despite the inherent risks and uncertainties of the chapter 11 process.

*See, e.g., In re Comdisco, Inc.*, Case No. 01 24795 (RB) (Bankr. N.D. Ill. Aug. 9, 2002)

(approving a termination fee as, inter alia, an actual and necessary cost and expense of

preserving the debtor's estate, of substantial benefit to the debtor's estate and a necessary

inducement for, and a condition to, the proposed purchaser's entry into the purchase agreement);

*Integrated Resources*, 147 B.R. at 660 (noting that fees may be legitimately necessary to

convince a "white knight" to offer an initial bid by providing some form of compensation for the

expenses such bidder incurs and the risks such bidder faces by having its offer held open, subject

to higher and better offers); *In re Hupp Indus.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1997)

(without any reimbursement, "bidders would be reluctant to make an initial bid for fear that their

first bid will be shopped around for a higher bid from another bidder who would capitalize on the

initial bidder's. . . due diligence"); *In re Marrose Corp.*, 1992 WL 33848, at *5 (Bankr. S.D.N.Y.

1992) (stating that "agreements to provide reimbursement of fees and expenses are meant to

compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more

favorable offers"); *In re 995 Fifth Ave. Assocs.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (finding

that bidding incentives may be "legitimately necessary to convince a white knight to enter the

bidding by providing some form of compensation for the risks it is undertaking") (citations

omitted).

89.    A proposed bidding incentive, such as the Breakup Fee and Expense

Reimbursement, should be approved when it is in the best interests of the estate. *See In re S.N.A.*

*Nut Co.*, 186 B.R. 98, 104 (Bankr. N.D. Ill. 1995); *see also In re America West Airlines, Inc.*,

166 B.R. 908 (Bankr. D. Ariz. 1994); *In re Hupp Indus., Inc.*, 140 B.R. 191 (Bankr. N.D. Ohio 1992). Typically, this requires that the bidding incentive provide some benefit to the debtor's estate. *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 533 (3d Cir. 1999) (holding even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions the administrative expense provisions of Bankruptcy Code section 503(b) govern in the bankruptcy context).

90.    In *O'Brien Environmental Energy*, the Third Circuit found that whether breakup fees and expenses could be paid to Calpine Corp. as a "stalking horse" depended on whether such fees were necessary to preserve the value of the estate. *See* 181 F.3d at 536. The court determined that Calpine's right to break up fees and expenses depended on whether it provided a benefit to the debtor's estate by promoting competitive bidding or researching the value of the assets at issue to increase the likelihood that the selling price reflected the true value of the company. *Id.* at 537. The Debtors believe that approval of the Breakup Fee and Expense Reimbursement will create such a competitive bidding process.

91.    The Debtors believe that the proposed Breakup Fee and Expense Reimbursement are fair and reasonably compensate the Stalking Horse Purchaser for taking actions that will benefit the Debtors' estates. The Breakup Fee and Expense Reimbursement compensate the Stalking Horse Purchaser for diligence and professional fees incurred in negotiating the terms of the Purchase Agreement on an expedited timeline.

92.    The Debtors do not believe that the Breakup Fee and Expense Reimbursement will have a chilling effect on the sale process. Rather, the Stalking Horse

DOCS_LA:313942.8 05062/001

Purchaser will increase the likelihood that the best possible price for the Assets will be received, by permitting other qualified bidders to rely on the diligence performed by the Stalking Horse Purchaser, and moreover, by allowing qualified bidders to utilize the Purchase Agreement as a platform for negotiations and modifications in the context of a competitive bidding process.

93.    Payment of the Breakup Fee and Expense Reimbursement, if any, shall be made in accordance with the terms of the Purchase Agreement.  Section 7.2 of the Purchase Agreement provides that in the event that the Purchase Agreement is terminated by Purchaser in accordance with Section 7.1(b), (c), (e) or (f) of the Purchase Agreement, the Stalking Horse Purchaser shall be entitled to (i) reimbursement of all reasonable out-of-pocket third party costs and expenses actually incurred in connection with and relating to the execution of the Purchase Agreement and consummation of the transactions contemplated thereby, including, without limitation, reasonable attorney's fees and expenses, diligence fees and costs and expenses incurred in connection with the capital structure of Purchaser, in an aggregate amount not to exceed $400,000 (the "Expense Reimbursement") and (ii) a break-up fee in consideration of the Stalking Horse Purchaser's time, effort and expenses incurred in conducting its due diligence and benefit to the Debtors' estates from the submission of the Purchase Agreement, in an amount equal to $500,000 (the "Break-Up Fee"), and the Stalking Horse Purchaser shall be granted an allowed administrative claim in the amount of the Expense Reimbursement and Break-Up Fee in accordance with Section 503(b)(l) of the Bankruptcy Code without further act, notice, deed or court order.  In the event of an occurrence of an Alternative Transaction (as defined in the Purchase Agreement) pursuant to clause (iii) or (iv) of the definition thereof, such Expense

46

Reimbursement and Break-Up Fee shall be paid to Purchaser at the closing of such Alternative

Transaction from the proceeds thereof. The Breakup Fee and Expense Reimbursement shall, in

no event, be paid from or out of the professional fee account established pursuant to any cash

collateral order entered in the Debtors' chapter 11 cases. The conditions under which the

Stalking Horse Purchaser is not entitled to the Breakup Fee and Expense Reimbursement are

described in section 7.2 of the Purchase Agreement.

94.    Furthermore, the Breakup Fee, in an amount of $500,000 and Expense

Reimbursement of up to $400,000 are not inconsistent with termination fees approved by

bankruptcy courts in chapter 11 cases. *See, e.g., In re FoxMeyer Corp. et al.*, Case No. 96-1329

(HSB) through 96-1334 (HSB) (Bankr. D. Del., Oct. 9, 1996) (Court approved termination fee of

7.47%, or $6,500,000, in connection with $87,000,000 sale of substantially all of debtors'

assets); *In re Global Motorsport Group, Inc., et al.*, (Case No. 08-10192 (KJC) (Bankr. D. Del.

February 14, 2008) (Court approved a breakup fee of approximately 4%, or $500,000 in

connection with sale); *In re Global Home Products*, Case No. 06-10340 (KG) (Bankr. D. Del.

July 14, 2006) (Court approved a breakup fee of 3.3%, or $700,000, in connection with sale); *In*

*re Ameriserve*, Case No. 00-0358 (PJW) (Bankr. D. Del., September 27, 2000) (Court approved

a breakup fee of 3.64%, or $4,000,000, in connection with $110,000,000 sale); *In re*

*Montgomery Ward Holding Corp., et al.*, Case No. 97-1409 (PJW) (Bankr. D. Del., June 15,

1998) (Court approved termination fee of 2.7%, or $3,000,000, in connection with $110,000,000

sale of real estate assets); *In re Medlab, Inc.*, Case No, 97-1893 (PJW) (Bankr. D. Del. April 28,

1998) (Court approved termination fee of 3.12%, or $250,000, in connection with $8,000,000

47

sale transaction); *In re Edison Bros. Stores. Inc., et al.*, Case No. 95-1354 (PJW) (Bankr. D. Del., Dec. 29, 1995) (Court approved termination fee of 3.5%, or $600,000, in connection with $17,000,000 sale of debtors' entertainment division); *In re NetEffect, Inc.*, Case No. 08-12008 (KJC) (Bankr. D. Del., Sept. 11, 2008) (Court approved breakup fee of 3%, or $240,000.00 in connection with sale of debtor's assets for purchase price of $8,000,000); *In re Champion Enterprises, et al.*, Case No. 09-14019 (KG) (Bankr. D. Del., Feb. 8, 2010) (Court approved breakup fee of less than credit bid or $3,000,000.00 in connection with sale of debtor's assets for purchase price of approximately $80,000,000); *In re Filene's Basement, Inc., et al.*, Case No. 09-11525 (MFW) (Bankr. D. Del., May 15, 2009) (Court approved breakup fee and expense reimbursement of 3.68%, or $810,000 in connection with sale of debtor's assets for purchase price of $22,000,000); *In re Western Nonwovens, Inc., et al.*, Case No. 08-11435 (PJW) (Bankr. D. Del., July 28, 2009) (Court approved breakup fee and expense reimbursement of $250,000 in connection with sale of debtor's assets for purchase price of $4,000,000 to $6,500,000 purchase price); and *In re Point Blank Solutions, Inc., et al.*, Case No. 10-11255 (PJW) (Bankr. D. Del, Oct. 5, 2011) (Court approved breakup and expense reimbursement of 3.75% or $750,000 in connection with sale of debtor's assets for purchase price of $20,000,000).

95.    In sum, the Breakup Fee and Expense Reimbursement are reasonable under the circumstances and will enable the Debtors to maximize the value for the Assets while limiting any chilling effect in the sale process.

## F.    Assumption and Assignment of Certain Executory Contracts and Unexpired Leases

96.    Section 365(a) of the Bankruptcy Code provides that, subject to the court's approval, a trustee "may assume or reject any executory contracts or unexpired leases of the debtor." 11 U.S.C. § 365(a).  Upon finding that a trustee has exercised its sound business judgment in determining to assume an executory contract or unexpired lease, courts will approve the assumption under section 365(a) of the Bankruptcy Code. *See Nostas Assocs. v. Costich (In re Klein Sleep Prods., Inc.)*, 78 F.3d 18, 25 (2d Cir. 1996); *see also Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1099 (2d Cir. 1993).

97.    Pursuant to section 365(f)(2) of the Bankruptcy Code, a trustee may assign an executory contract or unexpired lease of nonresidential real property if:

(A) the trustee assumes such contract or lease in accordance with the provisions of this section; and

(B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

98.    The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985)

49

("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

99.    Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *In re Bygaph, Inc.*, 56 B.R. 596, 605-6 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease has financial resources and expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding; chief determinant of adequate assurance is whether rent will be paid).

100.    The Debtors and the Successful Bidder(s) will present evidence at the Sale Hearing to prove the financial credibility, willingness, and ability of the Successful Bidder(s) to perform under the Assumed Executory Contracts. The Court and other interested parties therefore will have the opportunity to evaluate the ability of any Successful Bidder(s) to provide adequate assurance of future performance under the Assumed Executory Contracts, as required by section 365(b)(1)(C) of the Bankruptcy Code.

101.    In addition, the Debtors submit that the cure procedures set forth herein are appropriate, reasonably calculated to provide notice to any affected party, and afford the affected party to opportunity to exercise any rights affected by the Motion, and consistent with Section 365 of the Bankruptcy Code. To the extent that any defaults exist under any Assumed Executory Contracts, any such defaults will be cured pursuant to the Purchase Agreement or the Successful Bidder's APA. Except as otherwise limited by Section 365 of the Bankruptcy Code, any provision in the Assumed Executory Contracts that would restrict, condition, or prohibit an

50

assignment of such contracts will be deemed unenforceable pursuant to Section 365(f)(1) of the

Bankruptcy Code.

102.    Accordingly, the Debtors submit that the cure procedures for effectuating

the assumption and assignment of the Assumed Executory Contracts as set forth herein are

appropriate and should be approved.

**G.    The Successful Bidder Should be Afforded All
        Protections Under Section 363(m) as A Good Faith Purchaser**

103.    Section 363(m) of the Bankruptcy Code protects a good-faith purchaser's

interest in property purchased from the debtor's estate notwithstanding that the sale conducted

under section 363(b) is later reversed or modified on appeal.  Specifically, Section 363(m) states

that:

> The reversal or modification on appeal of an authorization under
> [section 363(b)] . . . does not affect the validity of a sale . . . to an
> entity that purchased . . . such property in good faith, whether or
> not such entity knew of the pendency of the appeal, unless such
> authorization and such sale were stayed pending appeal.

11 U.S.C. § 363(m).  Section 363(m) "fosters the 'policy of not only affording finality to the

judgment of the bankruptcy court, but particularly to give finality to those orders and judgments

upon which third parties rely.'" *In re Chateaugay Corp.*, 1993 U.S. Dist. Lexis 6130, *9

(S.D.N.Y. 1993) (quoting *In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986));

*see Allstate Ins. Co. v. Hughes*, 174 BR. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . .

provides that good faith transfers of property will not be affected by the reversal or modification

on appeal of an unstayed order, whether or not the transferee knew of the pendency of the

appeal"); *In re Stein & Day, Inc.*, 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant to

51

11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal").

104.    The selection of the Successful Bidder will be the product of arms' length, good-faith negotiations in an anticipated competitive purchasing process.  The Debtors intend to request at the Sale Hearing a finding that the Successful Bidder is a good faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code.

**H.     Relief from the 14-Day Waiting Period Under
         Bankruptcy Rules 6004(h) and 6006(d) is Appropriate**

105.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  The Debtors request that the Sale Order be effective immediately by providing that the 14-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

106.    The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).  Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay period, *Collier* suggests that the 14-day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure."  *Collier on Bankruptcy* P

6004.11 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).  Furthermore, *Collier* provides

that if an objection is filed and overruled, and the objecting party informs the court of its intent to

appeal, the stay may be reduced to the amount of time actually necessary to file such appeal.  *Id.*

107.    The Debtors hereby requests that the Court waive the 14-day stay periods

under Bankruptcy Rules 6004(h) and 6006(d) or, in the alternative, if an objection to the Sale is

filed, reduce the stay period to the minimum amount of time needed by the objecting party to file

its appeal.

### No Prior Request

108.    No prior request for the relief sought in this Motion has been made to this

or any other court.

### Notice

109.    Concurrently with this filing, copies of this Motion will be provided to (a)

the Office of the United States Trustee; (b) the Debtors' top 30 unsecured creditors; (c) all parties

who have timely filed requests for notice under Rule 2002 of the Federal Rules of Bankruptcy

Procedure; (d) all parties who assert Liens, Claims and Encumbrances, and other interests  with

respect to the Assets, including, but not limited to, the Prepetition Lenders and DIP Lenders; (e)

all entities known to have expressed an interest in bidding on the Assets, including the Stalking

Horse Purchaser; (f) all known counterparties to the Debtors' executory contracts and unexpired

leases; (g) the United States Attorney's office; (h) all state attorneys general in states in which

the Assets are located; (i) the Internal Revenue Service; (j) for each state in which the Assets are

located, the applicable taxing authorities; and (k) environmental and certain other regulatory

DOCS_LA:313942.8 05062/001

authorities in the states or applicable jurisdictions in which the Debtors' assets are located.  In

addition, within two (2) business days following entry of the Bid Procedures Order, the Debtors

will serve the Sale and Bid Procedures Notice and the Creditor Notice as provided herein.  The

Debtors respectfully submit that such notice is sufficient, and request that the Court find that no

further notice of the relief requested herein is required.

      **WHEREFORE**, the Debtors respectfully request that the Court enter orders,

substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, granting the relief

requested herein and such other and further relief as this Court deems appropriate.

Dated:  May 18, 2018           PACHULSKI STANG ZIEHL & JONES LLP

           */s/ James E. O'Neill*
           Ira D. Kharasch (CA Bar No. 109084)
           Maxim B. Litvak (CA Bar No. 215852)
           James E. O'Neill (Bar No. 4042)
           919 North Market Street, 17th Floor
           P.O. Box 8705
           Wilmington, Delaware  19899-8705 (Courier 19801)
           Telephone:  302-652-4100
           Facsimile:  302-652-4400
           Email: ikharasch@pszjlaw.com
                mlitvak@pszjlaw.com
                jo'neill@pszjlaw.com

           [Proposed] Counsel for Debtors and Debtors in Possession

DOCS_LA:313942.8 05062/001