# EXHIBIT C

**SALE ORDER**

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ARECONT VISION HOLDINGS, LLC, *et al.*,[1] | ) | Case No. 18-11142 (CSS) |
| | ) | |
| Debtors. | ) | **Docket Ref. Nos. 62, 110** |

**ORDER (A) AUTHORIZING THE SALE OF SUBSTANTIALLY
ALL OF THE DEBTORS' ASSETS PURSUANT TO ASSET
PURCHASE AGREEMENT(S) FREE AND CLEAR OF LIENS,
CLAIMS AND ENCUMBRANCES, AND OTHER INTERESTS, AND
OTHER INTERESTS; (B) APPROVING THE ASSUMPTION AND
ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED
LEASES RELATED THERETO; AND (C) GRANTING RELATED RELIEF**

This matter coming before the Court on the motion (the "Motion")[2] of the above-

captioned affiliated debtors and debtors in possession (the "Debtors") for the entry of an order

pursuant to sections 105(a), 363, 365 and 503 of title 11 of the United States Code (the

"Bankruptcy Code"), Rules 2002, 6004, 6006, 9007, and 9014 of the Federal Rules of

Bankruptcy Procedure (as amended from time to time, the "Bankruptcy Rules"), and Rule 6004-

1 of the Local Rules of Bankruptcy Practice and Procedures of the Bankruptcy Court for the

District of Delaware (the "Local Rules") (a) authorizing the sale of the Assets free and clear of

Liens, Claims and Encumbrances, and other interests, except as provided in the asset purchase

agreement by and between the Debtors and Arecont Vision Costar LLC, an affiliate of Costar

Technologies, Inc. and Costar Video Systems, LLC (the "Successful Bidder") and (b) approving

---

[1] The Debtors and the last four digits of their U.S. tax identification number are Arecont Vision Holdings, LLC (9187), Arecont Vision, LLC (1410), and Arecont Vision IC DISC. (5376). The Debtors' noticing address in these chapter 11 cases is 425 Colorado Street, Suite 700, Glendale, CA 91205.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

the assumption and assignment of certain of the Debtors' executory contracts and unexpired

leases related thereto to the Successful Bidder; and (c) granting related relief; and the Court

having reviewed the Motion and the Court having found that (i) the Court has jurisdiction to

consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; (ii)

venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409; (iii) this is a core

proceeding pursuant to 28 U.S.C. § 157(b); (iv) notice of the Motion was sufficient under the

circumstances; and after due deliberation the Court having determined that the relief requested in

the Motion is in the best interests of the Debtors, their estates and their creditors; and good and

sufficient cause having been shown;

**AND IT IS FURTHER FOUND AND DETERMINED THAT**:

A.    The findings and conclusions set forth herein constitute the Court's

findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to

this proceeding pursuant to Bankruptcy Rule 9014.

B.    The Debtors' notice of the Bid Procedures [Docket No. 155], the Cure

Amounts [Docket No. 114] as amended by a supplemental notice [Docket No. 156], the Auction

and the hearing [Docket No. 139] to approve any sale of the Assets (the "Sale Hearing") was

appropriate and reasonably calculated to provide all interested parties with timely and proper

notice, and no other or further notice is required.

C.    The Successful Bidder is not a successor to Debtors or this bankruptcy

estate by any reason or theory of law or equity, and that Successful Bidder shall not be subject to

successor liability for any acts of the Debtors, conduct of the Business, or products sold, in each

case prior to Closing.

        D.     The Purchase Price was negotiated at arms' length and constitutes fair consideration for the Assets.  The Successful Bidder is a good faith purchaser of the Assets pursuant to section 363(m) of the Bankruptcy Code.

        E.     Notice of the hearing on the Motion of the Sale and any related Auction was proper under the Bankruptcy Code, Bankruptcy Rules and Local Rules;

        F.     To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.

**IT IS HEREBY ORDERED THAT**:

        1.     The Motion is **GRANTED** as set forth herein.  The sale of the Assets to the Successful Bidder on the terms and conditions set forth in the Successful Bidder APA (defined below) are approved.  The Debtors are authorized to consummate the transactions under the Successful Bidder APA in accordance with this Order.

        2.     All objections and responses to the Motion that have not been overruled, withdrawn, waived, settled or resolved, and all reservations of rights included therein, are hereby overruled and denied.

        3.     The Successful Bidder's offer for the Assets, as embodied in the Successful Bidder's asset purchase agreement (as amended, the "Successful Bidder's APA"), is the highest and best offer for the Assets and is hereby approved.

        4.     The Successful Bidder's APA annexed hereto as **Exhibit 1** (inclusive of the amendment attached hereto as **Exhibit 1A**) is hereby approved pursuant to section 363(b) of

the Bankruptcy Code, and the Debtors are authorized to consummate and perform all of their

obligations under the Successful Bidder's APA and to execute such other documents and take

such other actions as are necessary or appropriate to effectuate the Successful Bidder's APA.

5.    Pursuant to section 363(f) of the Bankruptcy Code, the Assets may be sold

and transferred free and clear of all Liens, Claims and Encumbrances, and other interests, except

as otherwise provided in the Successful Bidder's APA, with any and all such Liens, Claims and

Encumbrances, and other interests to attach to proceeds of such sale with the same validity (or

invalidity), priority, force, and effect such Liens, Claims and Encumbrances, and other interests

had on the Assets immediately prior to the Sale and subject to the rights, claims, defenses, and

objections, if any, of the Debtors and all interested parties with respect to any such asserted

Liens, Claims and Encumbrances, and other interests.

6.    The Successful Bidder is not a successor to Debtors or these bankruptcy

estates by any reason or theory of law or equity, and the Successful Bidder shall not be subject to

successor liability for any acts of the Debtors, conduct of the Business, or products sold, in each

case prior to Closing.  All creditors or other persons are hereby barred from bringing any claim

or asserting any Liens, Claims and Encumbrances, and other interests against the Successful

Bidder or the Assets, except as relates to Assumed Liabilities.

7.    Pursuant to section 365 of the Bankruptcy Code, the assignment and

assumption of the Assumed Executory Contracts of the Debtors, as identified in the Successful

Bidder's APA, by the Successful Bidder, is hereby authorized and approved in all respects.

4

The Successful Bidder shall pay, concurrently with the Closing and as a condition to Debtors' assumption and assignment thereof, all cure amounts owing to the counterparties to the Assumed Executory Contracts that are assumed at the Closing. Any provision in an Assumed Executory Contract that purports to prohibit the assignment of such Assumed Executory Contract, or that purports to allow the counterparty to terminate, recapture, or impose penalties upon assignment, constitutes an unenforceable anti-assignment provision, and is void and of no force or effect. Upon Closing, in accordance with Sections 363 and 365 of the Bankruptcy Code, the Successful Bidder shall be fully and irrevocably vested with all right, title and interest of the Debtors under the Assumed Executory Contracts and the Assumed Executory Contracts shall remain in full force and effect for the benefit of the Successful Bidder. The Successful Bidder has provided adequate assurance of future performance under the Assumed Executory Contracts within the meaning of Section 365 of the Bankruptcy Code.

8.    Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code, the Sale by the Debtors to the Successful Bidder of the Assets and transactions related thereto, upon the closing under any Successful Bidder's APA, are authorized and approved in all respects.

9.    The stays provided for in Bankruptcy Rules 6004(h) and 6006(d) are hereby waived and this Order shall be effective immediately upon its entry.

10.    The terms of this Order shall be binding on the Successful Bidder and its successors, the Debtors, creditors of the Debtors, the non-Debtor parties to the Assumed Executory Contracts, and all other parties in interest in this Bankruptcy Case, and any successors

of the Debtors, including any trustee or examiner appointed any of these cases or upon a

conversion of any of these cases to Chapter 7 of the Bankruptcy Code.

11.    The Successful Bidder is a good faith purchaser entitled to the benefits,

protections and immunities afforded by section 363(m) of the Bankruptcy Code.  No reversal or

modification of this Order on appeal will affect the validity of the Successful Bidder's APA or

the Closing of, or terms of, the transaction contemplated thereby.  The Successful Bidder is not

an "insider" as defined by Section 101 of the Bankruptcy Code.  Neither the Debtors nor the

Successful Bidder is or will be entering into the Successful Bidder's APA fraudulently, or for the

purposes of hindering, delaying or defrauding any of the Debtors' creditors, and the Purchase

Price constitutes reasonably equivalent and fair value (as those terms or their equivalents are

defined by the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act and

Section 548 of the Bankruptcy Code) for the purchased Assets.

12.    With respect to the transactions consummated pursuant to this Order, this

Order shall be sole and sufficient evidence of the transfer of title to any particular purchaser, and

the sale transaction consummated pursuant to this Order shall be binding upon and shall govern

the acts of all persons and entities who may be required by operation of law, the duties of their

office, or contract, to accept, file, register, or otherwise record or release any documents or

instruments, or who may be required to report or insure any title or state of title in or to any of

the property sold pursuant to this Order, including without limitation, all filing agents, filing

officers, title agents, title companies, recorders of mortgages, recorders of deeds, administrative

agencies, governmental departments, secretaries of state, and federal, state, and local officials,

6

and each of such persons and entities is hereby directed to accept this Order as sole and sufficient evidence of such transfer of title and shall rely upon this Order in consummating the transactions contemplated hereby.

13.    This Court retains jurisdiction to interpret, implement and enforce the provisions of, and resolve any disputes arising under or related to, this Order and the Successful Bidder's APA, all amendments thereto, any waivers and consents thereunder and each of the agreements executed in connection therewith.

14.    The failure specifically to include any particular provision of the Successful Bidder's APA or any of the documents, agreements, or instruments executed in connection therewith in this Order shall not diminish or impair the force of such provision, document, agreement, or instrument, it being the intent of the Court that the Successful Bidder's APA and each document, agreement, or instrument be authorized and approved in its entirety.

15.    The Successful Bidder's APA and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto in accordance with the terms thereof without further order of the Court, provided that any such modification, amendment, or supplement does not have a material adverse effect on the Debtors' estates.

16.    To the extent that the sale to the Successful Bidder does not close under the terms of the Successful Bidder's APA, the last bid submitted by Arecont Technologies LLC, an affiliate of Turnspire Capital Partners, LLC (the "Back-Up Bidder"), and accepted by the Debtors, is approved and references herein to the Successful Bidder and the Successful Bidder's

7

APA shall be deemed to refer to the Back-Up Bidder and the Back-Up Bidder's APA,

respectively.

17.    The Back-Up Bidder is entitled to payment of the Break Up Fee and the

Expense Reimbursement (the "Bid Protection Amount") in accordance with the terms of the

Back-Up Bidder's APA and the Bid Procedures Order and, at the Closing of the Successful

Bidder's APA, the Debtors shall pay to Back-Up Bidder an amount equal to the Bid Protection

Amount in cash by wire transfer in accordance with the wire instructions provided by the Back

Up Bidder to the Debtors.

18.    The Back-Up Bidder is entitled to the return of the Deposit (as defined in

the Back-Up Bidder's APA) and the Debtors and the Back-Up Bidder shall jointly instruct the

Escrow Holder to disburse the Deposit to the Back-Up Bidder by wire transfer in accordance

with the wire instructions provided to the Debtors within three (3) Business Days after the

Closing of the Successful Bidder's APA.

19.    Notwithstanding anything in this Order, the Bid Procedures Order, the

Sale Motion, the Stalking Horse Purchase Agreement, any asset purchase agreement, any list or

schedule of assumed contracts, assumed and assigned contracts, or cure amounts (including,

without limitation, any other provision that purports to be preemptory or supervening), nothing

herein or therein shall permit or otherwise effect a sale, an assignment or any other transfer at

this time of (a) any insurance policies that have been issued by Federal Insurance Company or

any of its affiliates or successors (collectively, the "Chubb Companies") or that provide coverage

at any time to any of the Debtors (or their predecessors) and all agreements, documents or

8

instruments relating thereto (collectively, the "Chubb Insurance Contracts"), and/or (b) any rights, benefits, claims, rights to payments and/or recoveries under such Chubb Insurance Contracts.

20.     The Debtors (or "Licensor") and the Successful Bidder (or "Licensee") are authorized to enter into a license agreement (the "License Agreement"), substantially in the form and substance filed with the Court on July 10, 2018 prior to the Sale Hearing, with BSREP SoCal Glendale LLC ("Landlord"), with respect to certain premises (collectively, the "Premises") consisting of (a) approximately 40,799 rentable square feet known as Suites 100, 110, 700, 710, 720, 725, 750, and 755; and (b) certain storage premises to Licensor for its use in connection with the Lease containing approximately 2,530 rentable square feet and located in Level B Storage Room, all located in a building, or its parking facility, having an address at 425 East Colorado Boulevard, Glendale, California, as more particularly described in the lease and related documents between the Debtors and Landlord as described in the License Agreement (collectively, the "Lease").

21.     On the Closing Date:

i.   Licensee shall pay post-Petition Date stub rent to Landlord due for the month of May 2018 in the amount of $60,000.75, which payment shall be made by Licensee on behalf of Licensor in consideration of the payment for rent that the Debtors have made for the portion of the month of July 2018 following the Closing Date (Licensee shall not be required to reimburse Debtors for any portion of July 2018 rent);

    ii.   Licensee shall pay to Landlord fifty percent (50%) of the Monthly Basic Rental for the month of August in the amount of $45,478.88;[3]

    iii.   Licensee shall pay to Landlord $90,957.90 as a security deposit under the License Agreement;

    iv.   Licensee shall pay to Landlord a "licensee fee" of $2,000;

    v.   Licensee shall pay Landlord the sum of $25,000 on account of Landlord's attorneys' fees and expenses; and

    vi.   Licensee shall have delivered to Landlord evidence of insurance on the terms required under the Lease.

22.    The License Agreement is not a rejection or assumption of the Lease under Section 365 of the Bankruptcy Code. Nothing in the License Agreement absolves the Debtors from their obligations under the Lease or applicable law, except that Landlord acknowledges a credit in favor of Debtors under the Lease on account of any payments made by Licensee under the License Agreement.

23.    Notwithstanding (a) the Debtors' deadline to assume or reject the Lease pursuant to the *Order Pursuant to Section 365(d)(4) of the Bankruptcy Code Extending the Time Within Which the Debtors Must Assume or Reject Expired Lease of Nonresidential Real Property* [Docket No. 109] (the "Extension Order"), or (b) the *Notice of Auction and Supplemental Notice to Counterparties to Executory Contracts and Unexpired Leases That May Be Assumed and*

---

[3] For the avoidance of doubt, Licensee shall pay the balance of the Monthly Basic Rental for the month of August 2018 on August 1, 2018.

*Assigned or Rejected* [Docket No. 156], the Lease shall not be rejected as of the Closing or upon

expiration of the Debtors' time to assume or reject the Lease pursuant to Section 365(d)(4) of the

Bankruptcy Code, but rather the Lease and the time to assume or reject the Lease pursuant to

section 365(d)(4) of the Bankruptcy Code shall continue in full force and effect until the Lease is

automatically rejected as of the expiration or termination of the License Term (as defined in the

License Agreement) as such expiration or termination is provided for in the License Agreement.

The Debtors shall not be required to file any further motions to reject the Lease and no further

order of the Court shall be required to effectuate the rejection of the Lease as of the expiration or

termination of the License Term.  Landlord shall file a notice of the date of expiration or

termination of the License Term and such filing shall be conclusive proof of rejection of the

Lease as of the date of such expiration or termination of the License Term.

        24.     The Debtors acknowledge that the outstanding pre-Petition Date cure

amounts of $43,541.43, plus accrued and unpaid attorneys' fees costs and expenses, are due and

owing by the Debtors to Landlord, and the Debtors' obligation to pay the same is secured by the

security deposit that Debtors have provided to Landlord under the Lease.

        25.     Upon the expiration or termination of the License Agreement and

assuming no new written lease arrangement between Landlord and Licensee to the contrary: (i)

the Debtors and Licensee shall surrender possession of the Leased Premises to Landlord and

Landlord shall be entitled to take immediate possession of the Leased Premises, change all keys,

and exercise all rights and remedies under the Lease and applicable law to retake possession of

the premises; (ii) Landlord shall be authorized, and the automatic stay shall be deemed, and

herby is, lifted and modified to the extent necessary, to immediately, and without further order of

the Court, to (a) apply the security deposit held by Landlord against the cure amount and any

other amounts due and owing to Landlord, including arising from the rejection of the Lease, or

default under the Lease, and (b) enforce its rights and remedies under and subject to the License

Agreement, the Lease and applicable law (including the Bankruptcy Code) without further order

of the Court.  For the avoidance of doubt, nothing in subsection (b) of the foregoing sentence

shall entitle Landlord to take any action against Debtors relating to pre-Petition Date obligations

under the Lease except to apply the security deposit as set forth above and to assert a claim in the

Debtors' bankruptcy cases.

26.    Upon the Closing Date, that certain Collateral Access Agreement with

U.S. Bank National Association dated March 31, 2014 shall be deemed terminated and of no

further force and effect.

[remainder of page intentionally blank]

27.    In accordance with the *Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 362, 364 and 507, Bankruptcy Rules 2002, 4001, 6004, and 9014, and Local Rule 4001-2 (I) Authorizing the Debtors to Use Cash Collateral and Obtain Post-Petition Financing, (II) Granting Liens and Providing Super-Priority Administrative Expense Status, (III) Granting Adequate Protection, and (IV) Granting Related Relief* [D.I. 107] (the "DIP Order"), on the Closing Date (or at such time thereafter as may be agreed to by the DIP Lenders and the Prepetition Lenders), the Debtors are hereby authorized to, pay, or cause to be paid by the Buyer in cash from the proceeds of the Sale (a) the DIP Obligations and (b) the Prepetition Obligations (to the extent of available funds) (as such terms are defined in the DIP Order).

Dated:  July 10, 2018

_____
Honorable Christopher S. Sontchi
United States Bankruptcy Judge

13

## Exhibit 1

**Purchase Agreement**

Execution Version

ASSET PURCHASE AGREEMENT
BY AND BETWEEN

ARECONT VISION, LLC,
A DELAWARE LIMITED LIABILITY COMPANY,
AS SELLER,

AND

COSTAR TECHNOLOGIES, INC.
AND COSTAR VIDEO SYSTEMS, LLC,
AS PURCHASERS

DATED AS OF JUNE 29, 2018

Execution Version

ASSET PURCHASE AGREEMENT dated as of June 29, 2018 (the "Agreement"), by and among Arecont Vision, LLC, a Delaware limited liability company (the "Seller"), and Costar Technologies, Inc., a Delaware corporation, and Costar Video Systems, LLC a Delaware limited liability company (collectively, the "Purchaser" and, together with Seller, sometimes collectively referred to herein as the "Parties"). Capitalized terms used herein but not defined in the provisions in which they first appear shall have the meanings ascribed to them in Section 8.1(a) hereof.

## W I T N E S S E T H:

WHEREAS, Seller is in the business of designing, manufacturing, distributing and selling IP-based megapixel cameras for use in video surveillance applications (collectively, such business and operations are referred to as the "Business");

WHEREAS, Seller desires to sell, and Purchaser desires to purchase, substantially all of the assets of the Seller used or held for use by the Seller in conducting the Business and to assume certain liabilities of the Seller associated with the Business, and Seller desires to sell such assets to Purchaser and to assign such liabilities to Purchaser and have Purchaser assume the same, all on the terms and conditions set forth in this Agreement and in accordance with Sections 105, 363 and 365 of Title 11 of the United States Code (the "Bankruptcy Code") and other applicable provisions of the Bankruptcy Code (the "Acquisition");

WHEREAS, on May 14, 2018 (the "Petition Date"), Seller and certain Affiliates commenced a voluntary chapter 11 case under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), which case was assigned Case No.18-11142 and will be jointly administered by the Bankruptcy Court (the "Bankruptcy Case"); and

WHEREAS, it is contemplated that the Assets will be sold to Purchaser free and clear of Encumbrances (other than any Lien for personal property taxes attributable to any of the Assets which is a Lien not yet due and payable of the Closing Date) and the Acquisition will include the assumption by the Purchaser of the Assumed Contracts and Purchaser's assumption of the Assumed Liabilities, all in accordance with the terms, provisions and conditions of this Agreement and the Sale Approval Order.

NOW, THEREFORE, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties, and covenants herein contained, the Parties agree as follows:

1.     Purchase and Sale.

1.1     Assets to Be Transferred.

On the terms and subject to the conditions set forth in this Agreement, at the Closing, Seller shall sell, assign, transfer, convey and deliver (or cause to be sold, assigned, transferred, conveyed and delivered) to the Purchaser, and Purchaser shall purchase and assume from Seller, all of Seller's right, title and interest in and to

substantially all of the Seller's properties, assets, and rights, tangible and intangible (including goodwill) owned, used or held by Seller exclusively in the ownership, operation, or conduct of the Business, wherever such properties, assets and rights are located, whether real, personal or mixed, whether accrued, fixed, contingent or otherwise, other than the Excluded Assets (collectively, other than the Excluded Assets, the "Assets"), free and clear of all Liens (other than any Lien for personal property taxes attributable to any of the Assets which is a Lien not yet due and payable as of the Closing Date). Subject in all events to Section 1.2 below, the Assets shall include all of Seller's right, title, and interest in and to the following, in each case to the extent owned, used or held by Seller exclusively in connection with Seller's conduct of the Business:

(a)     [reserved];

(b)     all (i) Contracts listed on Schedule 1.1(b), and (ii) any other Contract entered into by Seller in the ordinary course of the Business (as conducted by Seller on the Execution Date) between the Execution Date and the Closing Date (collectively, the "Assumed Contracts"), provided that Purchaser may identify additional contracts to Seller up to five (5) days prior to the Auction (as such term is defined in the Bid Procedures Order) or, if no Auction is required, up to five (5) days prior to the Sale Hearing (as such term is defined in the Bid Procedures Order), to be deemed Assumed Contracts hereunder or may remove contracts currently on Schedule 1.1(b) as Assumed Contracts up to five (5) days prior to the Auction;

(c)     all Intellectual Property and all income, royalties, damages and payments due or payable at the Closing or thereafter relating to the Intellectual Property (including, without limitation, damages and payments for past or future infringements or misappropriations thereof);

(d)     all Fixed Assets;

(e)     all Inventory;

(f)     all Accounts Receivable;

(g)     all Prepaid Expenses;

(h)     all Security Deposits;

(i)     to the extent transferable without violating any privacy rights of any Business Employee, all Books and Records;

(j)     all material licenses, franchises, permits, variances, exemptions, orders, approvals, and authorizations issued by Governmental Bodies in connection with Seller's conduct of the Business (collectively, "Permits"), in each case to the extent transferable without the consent of the applicable Governmental Body;

(k)     all Equipment;

2

(l)    all telephone numbers, addresses (including electronic mail addresses) used by the Seller in connection with the Business;

(m)    all goodwill to the extent relating to the Assets and/or the Business;

(n)    all rights to causes of action, lawsuits, judgments and Claims of any nature available to Seller (whether or not such cause of action, lawsuit, judgment or Claim is being pursued) to the extent relating to the ownership, use, function or value of any Asset, whether arising by way of counterclaim, set off, or rights of self-help or otherwise;

(o)    all advertising, marketing and promotional materials and all other printed or written materials;

(p)    to the extent relating to or enforceable against any existing customer or vendor of the Business as of the Closing Date, all of the rights and claims of Seller for preference or avoidance actions available to the Seller under the Bankruptcy Code, of whatever kind or nature, including, without limitation, those set forth in Sections 544 through 551 and any other applicable provisions of the Bankruptcy Code, and any related claims and actions arising under such sections by operation of law or otherwise, including any and all proceeds of the foregoing (collectively, "Ongoing Business Avoidance Claims");

(q)    the capital stock of or membership interest in any subsidiary acquired in connection with this transaction, which may be identified to the Seller up to five (5) days prior to the Auction or, if no Auction is needed, up to five (5) days prior to the Sale Hearing (the "Acquired Stock");

(r)    to the extent still in force and effect as of the Closing Date, that certain promissory note dated May 2, 2014, executed by Raul Calderon in favor of Seller in the original principal amount of $975,000.00 (the "Note"), the outstanding balance of which is approximately $390,000.00 as of the date hereof; and

(s)    all representations, warranties, guarantees, indemnities, and undertakings to the extent solely benefiting the Business.

1.2    Excluded Assets.

Notwithstanding anything to the contrary contained in Section 1.1 or any other provision of this Agreement, the Assets shall exclude the Seller's right, title and interest in and to the following assets, properties and rights of the Seller (collectively, the "Excluded Assets"), all of which Excluded Assets shall be retained by Seller:

(a)    any cash, bank deposits and cash equivalents (excluding Security Deposits);

3

WEST\281884727.4

(b)     any assets, rights, claims, and interests expressly excluded pursuant to the provisions of Section 1.1 above;

(c)     all Real Property Leases;

(d)     all (i) fixed assets and Books and Records to the extent specifically identifiable to the ownership, business or conduct of any Excluded Asset or any Real Property Leases, and (ii) Books and Records to the extent excluded pursuant to the qualification to Section 1.1(i);

(e)     all capital stock or membership interests held by Seller in other Persons (other than the Acquired Stock);

(f)     all Contracts not listed on Schedule 1.1(b) (collectively, the "Excluded Contracts");

(g)     all of the rights and claims of Seller for preference or avoidance actions available to the Seller under the Bankruptcy Code, of whatever kind or nature, including, without limitation, those set forth in Sections 544 through 551 and any other applicable provisions of the Bankruptcy Code, and any related claims and actions arising under such sections by operation of law or otherwise, including any and all proceeds of the foregoing, but in each of the foregoing cases excluding the Ongoing Business Avoidance Claims;

(h)     all rights, claims and causes of action of Seller against present and former officers, directors, employees, members, principals, agents, and representatives of such Seller;

(i)     Seller's rights under this Agreement and all cash and non-cash consideration payable or deliverable to the Seller pursuant to the terms and provisions hereof;

(j)     any letters of credit or similar financial accommodations issued to any third party(ies) for the account of Seller and all collateral or security of any kind posted with or held by any such third party in connection therewith;

(k)     all deposits and prepaid amounts of Seller held by or paid to third Parties in connection with any Excluded Asset (including, without limitation, any deposits made by Seller with a utility pursuant to Section 366 of the Bankruptcy Code);

(l)     any tangible or intangible personal property held by Seller pursuant to a lease, rental agreement, license or other Contract to the extent that the associated lease, license or other Contract is not among the Assumed Contracts;

(m)     all rights, claims, credits and rebates of or with respect to (i) income Taxes that were paid or will be paid by Seller (whether prior to or after the Closing), and (ii) any taxes, assessments or similar charges paid by or on behalf of Seller to the extent applicable to any period prior to the Closing;

4

(n)    insurance proceeds, claims and causes of action with respect to or arising in connection with (A) any Excluded Contract, (B) any item of tangible or intangible property not acquired by Purchaser at the Closing, (C) any loss, damage or casualty to any item of tangible or intangible property to the extent the same is repaired, restored or replaced prior to the Closing, or (D) any claims or causes of action of third Parties where any associated liabilities are not included among the Assumed Liabilities (as defined below);

(o)    any Contract which is not assumable and assignable as a matter of applicable law (including, without limitation, any with respect to which any consent requirement in favor of the counterparty thereto may not be overridden pursuant to Section 365 of the Bankruptcy Code);

(p)    all securities, whether capital stock or debt, of the Seller;

(q)    tax records, minute books, stock transfer books and corporate seals of Seller;

(r)    any intercompany claims, obligations, and receivables between or among Seller and any of Seller's Affiliates (collectively, "Intercompany Obligations");

(s)    all rights, Claims and interests of Seller in, to and under that certain litigation styled as "Arecont Vision Holdings, LLC v. Wonder Vision Inc., et al.," pending under Case No. 2017-0741-JRS in the Court of Chancery of the State of Delaware;

(t)    any writing or other item that is protected from discovery by the attorney-client privilege, the attorney work product privilege, the litigation privilege, or any other recognized privilege or protection; and

(u)    those other assets of Seller, if any, listed on Schedule 1.2 attached hereto and incorporated herein by this reference.

1.3    Assumed Liabilities.

Upon the terms and subject to the conditions hereof, at the Closing, the Purchaser shall assume from the Seller only those Liabilities (collectively, the "Assumed Liabilities") arising with respect to (i) the performance from and after the Closing Date of the Assumed Contracts, (ii) any accrued sick pay, vacation and other paid time off to which any Business Employee is entitled to that have not been paid to such Business Employee prior to the Closing Date, provided, however, to the extent that any Business Employees is entitled under applicable law to that have any such amounts paid to them at the Closing (rather than having them assumed by Purchaser), then Purchaser shall pay such amounts to such Business Employee at the Closing in addition to (and not as part of) the cash portion of the Purchase Price; (iii) all Cure Costs payable in connection with the Assumed Contracts, (iv) all product warranties, guaranties, indemnities and the like related to the Business (whether arising out of activities occurring prior to or following the Closing), and (v) accounts payable of Seller as of the Closing Date owing to third

5

parties (including, for purposes of this Section 1.3, any accrued but unpaid sales commissions as of the Closing, whether to Business Employees or independent contractors) and obligations to customers of Seller for refunds, rebates, returns, discounts and the like as of the Closing Date, in each case, to the extent incurred by Seller in the ordinary course of Seller's Business (as conducted by Seller as of the Execution Date as the same may thereafter be restricted or otherwise modified by Seller's status as a Chapter 11 debtor in possession) (but specifically excluding any obligation on Purchaser's part to assume any Intercompany Obligations).  Purchaser shall not assume or undertake to perform, pay, satisfy or discharge any other Liabilities or obligations of the Seller.  Except as otherwise provided above or elsewhere in this Agreement, Purchaser shall not assume and shall be deemed not to have assumed, and the Seller shall remain liable with respect to, any and all Liabilities of the Seller arising out of, relating to or otherwise in respect of the Business, the Business Employees or the Assets prior to the Closing Date, and all other Liabilities of any Seller, other than the Assumed Liabilities, including but not limited to any obligations or liabilities under the WARN Act (collectively, the "Excluded Liabilities").

      1.4     Non-Assignment of Assets.

Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer and shall not effectuate the assignment or transfer of any Asset if (i) an attempted assignment or transfer thereof, without the approval, authorization or consent of, or granting or issuance of any license or permit by, any third party thereto or a Governmental Body (each such action, a "Necessary Consent"), would constitute a breach, default or violation thereof or of any applicable law, rule, regulation, statute or order, or in any way adversely affect the rights of Purchaser thereunder and (ii) the Bankruptcy Court has not entered an order providing that such Necessary Consent is not required.  In such event, such assignment or transfer is subject to such Necessary Consent being obtained, and the Seller shall use its commercially reasonable efforts (which shall not be interpreted to require Seller to pay any material fee or the like to any third party) to obtain the Necessary Consents with respect to any such Asset or any claim or right or any benefit arising thereunder for the assignment or transfer thereof to Purchaser as Purchaser may reasonably request. For the avoidance of doubt, any asset that would be an "Asset" but is not assigned in accordance with this Section 1.4 shall not be considered an "Asset" for purposes hereof unless and until such asset is assigned to Purchaser following the Closing Date upon receipt of the Necessary Consent and Bankruptcy Court approval. If such Necessary Consent is not obtained, or if an attempted assignment or transfer thereof would be ineffective or would adversely affect the rights of Purchaser to such Asset following the Closing, the Seller shall (provided that Purchaser promptly (and in no event later than fifteen (15) days following written demand therefor (accompanied by reasonable evidence of such costs), the out of pocket costs incurred by Seller to maintain such Asset or continue to make such Asset available for use during such period) cooperate with Purchaser in any commercially reasonable arrangement to provide for Purchaser to obtain the benefits and assume the obligations thereunder in accordance with this Agreement, including subcontracting, sub-licensing, or subleasing to Purchaser, or under which the Seller

6

would enforce for the benefit of Purchaser (and at Purchaser's cost and expense) all of their rights thereunder.

     1.5     Purchase Price; Deposit; Allocation of Purchase Price.

     (a)     In consideration for the sale and purchase of the Assets and assumption of the Assumed Liabilities, the Purchase Price shall be paid as follows:

     (i)     Concurrently with the delivery of this Agreement to Seller, Purchaser shall deposit into an escrow (the "Escrow") with Pachulski Stang Ziehl & Jones LLP (the "Escrow Holder") an amount equal to $1,125,000.00 (the "Deposit") in immediately available, good funds of the United States of America (funds delivered in this manner are referred to herein as "Good Funds"), pursuant to escrow instructions reasonably satisfactory to the Parties (the "Escrow Agreement"). Upon receipt of the Deposit, the Escrow Holder shall immediately deposit such amount into a non interest-bearing trust account.

     (ii)     At the Closing, the Purchaser shall cause the Deposit to be disbursed to Seller and shall tender the balance of the Purchase Price (in Good Funds) to Seller. As used in this Agreement, the term "Purchase Price" shall mean and refer to an amount equal to Eleven Million Two Hundred Fifty Thousand Dollars ($11,250,000.00) plus the amount of the Assumed Liabilities, subject to the working capital adjustment set forth in Section 1.6 below.

     (iii)     In the event this Agreement is terminated pursuant to Section 7.1, the Deposit shall be disbursed in accordance with Section 7.2.

     (b)     The Purchaser shall prepare a proposed allocation of the Purchase Price (and all other capitalized costs) among the Assets for U.S. federal, state, local and foreign income and franchise Tax purposes, which allocation shall be subject to Seller's reasonable approval. No later than thirty (30) Business Days following the Closing Date, the Purchaser shall deliver such proposed allocation to Seller. Following their mutual written agreement thereto, Purchaser and Seller and their respective Affiliates shall report, act and file Tax Returns in all respects and for all purposes consistent with such allocation prepared by the Purchaser. Neither the Purchaser nor Seller shall take any tax position (whether in audits, Tax Returns or otherwise) with respect to the mutually approved allocation which is inconsistent with such allocation, unless (and then only to the extent) required by a "determination" within the meaning of Section 1313(a) of the Code.

     1.6     Adjustment of Purchase Price.

     (a)     Not less than five (5) days prior to the Closing Date, Seller shall in good faith and in consultation with Purchaser prepare and deliver to Purchaser a good faith estimated calculation of the Net Working Capital as of the Closing Date (the "Estimated Closing Net Working Capital"). If the Purchaser in good faith reasonably disputes the Estimated Closing Net Working Capital calculation provided by Seller by an amount greater than $300,000.00, then the Seller and the Purchaser agree to submit the

7

Seller's Estimated Closing Net Working Capital calculation and the Purchaser's Estimated Closing Net Working Capital calculation to CohnReznick LLP or such other party mutually acceptable to Purchaser and Seller, who shall by no later than three (3) Business Days of submission of the dispute to it determine, as between Seller's and Purchaser's Estimated Closing Net Working Capital calculations, which Closing Net Working Capital calculation shall be binding on Seller and Purchaser. Purchaser's calculation of the Estimated Closing Net Working Capital shall be made in accordance with the methodology, procedures, assumptions and adjustments as set forth in Schedule 1.6 (the "Target Closing Net Working Capital Calculation Statement"). If (i) the Estimated Closing Net Working Capital exceeds the Target Closing Net Working Capital, the Purchase Price to be paid by Purchaser at the Closing shall be increased by such excess (the "Estimated Closing Net Working Capital Excess Amount") or (ii) the Estimated Net Closing Working Capital is less than the Target Closing Net Working Capital, the Purchase Price to be paid by Purchaser at the Closing shall be decreased by such deficiency (the "Estimated Closing Net Working Capital Deficiency Amount"), provided, however, that (A) if the Estimated Closing Net Working Capital Excess Amount or the Estimated Closing Net Working Capital Deficiency Amount, as applicable, is $300,000.00 (such amount is referred to herein as the "Band Amount") or less, there shall be no adjustment to the Purchase Price based on such deficiency, or (B) if the Estimated Closing Net Working Capital Excess Amount or the Estimated Closing Net Working Capital Deficiency Amount, as applicable, is more than the Band Amount, the adjustment to the Purchase Price shall be the full amount of such excess or deficiency, as applicable.

(b)    As promptly as possible and in any event within sixty (60) days after the Closing Date, Purchaser shall in good faith and in consultation with Seller prepare and deliver to Seller a good faith calculation of the Net Working Capital of Seller as of the Closing Date (the "Closing Net Working Capital"). Seller will have reasonable access to all work papers and books and records of the Business used by Purchaser in its calculation of the Closing Net Working Capital.

(c)    Purchaser's determination of the Closing Net Working Capital will be final, conclusive and binding on Purchaser and Seller unless Seller provides a written notice (a "Dispute Notice") to Purchaser no later than the thirtieth (30th) day after delivery of Purchaser's calculation of the Closing Net Working Capital setting forth in reasonable detail (i) any item of Purchaser's calculation of the Closing Net Working Capital which Seller believes has not been prepared in accordance with this Agreement or the Target Closing Net Working Capital Calculation Statement (an "Item of Dispute") and (ii) the correct amount of such Item of Dispute in accordance with this Agreement. Any item or amount to which no dispute is raised in a timely fashion under the Dispute Notice will be final, conclusive and binding on Purchaser and Seller.

(d)    If any dispute remains unresolved for a period of fifteen (15) days after Purchaser's receipt of a Dispute Notice, Purchaser and Seller shall jointly retain submit the remaining dispute to CohnReznick LLP or other mutually agreeable accounting firm (the "Independent Auditor"). Purchaser and Seller shall request that the Independent Auditor render a determination (which determination shall be solely based on whether the

8

Item of Dispute was prepared in accordance with the terms of this <u>Section 1.6</u> or whether a mathematical error was made) as to each unresolved Item of Dispute within thirty (30) days after its retention, and Purchaser and Seller shall cooperate fully with the Independent Auditor so as to enable it to make such determination as quickly and as accurately as practicable. The Independent Auditor's determination as to each Item of Dispute shall be (i) based solely on presentations by Purchaser and Seller which are in accordance with the guidelines and procedures set forth in this Agreement (i.e., not on the basis of an independent review), (ii) in writing and (iii) conclusive and binding upon Purchaser and Seller, and the Closing Net Working Capital shall be modified to the extent necessary to reflect such determination. The Independent Auditor shall consider only the remaining Items of Dispute and the Independent Auditor may not assign a value to any Item of Dispute greater than the greatest value assigned by Purchaser, on the one hand, or Seller, on the other hand, or less than the smallest value for such item assigned by Purchaser, on the one hand, or Seller, on the other hand. The costs and expenses of the Independent Auditor shall be borne by the Parties in proportion to the difference in value assigned to any Item of Dispute by Purchaser, on the one hand, or Seller, on the other hand, and the value determined by the Independent Auditor.

(e)    The final Closing Net Working Capital as finally determined pursuant to <u>Section 1.6(c)</u>, if there is no dispute, or <u>Section 1.6(d)</u>, if there is a dispute, is referred to as the "<u>Final Closing Net Working Capital</u>." If (i) the Final Closing Net Working Capital exceeds the Estimated Closing Net Working Capital (such an amount, the "<u>Final Closing Net Working Capital Excess Amount</u>"), then Purchaser shall within five (5) days of the determination of the Final Closing Net Working Capital pay to Seller the Final Closing Net Working Capital Excess Amount less the Estimated Closing Net Working Capital Excess Amount previously paid by Purchaser at the Closing or (ii) the Final Closing Net Working Capital is less than the Estimated Closing Net Working Capital (such an amount, the "<u>Final Closing Net Working Capital Deficiency Amount</u>"), then Seller shall within five (5) days of the determination of the Final Closing Net Working Capital pay to Purchaser the Final Closing Net Working Capital Deficiency Amount less the Estimated Closing Net Working Capital Deficiency Amount previously deducted from the Cash Consideration paid by Purchaser at the Closing, *provided, however,* that (A) if the Final Closing Net Working Capital Excess Amount or the Final Closing Net Working Capital Deficiency Amount, as applicable, is equal to or less than the Band Amount, there shall be no adjustment to the Purchase Price or (B) if the Final Net Working Capital Excess Amount or the Final Net Working Capital Deficiency Amount, as applicable, is more than the Band Amount, the adjustment to the Purchase Price shall be limited solely to the amount of such excess or deficiency, as applicable.

"<u>Net Working Capital</u>" shall mean, with respect to the Seller, the sum, as of the Closing Date, of the (i) Accounts Receivable, plus (ii) Inventory, less (iii) accounts payable of Seller as of the Closing Date owing to third party vendors and suppliers of the Business ("<u>Accounts Payable</u>") which are attributable to the period prior to the commencement of the Bankruptcy Case, less (iv) Accounts Payable attributable to the period from the commencement of the Bankruptcy Case through the Closing Date, less (v) any purchase orders, commitments or contracts entered into outside of the Seller's ordinary course of business or as a result of an initiation of a new product line, including without limitation,

9

Contera inventory (but, as to Contera inventory, purchase orders shall only be so deducted to the extent such purchase order was placed after the Petition Date), in each case made without Purchaser's approval, determined (i) in accordance with generally accepted accounting principles applied in accordance with the methodology, procedures, assumptions and adjustments set forth in **Schedule 1.6**, subject only to such exceptions thereto as may be agreed to by Purchaser and Seller, and (ii) based upon a physical inventory to be conducted at Seller's and Purchaser's joint expense as of the Closing.

"Target Closing Net Working Capital" shall mean the Net Working Capital of the Business as of the Closing Date as set forth in the Target Closing Net Working Capital Calculation Statement, such amount being $10,300,000.00.

1.7    Closing.

Subject to the terms and conditions of this Agreement and entry of the Sale Approval Order, the sale and purchase of the Assets and the assumption of the Assumed Liabilities contemplated by this Agreement shall take place at a closing (the "Closing") to be conducted virtually by the Parties via electronic exchange and delivery of their respective deliverables and wire transfer of Good funds in accordance with such written wire transfer instructions as Seller may provide to Purchaser, such Closing to take place on the third (3rd) Business Day following the satisfaction or waiver of all conditions to the obligations of the Parties set forth in Sections 5 and 6 hereof (other than those conditions which by their nature can only be satisfied at the Closing), or at such other time, on such other date or in such other manner as the Seller and the Purchaser may mutually agree upon in writing (the day on which the Closing takes place being the "Closing Date").

1.8    Closing Deliveries by Seller.

At the Closing, unless otherwise waived in writing by the Purchaser, the Seller shall deliver or cause to be delivered to the Purchaser:

(a)    a duly executed Bill of Sale to transfer the Assets to the Purchaser;

(b)    a duly executed counterpart of the Assignment and Assumption Agreement;

(c)    a duly executed counterpart of the Assignment and Assumption Intellectual Property;

(d)    a duly executed counterpart of the Assumption of Assumed Liabilities;

(e)    evidence of transfer of ownership of the Acquired Stock, including share certificate or instrument of transfer, any amendment to shareholder registry or other corporate records reflecting such transfer;

(f)    copies or originals of all acquired Books and Records;

10

      (g)     originals of the Assumed Contracts, and if unavailable, true, correct and complete copies thereof;

      (h)     a certified copy of the Sale Approval Order;

      (i)     a duly executed copy of the Transition Services Agreement;

      (j)     UCC termination statements as to the assets of any subsidiary acquired by Purchaser in recordable form, with the cost of recordation to be at Purchaser's sole cost;

      (k)     current list of Inventory; and

      (l)     such other documents, notices, items and certificates (in each case to the extent not inconsistent with the other terms, provisions and limitations set forth herein and which do not otherwise impose any monetary cost on Seller or materially increase the burdens of this transaction upon Seller) as the Purchaser may reasonably require in order to consummate the transactions contemplated hereunder.

    1.9    <u>Closing Deliveries by the Purchaser.</u>

    At the Closing, unless otherwise waived in writing by the Seller, the Purchaser shall deliver or cause to be delivered to the Seller:

      (a)     An amount equal to the Purchase Price, by wire transfer of immediately available funds to an account (or accounts) designated in writing by Seller at least two (2) Business Days prior to the Closing Date;

      (b)     A duly executed counterpart of the Assignment and Assumption Agreement;

      (c)     A duly executed counterpart of the Assignment and Assumption of Intellectual Property;

      (d)     A duly executed counterpart of the Assumption of Assumed Liabilities; and

      (e)     Such other documents, notices, items and certificates as the Seller may reasonably require (in each case to the extent not inconsistent with the other terms, provisions and limitations set forth herein and which do not otherwise impose any monetary cost on Purchaser or materially increase the burdens of this transaction upon Purchaser) in order to consummate the transactions contemplated hereunder.

    1.10   <u>Further Conveyances and Assumptions.</u>

    From time to time following the Closing, the Seller and Purchaser shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions, assignments, releases and other instruments

11

(collectively, "Further Instruments"), and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to Purchaser and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement and to assure fully to Seller and its Affiliates and their successors and assigns, the assumption of the liabilities and obligations intended to be assumed by Purchaser under this Agreement, and to otherwise make effective the transactions contemplated hereby; provided, that nothing in this Section 1.10 shall (i) require Purchaser or any of their respective Affiliates to assume any Liabilities other than the Assumed Liabilities, or (ii) require Seller or any of its Affiliates to execute any Further Instrument or take any action that would in any material respect expand the Liabilities or monetary or other obligations imposed upon Seller by the other provisions of this Agreement, or require Seller or any Affiliate to initiate or join in any action, litigation or other proceeding other than those specifically contemplated by this Agreement.

1.11    Assignment to Affiliates of Purchaser.

Prior to the Closing, Purchaser shall have the right to assign its rights to receive all or any part of the Assets and its obligations to assume all or any part of the Assumed Liabilities, in each case to one or more Affiliates of Purchaser (each, a "Designated Purchaser") by providing written notice to Seller and each such Designated Purchaser shall be deemed to be a "Purchaser" for all purposes under this Agreement and under the Ancillary Agreements, except that no such assignment shall relieve Purchaser of any of its obligations hereunder.

1.12    Disposition of the Note.  Unless Seller has previously obtained Bankruptcy Court approval to waive, and has waived, the obligations under the Note prior to the Closing, then immediately following the Closing, Purchaser shall terminate and forgive the Note and deliver to the maker thereof the original of the Note endorsed "discharged in full."  The maker of the Note is intended to be (and shall be) an intended third party beneficiary of the covenant set forth in this Section 1.12.

2.    Representations and Warranties of the Seller.

Except as set forth in any disclosure schedules to this Agreement (the "Disclosure Schedules") mutually agreed upon by the Parties in connection with the satisfaction of the conditions set forth in Sections 5.6 and 6.5 hereof, Seller hereby represents and warrants to the Purchaser on the date the Parties mutually execute and deliver this Agreement (the "Execution Date"), that:

2.1    Due Incorporation and Authority.

Seller is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware.  Seller is licensed, registered, qualified or admitted to do business in each jurisdiction in which the ownership, use or leasing of any of its assets or properties or the conduct or nature of the Business makes such licensing, qualification, or admission necessary (except where the failure to be so

12

licensed, registered, qualified or admitted could not, individually or in the aggregate, have a material adverse effect on the Business). Seller has all requisite entity power and authority to own, lease and operate its properties and to carry on its business as now being conducted. Subject to the entry of the Bid Procedures Order and the Sale Approval Order, (a) Seller has all requisite corporate power and authority to enter into this Agreement, the Ancillary Agreements and each other agreement, document or instrument contemplated hereby or thereby to which Seller is a party, to carry out its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby and (b) the execution and delivery of this Agreement, the Ancillary Agreements and each other agreement, document or instrument contemplated hereby and thereby to which Seller is a party, the performance by Seller of its obligations hereunder and thereunder, and the consummation by Seller of the transactions contemplated hereby and thereby have been duly authorized by all requisite entity action on the part of Seller. This Agreement has been duly and validly executed and delivered by Seller and (assuming the due authorization, execution and delivery by the other parties hereto and the entry of the Bid Procedures Order and the Sale Approval Order) this Agreement, the Ancillary Agreements and each other agreement, document or instrument contemplated hereby and thereby to which Seller is a party constitutes legal, valid and binding obligations of Seller enforceable against Seller in accordance with its respective terms and provisions, subject to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

    2.2    <u>No Conflicts or Consents of Third Parties.</u>

    (a)    The execution and delivery by the Seller of this Agreement, the Ancillary Agreements and each other agreement, document or instrument contemplated hereby or thereby to which Seller is a party, the consummation of the transactions contemplated hereby and thereby, and the performance by Seller of this Agreement, the Ancillary Agreements and each other agreement, document or instrument contemplated hereby or thereby to which Seller is a party in accordance with its terms will not (with or without notice or lapse of time or both) conflict with, or result in violation of or default, or give rise to a right of termination, cancellation or acceleration of any obligation, under any provision of:

    (i)    the articles of organization or by-laws (or comparable instruments) of Seller;

    (ii)    subject to the entry of the Bid Procedures Order and the Sale Approval Order, any Permit or Material Contract to which Seller is a party or by which any of the assets, Liabilities or properties of Seller are bound;

    (iii)    subject to the entry of the Bid Procedures Order and the Sale Approval Order, any law to which Seller or any of its assets, Liabilities or properties are subject.

13

(b)      Subject to the entry of the Bid Procedures Order and the Sale Approval Order, no consent, waiver, approval, order, Permit, authorization of or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of Seller in connection with the execution and delivery of this Agreement, the Ancillary Documents and any other agreement, document or instrument contemplated hereby or thereby to which Seller is a party, the compliance by Seller with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by the Seller of any other action contemplated hereby or thereby (with or without notice or lapse of time or both).

2.3      Litigation.

Except as set forth on Schedule 2.3 attached hereto, there are no claims pending or, to the knowledge of the Seller, threatened against Seller, before any Governmental Body that would prevent or materially delay the consummation by Seller of the transactions contemplated by this Agreement, the Ancillary Agreements or affect any of the Assets or the Business or that could reasonably be expected to have a Material Adverse Change with respect to Seller.

2.4      Taxes.

Except as set forth on Schedule 2.4 attached hereto, Seller has (i) paid or caused to be paid to the proper authorities when due all federal, state, provincial, and local Taxes required to be paid or withheld by Seller, (ii) filed all federal, provincial, state and local tax returns which, to Seller's knowledge, are required to be filed, and (iii) paid or caused to be paid to the respective taxing authorities all Taxes as shown on said returns or on any assessment received by Seller to the extent such Taxes have become due. No audit or other proceeding by any Governmental Body is pending or, to the knowledge of Seller, threatened with respect to any Taxes due from or with respect to the Seller or any of its subsidiaries or with respect to any of the Assets. No written notice has been received from any Governmental Body of any intention to assert any deficiency or claim for additional Taxes against Seller or any of its subsidiaries or with respect to any of the Assets.

2.5      Titles and Liens.

Seller has good and absolute title to all of the Assets. Except as set forth on Schedule 2.5, the Seller owns the Assets free and clear of all Liens and, subject to the entry of the Sale Approval Order, at the Closing, Purchaser shall be vested with defensible title to such Assets, free and clear of all Liens, to the fullest extent permissible by applicable law, including section 363(f) of the Bankruptcy Code.

2.6      Intellectual Property Rights.

(a)      Owned Intellectual Property.  Schedule 2.6(a) attached hereto is a complete list of all intellectual property rights for which Seller is an owner of record as of the date of this Agreement (the "Owned Intellectual Property"). Except as disclosed on Schedule 2.6(a), (i) Seller owns its Owned Intellectual Property free and clear of all

14

WEST\281884727.4

restrictions (including covenants not to sue a third party), court orders, injunctions, decrees, or writs, whether by written agreement or otherwise, (ii) no person other than Seller owns or, except under content sharing licenses granted in the ordinary course of business or as set forth on Schedule 2.6(a), has been granted any right in the Owned Intellectual Property, (iii) all material Owned Intellectual Property is valid, subsisting and enforceable, and (iv) Seller has taken all commercially reasonable action necessary to maintain and protect the Owned Intellectual Property.

(b)    Intellectual Property Rights Licensed from Others.    Schedule 2.6(b) is a complete list of all agreements under which Seller has licensed Intellectual Property Rights from another Person (the "Licensed Intellectual Property") as of the date of this Agreement other than content sharing licenses granted in the ordinary course of business and readily available, non-negotiated licenses of computer software and other intellectual property used solely for performing accounting, word processing and similar administrative tasks. Except as disclosed on Schedule 2.6(b), Seller's licenses to use the Licensed Intellectual Property are free and clear of all restrictions, court orders, injunctions, decrees, or writs, whether by written agreement or otherwise. Except as disclosed on Schedule 2.6(b), Seller is not obligated or under any liability whatsoever to make any payments of a material nature by way of royalties, fees or otherwise to any owner of, licensor of, or other claimant to, any intellectual property rights.

(c)    Infringement. Except as disclosed on Schedule 2.6(c), Seller does not have knowledge of, or has received any written claim or notice alleging, any Infringement of another person's intellectual property rights (including any written claim that Seller must license or refrain from using the intellectual property rights of any third party) nor, to such Seller's knowledge, is there any such threatened claim.

(d)    The Intellectual Property constituting "Assets" is sufficient for Purchaser to carry on the Business from and after the Closing Date as presently carried on by the Seller in the ordinary course, consistent with past practice.

2.7    Real Property.

Schedule 2.7 attached hereto sets forth each lease or sublease for real property to which Seller is a party (each a "Leased Real Property"). Except as described on Schedule 2.7 attached hereto, each lease or sublease for the Leased Real Property is valid and enforceable in accordance with its terms and is in full force and effect, other than as a result of the commencement of the Bankruptcy Case. Except as described on Schedule 2.7, to Seller's knowledge, no default by any party to any lease or sublease for the Leased Real Property exists other than as a result of the commencement of the Bankruptcy Case. There are no leases, subleases, licenses, concessions, options or rights of first refusal to purchase or lease, or other agreements, written or oral, granting to any party or parties the right of use or occupancy of any Leased Real Property or any portion thereof and there are no parties (other than the Seller) in possession of the Leased Real Property or any portion thereof. No Equipment, Inventory or other tangible personal property is located at any real estate location other than the Leased Real Property. Seller does not own any fee interest in real property.

15

2.8        [reserved]

2.9        Material Contracts.

Schedule 2.9 sets forth a true, correct and complete list of all Material Contracts. Other than arising as a result of the commencement of the Bankruptcy Case, each Material Contract (other than those that have expired at the end of their normal terms) (a) is in full force and effect and is binding upon and enforceable against Seller and, to Seller's knowledge, each other person that is a party thereto in accordance with its terms, (b) has not been otherwise amended or modified, and (c) is not in default in any material respect due to the action or inaction of Seller except any defaults based on unpaid prepetition obligations.

"Material Contract" means each contract or agreement to which Seller is a party involving aggregate consideration payable to or by Seller of $50,000 or more.

2.10        Environmental Condition.

(a)        Seller is in compliance in all material respects with all Environmental Laws and has not caused a Release of Hazardous Material at the location of the Real Property Lease or at any off-site location. In addition, (a) none of Seller's properties or assets have ever been used by Seller or, to the Seller's knowledge, by previous owners or operators in the disposal of, or to produce, store, handle, treat, release, or transport, any Hazardous Materials, where such disposal, production, storage, handling, treatment, release or transport was in violation, in any material respect, of any applicable Environmental Law, (b) to Seller's knowledge, none of Seller's properties or assets has ever been designated or identified in any manner pursuant to any environmental protection statute as a Hazardous Materials disposal site, (c) Seller has never received notice that a Lien arising under any Environmental Law has attached to any revenues or to any Real Property Lease operated by Seller, and (d) Seller nor any of its facilities or operations is subject to any outstanding written order, consent decree, or settlement agreement with any person relating to any Environmental Law or environmental liability that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Change.

(b)        There is no applicable order under which Seller or any Asset with respect to the Business currently has outstanding obligations, or any pending or, to the Seller's knowledge, threatened and unresolved written notice (including a notice of investigation), claim, or complaint, with respect to a Release of Hazardous Materials or violation of an Environmental Law in connection with the operation of the Business or the Real Property Lease.

(c)        Seller holds and is in compliance in all material respects with all material Permits required under Environmental Laws in connection with the operation of the Business and the use of the Real Property Lease ("Environmental Permits") and there are no regulatory proceedings pending or, to the Seller's knowledge, threatened to revoke, cancel or materially modify the terms of any such Environmental Permits. Seller

16

has not expressly assumed by Contract or provided any contractual indemnity in any lease or real estate purchase or sales contract with respect to any material Liability of any other person under Environmental Laws.

2.11    Employee Benefits.

Neither Seller nor any Affiliate thereof maintains or contributes to any Benefit Plan.

2.12    Labor Matters.

(a)    Schedule 2.12 sets forth a true, correct and complete list as of the date hereof of all Business Employees, including each Business Employee's (i) full name, (ii) job title or function, (iii) job location, (iv) salary or wage rate, (v) bonus opportunity, commission status or other incentive compensation paid or payable for 2017 and 2018, (vi) bonus, commission or incentive compensation paid in 2017 and 2018, (vii) the amount of accrued but unused vacation time, (viii) date of hire, (ix) visa type (if applicable) and (x) current status (as to leave or disability status, full-time or part-time, exempt or nonexempt and temporary or permanent status).  Schedule 2.12 sets forth (i) a true, correct and complete list of all consultants or independent contractors (collectively, the "Service Providers") who has been performing services for the Seller and its subsidiaries and whose compensation has been in the most recent calendar year or for the current calendar year is anticipated to be in excess of $50,000, including each such person's (A) full name, (B) function or services provided, (C) job location, and (D) current compensation structure.  Except as set forth on Schedule 2.12, no Business Employee or Service Provider is located outside the jurisdiction of the United States.

(b)    The Seller and its subsidiaries have complied in all material respects with all applicable Labor Laws for all Business Employees and Service Providers.  A properly completed Form 1-9 is on file with respect to each Business Employee.  Except as set forth in Schedule 2.12, there is no pending, nor, to the knowledge of Seller, is there any threatened, legal proceeding reasonably likely to give rise to a material Liability asserting that Seller or any of its subsidiaries has committed an unfair labor practice, act of discrimination, or other similar complaints with respect to any Employee or Service Provider.

(c)    Neither Seller nor any of its subsidiaries is party to any labor, collective bargaining, union and similar agreement with respect to any Business Employee or Service Provider.  No collective bargaining or any other labor-related contract with any labor union or labor organization is currently being negotiated with respect to any Business Employee or Service Provider. There is not pending or, to the knowledge of Seller, threatened, any organized effort or demand for recognition or certification or attempt to organize the Business Employees by any labor organization. There are no strikes, slow-downs, work stoppages, other labor disturbance or other concerted action by any union or other group of employees or other persons against or involving Seller presently occurring or, to the knowledge of Seller, threatened against or involving Seller.

17

(d)     There has been no "mass layoff" or "plant closing" (as defined by the WARN Act) with respect to Seller or the Business within the past twelve months. Neither Seller or any subsidiary of Seller has incurred any Liability under the WARN Act that remains unpaid or unsatisfied.

(e)     Since the Petition Date, Seller has not increased the compensation or benefits paid or payable to any Business Employee or Service Provider (including any such increase pursuant to any bonus, pension, profit sharing, severance or termination pay).

(f)     Neither Seller nor any of its subsidiaries is party to any employment or similar agreement with respect to any Business Employee.

2.13     Compliance with Laws.

Seller (a) is not in violation of any applicable laws, rules, regulations, executive orders, or codes (including environmental laws) that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Change, and (b) is not subject to or in default with respect to any final judgments, writs, injunctions, decrees, rules or regulations of any court or any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Change.

2.14     [reserved]

2.15     Ordinary Course of Business; No Undisclosed Liabilities.

(a)     Except as ordered by the Bankruptcy Court and disclosed in the filings made by the Seller with the Bankruptcy Court in connection with the Bankruptcy Case on or before the Effective Date, since the Petition Date, Seller has conducted the Business and owned and operated the Assets in the ordinary course of business.

(b)     There are no material Liabilities related to the Business that would be Assumed Liabilities except for Liabilities incurred in the ordinary course of business consistent with historical practice.

2.16     Broker; Financial Advisor.

No Person has acted, directly or indirectly, as a broker, agent, finder or financial advisor for the Seller in connection with the transactions contemplated by this Agreement and each agreement, document or instrument contemplated hereby, and no Person is entitled to any fee or commission or like payment in respect thereof, except for Imperial Capital, LLC, whose success fee in connection with the transaction contemplated by this Agreement shall be paid by Seller.

2.17     Accounts Receivable.

18

WEST\281884727.4

All accounts receivable of the Business have arisen in the ordinary course of business and represent valid assets of the Seller.

2.18        [reserved]

2.19        Insurance and Bonds.

Schedule 2.19 sets forth a true, correct and complete list of all insurance policies of the Seller which insure the Business or any of the Assets, and a true, correct and complete list of all letters of credit, surety bonds and performance bonds required to be obtained by the Seller in connection with the Business.  All such insurance policies are in full force and effect, all premiums with respect thereto covering all periods up to and including the Closing have been paid, and other than has been disclosed on Schedule 2.19, no notice of cancellation or termination has been received with respect to any such insurance policy.

2.20        Affiliate Transactions.

Except as set forth on Schedule 2.20, no current or, to the knowledge of the Seller, no former director, officer, employee, Affiliate or representative of the Seller (nor any spouse or child of any of such Persons, or any trust, partnership or corporation in which any of such Persons has a material economic interest) (a) owns any property, assets, interests and rights, tangible or intangible, that is an Asset or that is material to the conduct of the Business, (b) has filed or otherwise has any legal proceeding against the Business, (c) is a controlling Affiliate of any customer or supplier of the Business, or (d) is a party to or the beneficiary of any Contract with the Business.

2.21        Seller as Debtor in Possession; No Trustee.

From the Petition Date through the Closing Date, the Seller has been at all times in its Bankruptcy Case a debtor-in-possession pursuant to section 1107 of the Bankruptcy Code, and no trustee or examiner has been appointed in the Bankruptcy Case.

3.        Representations and Warranties of the Purchaser.

The Purchaser represents and warrants to the Seller on the Execution Date as follows:

3.1        Due Incorporation and Authority.

The Purchaser is comprised of two entities, one a limited liability company, and the other a corporation, each duly organized, validly existing and in good standing under the laws of the State of Delaware.  Subject to the entry of the Bid Procedures Order and the Sale Approval Order, the Purchaser has all requisite entity power and authority to enter into this Agreement, the Ancillary Agreements and each other agreement, document or instrument contemplated hereby and thereby to which Purchaser is a party, to carry out its obligations hereunder, and to consummate the transactions contemplated hereby and thereby.  The execution and delivery by the Purchaser of this Agreement, the Ancillary

19

Agreements and each other agreement, document or instrument contemplated hereby or thereby to which Purchaser is a party, the performance by the Purchaser of its obligations hereunder and thereunder and the consummation by the Purchaser of the transactions contemplated hereby and thereby have been duly authorized by all requisite entity action on the part of the Purchaser. This Agreement has been duly executed and delivered by the Purchaser and (assuming the due authorization, execution and delivery by the other parties hereto and the entry of the Bid Procedures Order and the Sale Approval Order) this Agreement, the Ancillary Agreements and each other agreement, document or instrument contemplated hereby and thereby to which Purchaser is a party constitutes legal, valid and binding obligations of Purchaser enforceable against Purchaser in accordance with its respective terms and provisions, subject to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

3.2    No Conflicts.

The execution and delivery by Purchaser of this Agreement, the Ancillary Agreements and each other agreement, document or instrument contemplated hereby or thereby to which Purchaser is a party, the consummation of the transactions contemplated hereby and thereby, and the performance by Purchaser of this Agreement, the Ancillary Agreements and each other agreement, document or instrument contemplated hereby or thereby to which Seller is a party in accordance with its terms will not (with or without notice or lapse of time or both) conflict with, or result in violation of or default, or give rise to a right of termination, cancellation or acceleration of any obligation, under any provision of:

(a)    the certificate of formation and operating agreement (or comparable instruments) of the Purchaser;

(b)    subject to the entry of the Bid Procedures Order and the Sale Approval Order, require the Purchaser to obtain any material consents, approvals, authorizations or actions of, or make any filings with or give any notices to, any Governmental Bodies or any other Person, except for (i) the notification requirements of the HSR Act (and any foreign counterpart thereof) or (ii) consents, approvals or authorizations of, or declarations or filings with, the Bankruptcy Court;

(c)    subject to the entry of the Bid Procedures Order and the Sale Approval Order, any material Contract to which the Purchaser is a Party or by or to which each of the Purchaser or any of its properties is or may be bound or subject; or

(d)    violate any law to which the Purchaser is subject.

Subject to the entry of the Bid Procedures Order and the Sale Approval Order, no consent, waiver, approval, order, Permit, authorization of or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of Purchaser in connection with the execution and delivery of this Agreement, the Ancillary Documents and any other agreement, document or instrument contemplated hereby or thereby to

20

which Purchaser is a party, the compliance by Purchaser with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by the Purchaser of any other action contemplated hereby or thereby (with or without notice or lapse of time or both).

3.3     Litigation.

There are no legal proceedings pending or, to the knowledge of the Purchaser, threatened against the Purchaser, before any Governmental Body, which if adversely determined, would reasonably be expected to have a material adverse change with respect to Purchaser.

3.4     Availability of Funds.

Purchaser has, and on the Closing Date will have, cash available and committed to the transactions contemplated herein that is sufficient to enable Purchaser to consummate such transactions and perform all of its obligations in accordance with the terms and provisions of this Agreement.

3.5     Broker or Financial Advisor.

No Person has acted, directly or indirectly, as a broker, agent, finder or financial advisor for Purchaser in connection with the transactions contemplated by this Agreement and each agreement, document or instrument contemplated hereby and no Person is entitled to any fee or commission or like payment in respect thereof.

3.6     "AS IS" Transaction.

Purchaser hereby acknowledges and agrees that, except as expressly provided in Section 2 of this Agreement, Seller makes no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Assets that will survive or continue beyond the Closing (including, without limitation, income to be derived or expenses to be incurred in connection with the Assets, the physical condition of any personal property comprising a part of the Assets or which is the subject of any Assumed Contract to be assumed by Purchaser at the Closing, the condition or other matter relating to the physical condition of any real property or improvements, the value of the Assets (or any portion thereof), the transferability of Assets, the terms, amount, validity, collectability or enforceability of any Assumed Liabilities or other Assumed Contract, the title of the Assets (or any portion thereof), the merchantability or fitness of the Fixed Assets or Equipment or other tangible personal property included among the Assets or any other portion of the Assets for any particular purpose, or any other matter or thing relating to the Assets or any portion thereof). Without in any way limiting the foregoing, Seller hereby disclaims any warranty (express or implied) of merchantability or fitness for any particular purpose as to any portion of the Assets. Purchaser further acknowledges that Purchaser has conducted an independent inspection and investigation of the physical condition of all portions the Assets and all such other matters relating to or affecting the Assets as Purchaser deemed necessary or appropriate and that in proceeding with its acquisition of the Assets, Purchaser is doing so based solely upon

21

WEST\281884727.4

such independent inspections and investigations. Accordingly, Purchaser will accept the Assets at the Closing **"AS IS, "WHERE IS," "WITH ALL FAULTS."**

4.      Covenants and Agreements.

4.1      Conduct of Business.

Except (i) as expressly provided in this Agreement or on Schedule 4.1(b), or (ii) to the extent that the following is inconsistent with Seller's duties and obligations as a debtor in the Bankruptcy Case or with orders issued by the Bankruptcy Court, or (iii) as otherwise agreed to in writing by the Purchaser, Seller agrees that, from the date hereof until the earlier of the Closing and the date, if any, on which this Agreement is terminated pursuant to Section 7.1 hereof:

(a)      Seller shall use commercially reasonable efforts to operate the Business in the ordinary course of business consistent with past practice during the period immediately preceding the Execution Date and to preserve intact the Business, keep available the service of its officers and employees and preserve its relationships with suppliers.

(b)      Seller shall not, directly or indirectly:

(i)      sell or convey any of the Assets or any interests therein, except in the ordinary course of business consistent with past practice during the period immediately prior to the Execution Date;

(ii)      with respect to the Business, change its method of accounting or any accounting principle, method, estimate or practice, except in the ordinary course of business consistent with past practice or as may be required by GAAP or any other applicable law;

(iii)      cancel, terminate or amend the Real Property Lease or any other Material Contract;

(iv)      acquire or agree to acquire by merging or consolidating with, or by purchasing any equity interest in or a portion of the assets of, or by any other manner, any business or any Person or division thereof;

(v)      enter into any joint ventures, strategic partnerships or alliances;

(vi)      enter into any Contract the effect of which would be to grant to a third party any license to use any Intellectual Property for a period extending beyond the Closing Date;

(vii)      adopt a plan of complete or partial liquidation, dissolution, merger, consolidation, restructuring, recapitalization or reorganization in the Bankruptcy Case;

22

(viii)    sell, lease, transfer, encumber, or otherwise dispose of any Intellectual Property; or

(ix)    agree in writing or otherwise to take any of the actions described in (i) through (viii) above.

Notwithstanding anything in this Agreement to the contrary, (i) all of the actions described in this Section 4.1 relate solely to the Business and the Assets and the Purchaser acknowledges that the Seller can take any actions, in its sole and absolute discretion, relating solely to the Excluded Assets and/or Excluded Liabilities, and (ii) nothing in this Section 4.1 or the other provisions of this Agreement shall be construed as precluding or restricting Seller from liquidating or otherwise disposing of "excess," "discontinued" or "B stock" Inventory in such manner as Seller may deem appropriate pending the Closing.

4.2    Expenses.

Except as otherwise specifically provided herein, the Purchaser and the Seller shall bear their respective expenses incurred in connection with the preparation, execution and performance of this Agreement, the Ancillary Agreements and the transactions contemplated hereby.

4.3    Access to Information.

From the date hereof until the earlier of (x) the Closing and (y) any termination of this Agreement pursuant to Section 7.1, upon reasonable notice, Seller shall, and shall cause each of its officers, directors, employees, auditors and agents to, (i) afford the officers, employees and representatives of the Purchaser reasonable access, during normal business hours, to the offices, plants, warehouses, properties, books and records of Seller, and (ii) furnish to the officers, employees and representatives of the Purchaser such additional financial and operating data and other information regarding the operations of Seller and the Business as are then in existence and as the Purchaser may from time to time reasonably request; provided, however, that such investigation shall not unreasonably interfere with the operations of the Seller; and provided further, however, that (i) the auditors of the Seller shall not be obliged to make any work papers available to any Person except as otherwise provided herein, (ii) without Seller's prior written consent (which consent Seller's may grant or withhold in their sole discretion), in no event shall Purchaser be entitled to conduct or cause to be conducted any Phase II environmental or other "invasive" testing of or at any of Seller's plants, offices, warehouses, or properties, and (iii) nothing in this Section 4.3 shall be deemed to give rise to any condition or contingency to Purchaser's obligation to consummate the transactions contemplated herein.  Other than in the case of information that is publicly disclosed or filed in the Bankruptcy Court or further made available by Seller to prospective bidders, information provided pursuant to this Section 4.3 shall be governed by the terms of the confidentiality agreement in place between Seller and Purchaser.

23

4.4     Further Assurances; Consents; Regulatory Filings.

(a)     Each of the Parties shall cooperate and use its commercially reasonable efforts to (i) take, or cause to be taken, all appropriate action, and do, or cause to be done, all things necessary, proper or advisable under any law or otherwise to consummate and make effective the transactions contemplated by this Agreement and the Ancillary Agreements, (ii) obtain any consents, licenses, permits, waivers, approvals, authorizations or orders required to be obtained or made in connection with the authorization, execution and delivery of this Agreement and, to the extent that the need for the same is not obviated by the entry of the Sale Approval Order, the consummation of the transactions contemplated hereby, and (iii) within thirty (30) calendar days of the date hereof, make all filings and give any notice, and thereafter make any other submissions either required or reasonably deemed appropriate by each of the Parties, with respect to this Agreement and the transactions contemplated hereby required under any law, including applicable securities and antitrust laws, and the rules and regulations of any stock exchange on which the securities of any of the Parties are listed or traded.  For the avoidance of doubt, commercially reasonable efforts shall not obligate Seller or Purchaser to make or offer to make any payments to obtain any consents, licenses, permits, waivers, approvals, authorizations or orders.

(b)     The Parties shall cooperate and consult with each other in connection with the making of all such filings and notices, including by providing copies of all such documents to the non-filing Party and its advisors a reasonable period of time prior to filing or the giving of notice to the extent practicable.  Neither Party to this Agreement shall consent to any voluntary extension of any statutory deadline or waiting period or to any voluntary delay of the consummation and the transactions contemplated in this Agreement at the behest of any Governmental Body without the consent and agreement of the other Party to this Agreement, which consent shall not be unreasonably withheld or delayed.  Each Party shall promptly inform the others of any material communication from any Governmental Body regarding any of the transactions contemplated by this Agreement.  To the extent practicable, no Party shall agree to participate in any meeting with any Governmental Body in respect of any filing with such body, investigation or other inquiry unless it consults with the other Party in advance and, to the extent permitted by such Governmental Body, gives the other Party the opportunity to attend and participate at such meeting.

(c)     If after the Closing (i) Purchaser holds any Excluded Assets or Excluded Liabilities or (ii) Seller holds any Assets or Assumed Liabilities (including any proceeds, accounts receivable, notes receivable, income, revenues, monies and other items attributable to the Assets), Purchaser, on the one hand, or the Seller on the other hand, shall promptly transfer (or cause to be transferred) such Assets or assume (or cause to be assumed) such Liabilities to or from (as the case may be) the other party.  Prior to any such transfer, the party receiving or possessing any such Asset shall hold it in trust for such other party. The Seller hereby grants Purchaser an irrevocable power of attorney to endorse such checks, drafts and other instruments, and any check, draft or other instrument arising from and after the Closing that constitute Assets issued in the name of the Seller.

24

WEST\281884727.4

4.5    [reserved].

4.6    <u>Employee Matters.</u>

(a)    From and after the date hereof, the Purchaser, in its sole and absolute discretion, may: (i) in consultation and cooperation with the Seller, communicate with any of the Business Employees about possible employment with the Purchaser after the Closing Date; and/or (ii) offer employment to any of the Business Employees as of the Closing Date. The Purchaser shall make offers of employment to not less than ninety percent (90%) of the Business Employees for compensation and otherwise on terms and conditions at least comparable to those applicable to their respective employment by Seller. Those of the Business Employees that accept the Purchaser's offer of employment shall be terminated by the Seller, and shall become employed by the Purchaser or one of its Affiliates (referred to in this Agreement as "<u>Transferred Employees</u>") as of the Closing Date. All employment offers are subject to the satisfactory completion by the Purchaser of its customary employment interview, background checks and drug testing procedures.

(b)    To the extent that length of employment service is relevant for purposes of eligibility or vesting under any employee benefit plan, program or arrangement established or maintained by the Purchaser and provided to the Transferred Employees (excluding any equity-related plan, program or arrangement), the Purchaser shall credit the Transferred Employees under such plan, program or arrangement for service on or prior to the Closing with the Seller as service with the Purchaser to the extent Seller recognized such service under any comparable plan, program or arrangement of the Seller.

(c)    The employment of each Transferred Employee with Purchaser or one of its Affiliates shall commence immediately upon the Closing and shall be deemed for all purposes, consistent with applicable law and except as otherwise expressly provided herein, to have occurred with no interruption or break in service and no termination of employment. The Seller shall cause to be terminated the employment of all Transferred Employees effective as of the Closing. Subject to, and effective as of, the Closing, the Seller hereby waives and releases each of the Transferred Employees from any and all contractual, common law or other restrictions enforceable by the Seller and their respective Affiliates on the employment, activities or other conduct of such individuals after their termination of employment with the Seller, except with respect to obligations related to confidentiality and trade secrets which obligations shall remain in full force and effect and survive such employee's termination and the Closing. Notwithstanding the foregoing, the foregoing waiver and release shall not apply to any individual who is or was at any time an officer or director of Seller or any of Seller's Affiliates, other than any individual who is an officer or director as of the execution date of this Agreement who is being hired by Purchaser.

(d)    Provided that Purchaser fully complies with its obligations pursuant to Section 4.6(a), Seller shall be responsible for any liabilities or obligations (i) arising under the WARN Act, if any, and (ii) resulting from or precipitated by layoffs,

25

if any, in respect of employees of Seller whose employment was terminated on or prior to the Closing.

    4.7     Bankruptcy Court Approvals; Process.

    (a)     If Seller has not already done so, no later than the Business Day immediately following the date of the mutual execution and delivery of this Agreement, Seller shall file a motion (the "Sale Motion") with the Bankruptcy Court in the Bankruptcy Case seeking entry of that certain "Order (A) Authorizing Entry Into the Asset Purchase Agreement With Respect to the Sale of Substantially All of the Debtors' Assets; (B) Approving Bid Procedures for the Sale of Substantially All of the Assets of Debtors; (C) Scheduling an Auction and Hearing to Consider the Sale and Approve the Form and Manner of Notice Related Thereto; (D) Establishing Procedures Relating to the Assumption and Assignment of Certain Contracts and Leases, Including Notice of Proposed Cure Amounts; (E) Approving Certain Breakup Fee Provisions; and (F) Granting Other Related Relief" to be entered in the Bankruptcy Case (the "Bid Procedures Order"), pursuant to which Seller will conduct its further marketing and sale of the Assets. On or before June 8, 2018, or by such later date as hereafter agreed to by Purchaser in its sole discretion (the "Bid Order Deadline"), Seller shall have obtained the entry in the Bankruptcy Case of the Bid Procedures Order in substantially the form and substance attached hereto as **Exhibit A** (or otherwise acceptable to counsel for Purchaser and Seller in their respective sole discretion). Pursuant to the Sale Motion, Seller shall request that following the Sale Hearing, the Bankruptcy Court enter an order in the form and content attached hereto as **Exhibit B** and incorporated herein by this reference (the "Sale Approval Order").

    (i)     The Bid Procedures Order shall provide for a Bid Deadline (as defined therein) of no later than June 29, 2018.

    (ii)     The Bid Procedures Order shall provide for an Auction to take place, if needed, no later than July 9, 2018.

    (iii)     The Bid Procedures Order shall provide for the Sale Hearing to take place no later than July 10, 2018.

    (b)     Following Seller's determination of the Successful Bidder at the Auction or, if no Auction is conducted, of the Qualified Bidder (as defined in the Bid Procedures Order) to whom Seller has determined to sell the Assets pursuant to the Bid Procedures Order (as applicable, the "Ultimate Bidder"), Seller shall submit such Ultimate Bidder and such Ultimate Bidder's asset purchase agreement (the "Ultimate APA") to the Bankruptcy Court for approval at the Sale Hearing. Seller shall use commercially reasonable efforts to obtain entry of the Sale Approval Order and Purchaser shall cooperate in all reasonable respects with such efforts of Seller. In accordance with Section 365 of the Bankruptcy Code, Seller shall seek authority to assume and assign to the Ultimate Bidder the Assumed Contracts contemporaneously with the Closing Date. Without limiting the foregoing, Purchaser shall be solely responsible for demonstrating,

26

to the Bankruptcy Court's satisfaction, adequate assurance of future performance under Section 365 of the Bankruptcy Code with respect to each Assumed Contract.

4.8    Books and Records; Access to Personnel.

The Purchaser agrees that it shall preserve and keep all Books and Records in respect of the operations of the Business in the Purchaser's possession for a period of at least five (5) years from the Closing Date. During the pendency of the Bankruptcy Case, Purchaser shall also make available to Seller and its representatives (to the extent in Purchaser's or an Affiliate's employ and to the extent that the same does not unreasonably interfere with Purchase operation of the Business) access at reasonable times and free of charge to those individuals listed on Schedule 4.8 to this Agreement for reasonable consultation in connection with matters relating to administration and wind down of the Bankruptcy Case.

4.9    Tax Matters.

(a)    The Purchaser shall be responsible for any and all Transfer Taxes incurred in connection with the transactions contemplated by this Agreement that are incurred after the Closing. Purchaser will, at its own expense, (i) file all necessary Tax Returns and other documentation with respect to all Transfer Taxes, and, if required by applicable law, the Parties will, and will cause their Affiliates to, join in the execution of any such Tax Returns and other documentation, and (ii) pay all Transfer Taxes payable in connection with the transactions contemplated herein.

(b)    Seller shall retain responsibility for, and shall bear and pay, all ad valorem, property, excise, severance, production or similar Taxes based upon operation or ownership of the Assets or the receipt of proceeds therefrom (but excluding, for the avoidance of doubt, income taxes, franchise taxes and Transfer Taxes) (collectively, the "Asset Taxes") assessed with respect to the Assets for (i) any period ending on or prior to the Closing Date and (ii) the portion of any Straddle Period ending on or prior to the Closing Date; provided, however, Seller shall not be obligated to pay any such Tax that is disputed in good faith by Seller for which adequate reserves have been recorded in Seller's books and records; and provided, further, that Seller shall place any such disputed amount into escrow pending resolution of such dispute, and if such dispute is not resolved within one (1) year of the Closing Date, such funds shall be made available for the settlement of any such dispute. For purposes of allocation between the Parties of Asset Taxes assessed with respect to the Assets that are payable with respect to any tax periods beginning before and ending after the Closing Date ("Straddle Periods"), the portion of any such taxes that are attributable to the portion of the Straddle Period that ends on or prior to the Closing Date shall (1) in the case of such Asset Taxes that are based upon or related to income or receipts or imposed on a transactional basis such as severance or production taxes, be allocated based on revenues from sales occurring on or before the Closing Date or, in the case of an Asset Tax imposed on a transaction basis, whether the relevant transaction closed on or prior to the Closing Date (which shall be Seller's responsibility) and from and after the Closing Date (which shall be Purchaser's responsibility); and (2) in the case of other Asset Taxes, be allocated pro rata per day

27

between the period on or prior to the Closing Date (which shall be Seller's responsibility) and the period after the Closing Date (which shall be Purchaser's responsibility). For purposes of clause (1) of the preceding sentence, any exemption, deduction, credit or other item that is calculated on an annual basis shall be allocated pro rata per day between the period ending on or prior to the Closing Date and the period beginning at the Closing Date. At the Closing, Asset Taxes with respect to each Asset for the applicable Straddle Period shall be prorated in accordance with the foregoing provisions based on the Asset Tax assessment for such Asset for such Straddle Period, if available, or if otherwise, based on the Asset Taxes paid with respect to such Asset during the preceding Tax period. With respect to any not yet delinquent Asset Taxes relating to a Tax year ending after the Closing Date, Purchaser will assume responsibility for the actual payment of all such Asset Taxes to the applicable Governmental Authority.

(c)    Seller, on the one hand, or Purchaser, on the other hand, as the case may be (the "Reimbursing Party"), shall provide reimbursement for any Tax paid by the other Party (the "Paying Party"), all or a portion of which is the responsibility of the Reimbursing Party, or which represents an overpayment for Taxes by the Paying Party, in accordance with the terms of this Section 4.9 (which such reimbursement may apply as a Purchase Price adjustment). Within a reasonable time prior to the payment of any such Tax, the Paying Party shall give notice to the Reimbursing Party of the Tax payable and the Paying Party's and Reimbursing Party's respective Liability therefor, although failure to do so will not relieve the Reimbursing Party from its Liability hereunder except to the extent the Reimbursing Party is prejudiced thereby.

(d)    The Parties shall cooperate with each other and with each other's respective representatives, including accounting firms and legal counsel, in connection with the preparation or audit of any Tax Return(s) and any Tax claim or litigation in respect of the Assets and Assumed Liabilities that include whole or partial taxable periods, activities, operations or events on or prior to the Closing Date, which cooperation shall include, but not be limited to, making available employees, if any, for the purpose of providing testimony and advice, or original documents, or any of the foregoing.

4.10    Cure Costs.

(a)    Schedule 4.10(a) sets forth each Executory Contract and the Seller's good faith estimate of the amount of the Cure Costs payable in respect of each such Executory Contract (and if no Cure Cost is estimated to be payable in respect of any particular Executory Contract, the amount of such Cure Cost designated for such Contract shall be "$0.00").

(b)    Schedule 4.10(b) hereto is a schedule of the Executory Contracts to be assumed and those to be rejected on the Closing Date. Any Executory Contracts that are not set forth on Schedule 4.10(b) for either assumption or rejection shall be deemed rejected. Seller shall provide sufficient notice under the Bankruptcy Rules and local rules of the Bankruptcy Court to all counterparties to the Contracts and the Real Property Leases of their assumption or rejection and, with respect to the Contracts and Real

28

Property Leases to be assumed, also provide a schedule of Cure Amounts. To the extent that any objections are received from such counterparties in response to such notice, the Seller shall use its commercially reasonable efforts to resolve such disputes with the applicable counterparty, provided that the Seller shall not resolve any such disputes for an amount that would have the effect of increasing the Purchase Price without the prior written consent of the Purchaser, which consent shall not be unreasonably withheld or delayed.

(c)     To the extent that any Executory Contract requires the payment of Cure Costs in order to be assigned to Purchaser and assumed pursuant to section 363 and 365 of the Bankruptcy Code, the Purchaser shall be exclusively responsible for the payment of, and shall pay prior to or at the Closing, all Cure Costs.

(d)     Notwithstanding anything to the contrary herein, Purchaser may from time to time, up to five (5) days prior to the Auction or, if no Auction is needed, up to five (5) days prior to the Sale Hearing, in its sole discretion designate any Contract as an Excluded Contract or as an Assumed Contract, in each case by providing written notice thereof to Seller. Such newly designated Contract shall be removed from or added to Schedule 1.1(b), as applicable, and shall be deemed to be an "Excluded Contract" or an "Assumed Contract", as applicable, and for all purposes hereunder, in each case, without further action by the Parties. For the avoidance of doubt, Purchaser shall pay the Cure Costs in accordance with Section 4.10(c) on any Contract designated an "Assumed Contract" pursuant to this Section 4.10(d).

4.11    Casualty and Insurance.

(a)     The Seller shall maintain until Closing all existing insurance policies relating to the Business or the Assets (the "Seller Policies"), at its sole cost and expense. If, between the date hereof and the Closing, any material Assets shall be damaged or destroyed by fire, theft, vandalism or other casualty event, or become subject to any condemnation or eminent domain proceeding, the Seller shall promptly notify Purchaser in writing of such fact and Purchaser shall have the option to (a) acquire such Assets on an "as is" basis and take an assignment from the Seller of any and all insurance proceeds payable to the Seller in respect of such event, (b) elect to exclude such Asset from this Agreement without adjustment to or deduction from the Purchase Price, or (c) in the event such event would give rise to a Material Adverse Change with respect to Seller, terminate this Agreement and the transactions contemplated hereby.

(b)     To the extent Seller can do so using commercially reasonable efforts and at no cost or expense to Seller (or if there is a cost or expense, at Purchaser's sole election, Purchaser may instruct Seller to add Purchaser, but it must reimburse Seller), Seller shall add Purchaser (or cause Purchaser to be added) as an additional insured or loss payee, as applicable, on each Seller Policy (other than directors' and officers' liability insurance terminable upon the Closing) for the duration of each Seller Policy as is in effect on the Execution Date, effective as of the Closing Date. Purchaser shall be entitled to insurance proceeds paid under such Seller Policies with respect to any

29

WEST\281884727.4

claim relating to an Asset or an Assumed Liability or the Business generally from and after the Closing Date.

4.12    Publicity.

No party hereto shall issue any press release or public disclosure concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other parties hereto, which approval shall not be unreasonably withheld, conditioned or delayed, unless such disclosure is required or contemplated by this Agreement, applicable law, or the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement and the Ancillary Agreements and the transactions contemplated hereby and thereby; provided, however, that the party intending to make such release uses its commercially reasonable efforts consistent with such applicable law or Bankruptcy Court requirement to consult with the other party with respect to the contents thereof to the extent practicable; provided that such right of consultation shall not afford any right to consent to any such document or release.

4.13    Notification of Certain Matters.

(a)    From time to time prior to the Closing, the Seller shall promptly deliver written notice to Purchaser of (i) any event, change, effect, condition, state of facts, or occurrence that comes to the knowledge of Seller that (A) would reasonably be expected to (x) cause a breach of the Seller's covenants under this Agreement, (y) render the satisfaction of the conditions in Section 6 reasonably unlikely to be fulfilled, or (z) prevent, prohibit or delay the Closing, (B) would reasonably be expected to constitute a Material Adverse Change with respect to Seller; or (C) that, if occurring or arising or in existence before or on the date of this Agreement would have caused a representation or warranty of the Seller to be inaccurate or deficient; (ii) any notice or other written communication from any Person alleging that the consent of such Person is or may be required in connection with the consummation of the transactions contemplated by this Agreement; and (iii) the commencement of any legal proceedings relating to the Business or the Assets. The delivery of any notice pursuant to this Section 4.13(a) shall not have any effect on the satisfaction of the condition to closing set forth in Section 6 or Purchaser's right to terminate the Agreement pursuant to Section 7 and shall not be deemed to amend or supplement any of the Disclosure Schedules, limit or otherwise affect any remedies available to Purchaser or prevent or cure any misrepresentations or breach of warranty.

(b)    From time to time prior to the Closing, Purchaser shall promptly deliver written notice to the Seller of (i) any event, change, effect, condition, state of facts, or occurrence that comes to the knowledge of Purchaser that (A) would reasonably be expected to (x) cause a breach Purchaser's covenants under this Agreement, (y) render the satisfaction of the conditions in Section 5 reasonably unlikely to be fulfilled, or (z) prevent, prohibit or delay the Closing or (B) that, if occurring or arising or in existence before or on the date of this Agreement would have caused a representation or warranty of Purchaser to be inaccurate or deficient; and (ii) any notice or other written

30

communication from any Person alleging that the consent of such Person is or may be required in connection with the consummation of the transactions contemplated by this Agreement. The delivery of any notice pursuant to this Section 4.13(b) shall not have any effect on the satisfaction of the condition to closing set forth in Section 5 or Seller's right to terminate the Agreement pursuant to Section 7 and shall not be deemed to limit or otherwise affect any remedies available to the Seller or prevent or cure any misrepresentations or breach of warranty.

4.14    Use of Names.

Within thirty (30) days of the Closing, the Seller shall discontinue use of and, as applicable, remove from any buildings, signs, vehicles or other asset or property of Seller, any trademarks included in the Intellectual Property comprising the Assets and any variations thereof and, in connection therewith, the Seller and each Affiliate shall change their names for purposes of the administration of the Bankruptcy Case and shall seek court approval for such change.

4.15    Confidentiality.

The Seller acknowledges and agrees that from and after the Closing, all non-public information relating to the Business, including the Assets and the Assumed Liabilities, shall be valuable and proprietary to Purchaser and its Affiliates. The Seller agrees that, from and after the Closing, Seller shall not disclose to any Person any information relating to Purchaser and its Affiliates, or the Business, including the Assets and the Assumed Liabilities, except as required by applicable law; provided, that the Seller shall give prompt notice to Purchaser prior to any such disclosure to the extent permitted by such applicable law. The Seller acknowledges and agrees that the remedies at law for any breach or threatened breach of this Section 4.15 by Seller may be inadequate to protect Purchaser and its respective Affiliates and that the damages resulting from any such breach may not be readily susceptible to measurement in monetary terms. Accordingly, without prejudice to any other rights or remedies otherwise available to Purchaser or its respective Affiliates, each party acknowledges and agrees that upon any breach or threatened breach by Seller of the terms and conditions of this Section 4.15, Purchaser and its respective Affiliates, as applicable shall be entitled to seek immediate injunctive relief and to an order restraining any threatened or future breach from any court of competent jurisdiction without proof of actual damages or posting of any bond in connection with any such remedy. The provisions of this Section 4.15 shall survive the Closing.

5.    Conditions Precedent to the Obligation of the Purchaser.

The obligation of the Purchaser to consummate the transactions contemplated by this Agreement is subject to the fulfillment on or prior to the Closing Date of each of the following conditions, any one or more of which (to the extent permitted by law) may be waived by the Purchaser:

31

WEST\281884727.4

5.1    Representations and Warranties; Covenants.

The representations and warranties of Seller set forth herein shall be true and correct on and as of Closing in all material respects, with the same force and effect as though made on as of said date, except as affected by the transactions contemplated hereby (except those representations and warranties that address matters only as of a specified date, which shall be true and correct in all respects as of that specified date). The Seller shall have performed in all material respects its obligations, covenants and agreements contained in this Agreement to be performed and complied with by the Seller at or before the Closing, including, without limitation, compliance in all material respects with all timing requirements contained in Section 4.7 hereof. The Purchaser shall have received a certificate of Seller to such effect signed by a duly authorized officer thereof.

5.2    No Material Adverse Change.

There shall have been no Material Adverse Change in (i) the Assets, or (ii) current vendors' or customers' willingness to continue doing business with the Seller as evidenced by written communication to Seller indicated they intend to terminate such existing business relationships with Seller; provided that in the case of vendors, such change shall not be deemed to have occurred unless (xx) current vendors representing thirty percent (30%) of Seller's purchases of parts, supplies or other materials over the twelve (12) month period immediately preceding the Closing have delivered such written communication to Seller, (yy) either Open Eye or Greenbase have delivered such written communication to Seller, or (zz) current customers representing thirty percent (30%) of Seller's revenue over the twelve (12) month period immediately preceding the Closing have delivered such written communication to Seller; in each of the foregoing cases to the extent occurring between the Execution Date until the Closing; *provided, however,* that in determining whether there has been a Material Adverse Change or whether a Material Adverse Change could or would occur, any change, event or occurrence principally attributable to, arising out of, or resulting from any of the following shall also be disregarded: (A) general economic, business, industry or general credit, financial or capital market conditions (whether in the United States or internationally), including conditions affecting generally the industry of which the Business forms a part; (B) the taking of any action required or permitted by this Agreement; (C) the taking of any action with the written approval of Purchaser, (D) acts of war (whether declared or not declared), sabotage, terrorism, military actions or the escalation thereof; (E) any prospective changes in applicable laws, regulations or accounting rules, including GAAP or interpretations thereof, or any changes or prospective changes in the interpretation or enforcement of any of the foregoing, or any changes in general legal, regulatory or political conditions; (F) any existing event, occurrence or circumstance with respect to which Purchaser has knowledge as of the date hereof (including any matter set forth in any written disclosures delivered to Purchaser); and/or (G) to the extent any adverse change arises out of any default or breach by Seller, the same is cured before the expiration of any applicable grace, notice and/or cure period applicable thereto hereunder.

32

5.3    <u>No Order.</u>

No Governmental Body shall have enacted, issued, promulgated, enforced or entered any statute, rule, regulation, injunction or other order (whether temporary, preliminary or permanent) which is in effect and has the effect of making the transactions contemplated by this Agreement illegal or otherwise restraining or prohibiting consummation of such transactions and which are not satisfied or resolved or preempted by the Sale Approval Order.

5.4    <u>Bankruptcy Filing; Bid Procedures and Sale Order.</u>

The Bankruptcy Case shall not have been dismissed or converted to Chapter 7 of the Bankruptcy Code and no trustee shall have been appointed and the Bankruptcy Court shall have entered the Bid Procedures Order, in substantially in the form and substance attached as **Exhibit A** hereto, and Sale Approval Order (in the form and content attached as **Exhibit B** to this Agreement or with such changes as are reasonably satisfactory to Purchaser) and neither the Bid Procedures Order nor the Sale Approval Order (as so entered) shall have been vacated, reversed or stayed.

5.5    <u>Transition Services Agreement.</u>

Seller and Purchaser shall have mutually executed and delivered, concurrently with the Closing, a transition services agreement (in the form and substance reasonably satisfactory to the Parties) providing for (i) an arrangement (the costs of which arrangement shall be borne entirely by Purchaser) to facilitate the transition of the employees of Seller's German affiliate to Purchaser or an Affiliate of Purchaser, (ii) an arrangement pursuant to which Purchaser will, subject to paying all of Seller's rent, insurance, utilities, and other carrying costs attributable to such premises and other customary terms and provisions of such arrangements, be entitled to utilize Seller's Glendale, California facility for a limited period of time following the Closing (not to exceed ninety (90) days), and (iii) any other arrangements or terms and provisions as Purchaser and Seller may, in their respective sole and absolute discretion, mutually agree upon (the "<u>Transition Services Agreement</u>").

5.6    <u>Schedules and Certain Exhibits.</u>

Purchaser and Seller shall have mutually agreed on the form and content of all Schedules (including, without limitation, the Disclosure Schedules) to this Agreement and **Exhibits C** through **F** hereto by not later than two (2) Business days following Seller's delivery of drafts thereof (which shall have been prepared and provided in good faith by Seller) to Purchaser.

5.7    <u>Closing Documents.</u>

The Seller shall have delivered the documents required to be delivered to Purchaser pursuant to <u>Section 1.8</u>, in each case, on the Closing Date.

33

Any waiver of a condition set forth in this Section 5 shall be effective only if such waiver is stated in writing and signed by the Purchaser; provided, however, that the consent of a Purchaser to the Closing shall constitute a waiver by Purchaser of any conditions to Closing not satisfied as of the Closing Date.

6.    Conditions Precedent to the Obligation of the Seller to Close.

The obligation of the Seller to consummate the transactions contemplated by this Agreement is subject to the fulfillment on or prior to the Closing Date of each of the following conditions, any one or more of which (to the extent permitted by law) may be waived by the Seller:

6.1    Representations and Warranties; Covenants.

The representations and warranties of the Purchaser set forth herein shall be true and correct in all material respects on and as of the Closing, with the same force and effect as though made on and as of the said date, except as affected by the transactions contemplated hereby (except those representations and warranties that address matters only as of a specified date, which shall be true and correct in all respects as of that specified date). The Purchaser shall have performed, in all material respects, its obligations, covenants and agreements contained in this Agreement to be performed and complied with by the Purchaser at or before the Closing. The Seller shall have received a certificate of the Purchaser to such effect signed by a duly authorized officer thereof.

6.2    No Order.

No Governmental Body shall have enacted, issued, promulgated, enforced or entered any statute, rule, regulation, injunction or other order (whether temporary, preliminary or permanent) which is in effect and has the effect of making the transactions contemplated by this Agreement illegal or otherwise restraining or prohibiting consummation of such transactions and which are not satisfied or resolved or preempted by the Sale Approval Order.

6.3    Approval Orders.

The Bankruptcy Court shall have entered the Bid Procedures Order (in the form and substance attached as **Exhibit A** hereto or with such changes as are reasonably acceptable to Purchaser) and Sale Approval Order (in the form and content attached as **Exhibit B** to this Agreement or with such changes as are reasonably acceptable to Purchaser) and neither the Bid Procedures Order nor the Sale Approval Order (as so entered) shall have been vacated, reversed or stayed.

6.4    Transition Services Agreement.

Seller and Purchaser shall have mutually executed and delivered, concurrently with the Closing, the Transition Services Agreement.

34

6.5    Schedules and Certain Exhibits.

Purchaser and Seller shall have mutually agreed on the form and content of all Schedules (including, without limitation, the Disclosure Schedules) to this Agreement and **Exhibits C** through **F** by not later than two (2) Business Days following Seller's delivery of drafts thereof (which shall have been prepared and provided in good faith by Seller) to Purchaser.

6.6    Closing Documents.

The Purchaser shall have delivered the documents and payments required to be delivered by it to Seller on the Closing Date.

Any waiver of a condition set forth in this Section 6 shall be effective only if such waiver is stated in writing and signed by Seller; provided, however, that the consent of Seller to the Closing shall constitute Seller's waiver of any conditions to Closing not satisfied as of the Closing Date.

7.    Termination of Agreement.

7.1    Termination Prior to Closing.

Notwithstanding anything herein to the contrary, this Agreement may be terminated, and the transactions contemplated by this Agreement abandoned, at any time before the Closing, upon notice by the terminating Party to the other Party:

(a)    by the mutual written consent of the Seller and the Purchaser, in which case, this Agreement shall be null and void and of no legal effect whatsoever;

(b)    by Purchaser, if (i) Seller shall have failed to comply with any of the deadlines set forth in Section 4.7(a) or (ii) the Closing shall not have occurred by July 13, 2018; provided, however, that the right to terminate this Agreement under this Section 7.1(b) shall not be available to Purchaser to the extent Purchaser shall have been the cause of, or Purchaser's acts or omissions shall have resulted in, the failure of the Closing to occur prior to such date;

(c)    by Purchaser, if (x) any condition set forth in Section 5.1 relating to the representations and warranties of Seller contained in this Agreement shall fail to be true and correct to the extent required by Section 5.1, or (y) any condition set forth in Section 5 (other than Section 5.1 and Section 5.2) shall fail to be satisfied provided, however, that the right to terminate this Agreement under this Section 7.1(c)(y) shall not be available to Purchaser to the extent Purchaser shall have been the cause of, or Purchaser's acts or omissions shall have resulted in, the failure of such condition to be satisfied or (z) there shall be a material breach by Seller of its covenants or agreements in this Agreement that in either case (i) would result in the failure of a condition set forth in Section 5 and (ii) which is not curable or, if curable, is not cured within five (5) calendar days after written notice thereof is delivered by the Purchaser to the Seller; provided, that

35

the Purchaser may not terminate this Agreement pursuant to this Section 7.1(c) if Purchaser is in material breach of this Agreement;

(d)     by Seller, if (w) any condition set forth in Section 6.1 relating to the representations and warranties of Purchaser contained in this Agreement shall fail to be true and correct to the extent required by Section 6.1, or (x) any condition set forth in Section 6 (other than Section 6.1) shall fail to be satisfied provided, however, that the right to terminate this Agreement under this Section 7.1(d)(x) shall not be available to Seller to the extent Seller shall have been the cause of, or Seller's acts or omissions shall have resulted in, the failure of such condition to be satisfied or (y) there shall be a material breach by the Purchaser of its covenants or agreements in this Agreement that in either case (i) would result in the failure of a condition set forth in Section 6.1 and (ii) which is not curable or, if curable, is not cured within five (5) calendar days after written notice thereof is delivered by the Seller to the Purchaser; or (z) the Closing shall not have occurred by July 13, 2018; provided, that the Seller may not terminate this Agreement pursuant to this Section 7.1(d) if Seller is in material breach of this Agreement;

(e)     by Purchaser or Seller, upon the occurrence of an Alternative Transaction; provided that Purchaser shall not have the right to terminate this Agreement pursuant to this Section 7.1(e) if Purchaser is in material breach of this Agreement;

(f)     by Purchaser, if an order of the Bankruptcy Court is entered dismissing the Bankruptcy Case, converting the Bankruptcy Case to a Chapter 7 of the Bankruptcy Code or appointing a Chapter 11 or Chapter 7 trustee in the Bankruptcy Case, provided, that the Purchaser may not terminate this Agreement pursuant to this Section 7.1(f) if Purchaser is in material breach of this Agreement;

(g)     [Intentionally Omitted]

(h)     by Purchaser, if the condition set forth in Section 5.2 is not satisfied.

7.2    Effect of Termination.

(a)     In the event this Agreement is terminated by Seller and Purchaser in accordance with Section 7.1(a), or in the event that this Agreement is terminated by Seller in accordance with Section 7.1(d)(x) provided that Purchaser shall not have been the cause of, or Purchaser's acts or omissions shall not have resulted in, the failure of a condition to be satisfied giving rise to Seller's right to terminate under such Section 7.1(d)(x), the Parties shall jointly instruct the Escrow Holder to disburse the Deposit to Purchaser within three (3) Business Days after the date of such termination. Each of the Parties shall otherwise suffer their own losses, costs, expenses or damages arising out of, under or related to this Agreement.

(b)     In the event this Agreement is terminated by Seller in accordance with Section 7.1(d)(y) or (z), or in the event that this Agreement is terminated by Seller in accordance with Section 7.1(d)(x) provided that Purchaser shall have been the cause of, or Purchaser's acts or omissions shall have resulted in, the failure of a condition to be

36

satisfied giving rise to Seller's right to terminate under such Section 7.1(d)(x), Seller and Purchaser shall jointly instruct the Escrow Holder to disburse the Deposit to Seller within three (3) Business Days after the date of such termination.  Each of the Parties shall otherwise suffer their own losses, costs, expenses or damages arising out of, under or related to this Agreement.  In the event this Agreement is terminated by Seller in accordance with Section 7.1(d)(y) or (z), or in the event that this Agreement is terminated by Seller in accordance with Section 7.1(d)(x) provided that Purchaser shall have been the cause of, or Purchaser's acts or omissions shall have resulted in, the failure of a condition to be satisfied giving rise to Seller's right to terminate under such Section 7.1(d)(x), under no circumstances shall the liabilities of Purchaser to Seller exceed the amount of the Deposit.

(c)    In the event this Agreement is terminated by Purchaser in accordance with Section 7.1(b), (c), (e), (f), (g) or (h), the Purchaser and Seller shall jointly instruct the Escrow Holder to disburse the Deposit to Purchaser within three (3) Business Days after the date of such termination.

(d)    [Intentionally Omitted]

(e)    If Purchaser is not in default hereunder and Seller fails to make the required deliveries at the Closing or materially defaults under this Agreement with no fault of Purchaser, then Purchaser shall have the right to pursue the remedy of specific performance of this Agreement in the Bankruptcy Court, in which case, if successful, Purchaser shall be entitled to offset from the Purchase Price paid at Closing all of its reasonable costs and expenses incurred in connection therewith (including, without limitation, reasonable attorneys' fees).

(f)    [Intentionally Omitted]

8.    Miscellaneous.

8.1    Certain Definitions.

(a)    As used in this Agreement, the following terms have the following meanings:

"Accounts Receivable" means accounts receivable and all trade receivables of the Seller to the extent relating to the Business, together with any unpaid interest accrued thereon from the respective obligors and any security or collateral therefor, including recoverable deposits.

"Affiliate" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common common control with such specified Person.

"Alternative Transaction" means, prior to the Closing, (i) Purchaser is the Back-Up Bidder (as defined in the Bid Procedures Order) and a third party is declared the Successful Bidder (as defined in the Bid Procedures Order) and a transaction with such

37

Successful Bidder for substantially all the Assets closes, (ii) a third party other than Purchaser is declared the Successful Bidder and/or Back-Up Bidder, and either of such transaction to the extent involving substantially all the Assets closes or (iii) confirmation of a plan of reorganization in the Bankruptcy Case.  For the avoidance of doubt, a piecemeal liquidation of Seller's Assets in a Chapter 7 proceeding or Chapter 11 proceeding outside of a plan of reorganization shall not be deemed an Alternative Transaction for purposes of this Agreement.

"Ancillary Agreements" means the Assignment and Assumption Agreement, the Bill of Sale, the Assignment of Intellectual Property, the Assumption of Assumed Liabilities, the Bid Procedures Order and all other agreements, documents and instruments delivered pursuant to Sections 1.7 and 1.8.

"Asset Taxes" has the meaning ascribed to such term in Section 4.9(b) hereof.

"Assignment and Assumption Agreement" means the Assignment and Assumption Agreement substantially in the form of **Exhibit C** hereto to be executed by the Purchaser and the Seller on the Closing Date.

"Assignment of Intellectual Property" means an instrument substantially in the form of **Exhibit D** hereto to be executed by the Purchaser and the Seller on the Closing Date.

"Assumption of Assumed Liabilities" means the Assumption of Assumed Liabilities substantially in the form of **Exhibit E** hereto to be executed and delivered by Purchaser on the Closing Date.

"Benefit Plan" means (i) all "employee benefit plans", as defined in section 3(3) of ERISA (whether or not such plan is subject thereto), (ii) all employment, consulting or other individual compensation Contracts, and (iii) all bonus or other incentive, equity or equity-based compensation, deferred or other compensation, profit sharing, pension, change-in-control, severance pay, separation, retention, sick leave, vacation pay, day or dependent care, salary continuation, disability, hospitalization, medical, life insurance, retiree healthcare, retiree life insurance, other retirement, scholarship, legal services, cafeteria, life, health, accident, disability, workers' compensation, paid time off, fringe benefit or other insurance or employee benefit programs, plans, policies or arrangements, whether written or oral, single employer, multiemployer or multiple employer, or whether for the benefit of a single individual or more than one individual, as to which any Seller or any of its ERISA Affiliates contributes, has an obligation to contribute, or has any Liability, contingent or otherwise, with respect to, or otherwise provides to, any current or former Business Employee or Service Provider.

"Bid Procedures Order" is defined in Section 4.7(a) hereof.

"Bill of Sale" means a Bill of Sale substantially in the form of **Exhibit F** hereto to be executed by the Seller on the Closing Date.

38

"Books and Records" means all files, documents, instruments, papers, books and records, including Tax books and records (whether stored or maintained in hard copy, digital or electronic format or otherwise) solely to the extent relating to the Business or the other Assets, including Contracts, customer lists, customer information and account records, computer files, data processing records, payroll, employment and personnel records, advertising and marketing data and records, credit records, records relating to suppliers and other data, but "Books and Records" shall not include any of the foregoing to the extent (i) the same are the subject of any attorney-client, work product or similar privilege with respect to work perform in anticipation of or in connection with the preparation or administration of Case, or (ii) the transfer of the same would violate any Person's privacy rights.

"Business Day" means any day that is not a Saturday, Sunday or other day on which banks located in New York, New York are authorized or obligated to close.

"Business Employees" means the Seller's current employees employed in connection with, or rendering services to, the Business, wherever located.

"Claim" means a suit, claim, action, proceeding, inquiry, investigation, litigation, demand, charge, complaint, grievance, arbitration, indictment, or grand jury subpoena.

"COBRA" means the Consolidated Omnibus Budget Reconciliation Act of 1985 as described in Section 4980B of the Code, sections 601 et seq. of ERISA, each as amended, and the regulations promulgated thereunder.

"Code" means the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder.

"Contract" means any written or oral agreement, arrangement, understanding, lease, license, sublicense, or instrument or other contractual or similar arrangement or commitment.

"Cure Costs" means the cure, compensation and restatement, costs and expenses of or relating to the assumption and assignment of the Assumed Contracts included in the Assets assumed and assigned to the Purchaser hereunder pursuant to Section 365 of the Bankruptcy Code.

"Encumbrances" means all Liens, claims, conditional sales agreements, rights of first refusal, rights of first offer or rights of first negotiation or options.

"Environmental Law" means any law, statute, regulation, rule, code, judgment, decree, ordinance, directive, policy or other requirement of a Governmental Body in effect at the relevant date or for the relevant period relating to the protection of health or the environment (including ambient air, indoor air, surface water, groundwater, land surfaces, sediment or subsurface strata) or natural resources, Releases of or exposure to Hazardous Material or the handling, generation, treatment, transportation, storage, use, arrangement for disposal or disposal, manufacture, distribution, formulation, packaging or labeling of Hazardous Materials, including the Comprehensive Environmental

39

WEST\281884727.4

Response, Compensation and Liability Act (42 U.S.C. §§ 9601, et seq.), the Hazardous Materials Transportation Act (49 U.S.C. App. §§ 1801, et seq.), the Resource Conservation and Recovery Act (42 U.S.C. §§ 6901, et seq.), the Clean Water Act (33 U.S.C. §§ 1251, et seq.), the Clean Air Act (42 U.S.C. §§ 7401, et seq.) the Toxic Substances Control Act (15 U.S.C. §§ 2601, et seq.), the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. §§ 136, et seq.)  and the regulations promulgated pursuant thereto and analogous State and local Laws.

"Environmental Liabilities and Obligations" means all Liabilities arising from any impairment or damage to the environment (including ambient air, indoor air, surface water, groundwater, land surfaces, sediment or subsurface strata) or natural resources, failure to comply with Environmental Laws, or the Release of or exposure to Hazardous Materials: (a) in connection with the prior or ongoing ownership or operation of the Business; or (b) on, in, under, to or from the real property currently or formerly owned, operated, occupied or leased in connection with the ongoing or prior ownership or operation of the Business, including Liabilities related to: (i) the handling, generation, treatment, transportation, storage, use, arrangement for disposal or disposal, manufacture, distribution, formulation, packaging or labeling of Hazardous Materials; (ii) the Release of or exposure to Hazardous Materials; (iii) any other pollution or contamination of the surface, substrata, soil, air, ground water, surface water or marine environments; and (iv) any other obligations imposed under Environmental Laws with respect to the Business or the real property currently or formerly owned, operated, occupied or leased in connection with the ongoing or prior ownership or operation of the Business; and (v) all other damages and losses arising under applicable Law as a result of any of the matters identified in clauses (i) - (iv) of this definition.

"Equipment" means all machinery, rolling stock, equipment, computer equipment, software, software systems, databases and database systems used at any premises which are the subject of the Assumed Lease assumed and assigned at the Closing.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"ERISA Affiliate" means any Affiliate of any Seller and any other entity that, together with the Seller, may be treated as a single employer under section 4001 of ERISA or section 414 of the Code.

"Executory Contracts" means any executory Contract related to the Business to which Seller is a party and that is set forth on Schedule 4.10(a), as such Schedule may be updated by Purchaser from time to time following the Execution Date (including pursuant to Section 4.10).

"Fixed Assets" means all furniture, furnishings, fixtures, trade fixtures, racks, pallets, displays and office equipment used exclusively in connection with the Business located in any premises that are held or operated pursuant to the Assumed Lease assumed and assigned at the Closing.

40

"GAAP" means United States generally accepted accounting principles, as applied by Seller on a consistent basis during the periods involved in accordance with Seller's historical practices.

"Governmental Body" means a domestic or foreign national, federal, state, provincial, or local governmental, regulatory or administrative authority, department, agency, commission, court, tribunal, arbitral body or self-regulated entity.

"Hazardous Material" means any substance, material or waste which is regulated by any Governmental Body, including petroleum and its by-products, asbestos, and any material or substance which is defined as a "hazardous waste," "hazardous substance," "hazardous material," "restricted hazardous waste," "industrial waste," "solid waste," "contaminant," "pollutant," "toxic waste" or "toxic substance" or otherwise regulated under any provision of Environmental Law or for which Liability can be imposed under any Environmental Law.

"Intellectual Property" means, to the extent relating to or used exclusively in connection with the Business, whether owned or licensed, whether related to use in the United States or another country, (i) any and all patents (including design patents) and patent applications (including docketed patent disclosures awaiting filing, reissues, divisions, continuations, continuations-in-part and extensions), patent disclosures awaiting filing determination, inventions and improvements thereto, (ii) trademarks, service marks, certification marks, trade names, brand names, trade dress, logos, business and product names, slogans, and registrations and applications for registration thereof, (iii) copyrights (including software) and registrations thereof, (iv) inventions, processes, designs, formulae, trade secrets, know-how, industrial models, confidential and technical information, manufacturing, engineering and technical drawings, product specifications, domain names, discoveries and confidential business information, (v) intellectual property rights similar to any of the foregoing, (vi) computer software, web site and domain names, and (vii) copies and tangible embodiments thereof (in whatever form or medium, including electronic media).

"Inventory" means all goods, products, and supplies sold or used in the sale of any goods or products and all other inventory owned and held by Seller, in each case to the extent used in connection with the Business, wherever located, and whether on hand, on order, or in transit to the Business.

"IRS" means the United States' Internal Revenue Service.

"Liabilities" means any direct or indirect, primary or secondary, liability, indebtedness, obligation, penalty, cost or expense (including costs of investigation, collection and defense) of or by any Person of any type, whether accrued, absolute or contingent, liquidated or unliquidated, choate or inchoate matured or unmatured, or otherwise. Without limiting the foregoing in any manner, the term "Liabilities" includes and refers to all liabilities and obligations for or with respect to Taxes, including liabilities for Taxes of any Person under Treasury Regulation Section 1.1502-6 (or any

41

similar provision of state, local, or foreign law), as a transferee or successor, by contract, or otherwise.

"Lien" means any security interest, mortgage, pledge, lien, encumbrance, right, hypothecation, option, charge or claim of any nature whatsoever.

"Material Adverse Change" means, with respect to Seller, any of the following:

        (a)    a material adverse effect on the business, operations, results of operations, prospects, assets, liabilities or financial condition of Seller and the Business, taken as a whole;

        (b)    a material adverse effect on the ability of Seller to perform its obligations under this Agreement;

        (c)    any claim against Seller, not previously disclosed to Purchaser, with a reasonable likelihood of an adverse decision that would result in the occurrence of an event described in clauses (a) or (b) above.

"Paying Party" shall have the meaning ascribed to such term in Section 4.9(c) hereof.

"Person" means any individual, corporation, partnership, limited liability company, limited liability partnership, joint venture, joint-stock company, trust, Governmental Body or other entity.

"Prepaid Expenses" means all credits, prepaid expenses (including unamortized advertising expenses), deferred charges, advance payments, security deposits, and prepaid items (including in respect of Taxes) of the Seller to the extent arising exclusively in connection with the Business, in each case which are paid or prepaid by Seller on or prior to the Closing Date and that correspond to, or are to be amortized during, a period after the Closing Date.

"Real Property Lease" means each lease, sublease or license of real property used or held for use by Seller in the conduct of the Business under which Seller is a tenant, as such lease, sublease or license may be amended, modified, extended or supplemented from time to time.

"Reimbursing Party" shall have the meaning ascribed to such term in Section 4.9(c) hereof.

"Release" means any release, spill, emission, leaking, pumping, injection, deposit, disposal, discharge, dispersal, migration or leaching into or through the indoor or outdoor environment, or into or out of any property.

"Remedial Action" means all actions to (i) clean up, remove, treat or in any other way address any Hazardous Material; (ii) prevent the Release of any Hazardous Material so it does not endanger or threaten to endanger public health or welfare or the indoor or

42

outdoor environment; (iii) perform pre-remedial studies and investigations or post-remedial monitoring and care; or (iv) to correct a condition of noncompliance with Environmental Laws.

"Representative" means, with respect to a particular Person, any director, officer, manager, partner, member, employee, agent, consultant, advisor or other representative of such Person, including legal counsel, accountants, and financial advisors.

"Sale Approval Order" is defined in Section 4.7(a) hereof.

"Security Deposits" means all security deposits (including cash) held by the landlord under the Assumed Lease or counterparties to any other Assumed Contract.

"Straddle Period" shall have the meaning ascribed to such term in Section 4.9(b) hereof.

"Tax" or "Taxes" means all taxes, charges, fees, imposts, levies or other assessments, including all net income, franchise, profits, gross receipts, capital, sales, use, ad valorem, value added, transfer, transfer gains, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, real or personal property, and estimated taxes, customs duties, fees, assessments and charges of any kind whatsoever, together with any interest and any penalties, fines, additions to tax or additional amounts thereon, imposed by any taxing authority (federal, state, local or foreign) and shall include any successor or transferee liability in respect of Taxes.

"Transfer Taxes" means all documentary, stamp, transfer, motor vehicle registration, sales, use, excise and other similar non-income Taxes and all filing and recording fees (and any penalties and interest associated with such Taxes and fees) arising from or relating to the consummation of the transactions contemplated by this Agreement.

"Tax Returns" means all returns, declarations, reports, forms, estimates, information returns and statements required to be filed in respect of any Taxes or to be supplied to a taxing authority in connection with any Taxes.

"WARN Act" means the Worker Adjustment and Retraining Notification Act (29 U.S.C. § 2101 et seq.) and any similar law.

8.2    Consent to Jurisdiction; Service of Process; Waiver of Jury Trial.

(a)    The Purchaser and the Seller irrevocably and unconditionally consent to submit to the jurisdiction of the Bankruptcy Court for any litigation arising out of or relating to this Agreement and the transactions contemplated hereby (and agree not to commence any litigation relating hereto except in the Bankruptcy Court).

(b)    Any and all service of process and any other notice in any such Claim shall be effective against any Party if given personally or by registered or certified

43

mail, return receipt requested, or by any other means of mail that requires a signed receipt, postage prepaid, mailed to such Party as herein provided. Nothing herein contained shall be deemed to affect the right of any Party to serve process in any manner permitted by law or to commence legal proceedings or otherwise proceed against any other Party in any other jurisdiction.

8.3    Notices.

Any notice or other communication required or permitted hereunder shall be in writing and shall be deemed to have been duly given (a) on the day of delivery if delivered in person or by electronic mail, (b) on the first (1st) Business Day following the date of dispatch if delivered by a nationally recognized express courier service, or (c) on the fifth (5th) Business Day following the date of mailing if delivered by registered or certified mail, return receipt requested, postage prepaid.  All notices hereunder shall be delivered as set forth below, or pursuant to such other instructions as may be designated by notice given in accordance with this Section 8.3 by the Party to receive such notice:

(a)    if to the Purchaser, to:

Costar Video Systems, LLC
Attention:  Scott Switzer, CFO
101 Wrangler Drive
Coppell, TX 75019
Email Address: scotts@costarvideo.com

with a copies to:

DLA Piper LLP (US)
4365 Executive Drive, Suite 1100
San Diego, CA 92121-2133
Attention:  Matthew W. Leivo
Email Address: matt.leivo@dlapiper.com

and

DLA Piper LLP (US)
2000 Avenue of the Stars, Suite 400 North
Los Angeles, CA 90067-4704
Attention: Eric D. Goldberg
Email Address: eric.goldberg@dlapiper.com

(b)    if to the Seller, to:

Arecont Vision, LLC
425 E. Colorado Street, 7th Floor
Glendale, CA 91205
Attention:  Scott Avila
Email Address: savila@armorystrategic.com

44

with a copy to:

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA  90067
Attention: Ira D. Kharasch, Esq.
Email Address: ikharasch@pszjlaw.com

8.4     Entire Agreement.

This Agreement (including any exhibits or schedules hereto), the Ancillary Agreements and any other collateral agreements executed in connection with the consummation of the transactions contemplated hereby, contain the entire agreement among the Parties with respect to the subject matter hereof and supersede all prior agreements, written or oral, with respect thereto.  Any exception or disclosure made by Seller in the Disclosure Schedules to this Agreement with regard to a representation of the Seller shall be deemed made with respect to any other representation by such Party to which such exception or disclosure is reasonably apparent.

8.5     Waivers and Amendments.

This Agreement may be amended, superseded, canceled, renewed or extended, and the terms hereof may be waived, only by a written instrument signed by the Purchaser and the Seller or, in the case of a waiver, by the Party waiving compliance.  No delay on the part of any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any waiver on the part of any Party of any such right, power or privilege, nor any single or partial exercise of any such right, power or privilege, preclude any further exercise thereof or the exercise of any other such right, power or privilege.

8.6     Governing Law.

This Agreement and all Claims with respect thereto shall be governed by and construed in accordance with federal bankruptcy law, to the extent applicable, and, where state law is implicated, the laws of the State of Delaware without regard to any conflict of laws rules thereof that might indicate the application of the laws of any other jurisdiction.

8.7     Binding Effect; Assignment.

This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns.  This Agreement is not assignable by any Party without the prior written consent of the other Party; provided that the Purchaser may assign this Agreement to a Designated Purchaser or one or more of its Affiliates, provided, further that the Purchaser shall not be relieved of any of its obligations under this Agreement as a result of such assignment.

45

WEST\281884727.4

8.8    Usage.

All pronouns and any variations thereof refer to the masculine, feminine or neuter, singular or plural, as the context may require. All terms defined in this Agreement in their singular or plural forms have correlative meanings when used herein in their plural or singular forms, respectively. Unless otherwise expressly provided, the words "include," "includes" and "including" do not limit the preceding words or terms and shall be deemed to be followed by the words "without limitation."

8.9    Articles and Sections.

All references herein to Articles and Sections shall be deemed references to such parts of this Agreement, unless the context shall otherwise require. The Article and Section headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

8.10    Interpretation.

The Parties acknowledge and agree that (a) each Party and its counsel reviewed and negotiated the terms and provisions of this Agreement and have contributed to its revision, (b) the rule of construction to the effect that any ambiguities are resolved against the drafting Party shall not be employed in the interpretation of this Agreement, and (c) the terms and provisions of this Agreement shall be construed fairly as to each Party, regardless of which Party was generally responsible for the preparation of this Agreement.

8.11    Severability of Provisions.

If any provision or any portion of any provision of this Agreement shall be held invalid or unenforceable, the remaining portion of such provision and the remaining provisions of this Agreement shall not be affected thereby. If the application of any provision or any portion of any provision of this Agreement to any Person or circumstance shall be held invalid or unenforceable, the application of such provision or portion of such provision to Persons or circumstances other than those as to which it is held invalid or unenforceable shall not be affected thereby.

8.12    Counterparts.

This Agreement may be executed by the Parties in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts together shall constitute one and the same instrument. Each counterpart may consist of a number of copies hereof each signed by less than all, but together signed by all, of the Parties.

8.13    No Third Party Beneficiaries.

No provision of this Agreement is intended to, or shall, confer any third party beneficiary or other rights or remedies upon any Person other than the Parties. Without

46

limiting the generality of the foregoing, no provision of this Agreement shall create any third party beneficiary rights in any employee or former employee of the Seller in respect of continued employment by the Seller.

8.14    Attorneys' Fees.

In the event that Seller or Purchaser bring an action or other proceeding to enforce or interpret the terms and provisions of this Agreement, the prevailing Party(ies) in that action or proceeding shall be entitled to have and recover from the non-prevailing Party(ies) all such fees, costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees) as the prevailing Party(ies) may suffer or incur in the pursuit or defense of such action or proceeding.

8.15    [reserved].

8.16    Survival.

The respective representations and warranties of Seller and Purchaser herein, or in any certificates or other documents delivered prior to or at the Closing, shall automatically lapse and cease to be of any further force or effect whatsoever upon the Closing.

8.17    Non-Recourse

No past, present or future director, officer, employee, incorporator, member, partner or equity holder of the Parties to this Agreement will have any liability for any obligations or liabilities of Seller or Purchaser, as applicable, under this Agreement, or any agreement entered into in connection herewith of or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby and thereby. Any claim or cause of action based upon, arising out of, or related to this Agreement or any agreement, document or instrument contemplated hereby may only be brought against Persons that are expressly named as Parties hereto or thereto, and then only with respect to the specific obligations set forth herein or therein. Other than the Parties, no Person shall have any liability or obligation for any of the representations, warranties, covenants, agreements, obligations or liabilities of any Party under this Agreement or the agreements, documents or instruments contemplated hereby or of or for any action or proceeding based on, in respect of, or by reason of, the transactions contemplated hereby or thereby (including breach, termination or failure to consummate such transactions), in each case whether based on contract, tort, fraud, strict liability, other Laws or otherwise and whether by piercing the corporate veil, by a claim by or on behalf of a Party hereto or another Person or otherwise.  In no event shall any Party be liable to another Party for any remote, speculative or punitive damages with respect to the transactions contemplated hereby.

8.18    [Intentionally Omitted].

*[Remainder of Page Intentionally Left Blank]*

47

IN WITNESS WHEREOF, Seller has executed this Agreement as of the date first above written.

SELLER:

Arecont Vision, LLC, a Delaware limited liability company

By:_____
    Name: T. Scott Avila
    Title: Chief Restructuring Officer

WEST\281884727.4

IN WITNESS WHEREOF, Purchaser has executed this Agreement as of the date first above written.

PURCHASERS:

Costar Technologies, Inc.,
a Delaware corporation

By: _____
Name: Scott Switzer
Title: Authorized Signatory


Costar Video Systems, LLC,
a Delaware limited liability company

By: _____
Name: Scott Switzer
Title: Authorized Signatory

Signature Page for Arecont – Costar APA

**SCHEDULES**

[TO BE COMPLETED AND ATTACHED AS AND WHEN PROVIDED IN THE
ASSET PURCHASE AGREEMENT]

Schedule 1.6
[To Be Appended Before Filing]

Schedule 1.6

WEST\28188847274

Schedule 1.6

**Closing Net Working Capital Calculation Detail & Example**

*Illustrative Calculation Based on Estimated Amounts; Not Intended for Bid Valuation Purposes*

| | | Source Data | Calculation/Comment |
|---|---|---|---|
| Accounts Receivable | $ 5,992,000 | A/R aging export from QuickBooks | Total gross accounts receivable, i.e., no accounting reserves |
| Less | | | |
| Over 90 Days Past Due | (210,376) | A/R aging export from QuickBooks | Net balances by customer only, no top-level journal entries, etc |
| Stock Rotation Accrual | (750,000) | TTM sales and stock rotation claims by customer, latest "Account Model 2017-2020" in data room | Calculate TTM actual rotation claims % by customer, apply rotation claims % by customer to pro-rated % of FTM sales per business plan; sum resulting projected claims by customer |
| Stock Rotation Claims Filed | (454,000) | Daily report of stock rotation claims | N/A |
| Ship & Debit Claims Filed | (396,000) | Daily report of ship & debit claims | N/A |
| Adjusted Accounts Receivable | $ 4,181,624 | | |
| Inventory | $ 8,678,000 | Fishbowl detail exports "Type A", "Type B", "In Transit" | Apply 60% to Type B values to reflect G/L carrying value |
| Less | | | |
| Discontinued/EOL | (965,693) | Fishbowl detail exports "Type A", as annotated by E Faust for discontinued/EOL as of 5/8/18 | Sum all values for parts/goods on E Faust list; list to remain unchanged from 5/8/18 |
| B Stock | (542,932) | Inventory "Type B" detail export from Fishbowl | Apply 60% to reflect G/L carrying value |
| Excess | (1,235,280) | Inventory Months-On-Hand analysis | Sum values in excess of 13 months on hand by part/good, based on monthly average usage over last six months; include parts/goods listed as "active" but not used over last six months, except new products |
| Adjusted Inventory | $ 5,930,095 | | |
| Accounts Payable | | | |
| Pre-Petition | (1,400,000) | A/P aging export from QuickBooks | N/A |
| Pre-Petition Accrued | (550,000) | Accrued Expenses-Inventory from QuickBooks, including any reconciling entries | N/A |
| Post-Petition | - | A/P aging export from QuickBooks | Zero balance presumes COD/CIA terms with all vendors |
| Post-Petition Accrued | - | Accrued Expenses-Inventory from QuickBooks, including any reconciling entries | Zero balance presumes COD/CIA terms with all vendors |
| Accounts Payable/Accrued | $(1,950,000) | | |
| Net Working Capital | $ 8,161,719 | | |

Schedule 1.6

Schedule 1.6

WEST\281884727.4

Schedule 1.6 (cont)

**Closing Net Working Capital Calculation Detail Source Data**

*Data/outputs of files named are subject to change as they are updated; ultimate calculation will be impacted by business activity between now and closing. See data room for Excel files.*

| | Source Data | Filename(s) | Calculation/Comment |
|---|---|---|---|
| **Accounts Receivable** | AR aging report from QuickBooks | A-R Aging 2018-04-28.xlsx | Total gross accounts receivable, i.e., no accounting reserves |
| Less | | | |
| Over 90 Days Past Due | AR aging export from QuickBooks | A-R Aging 2018-04-28.xlsx | Net balances by customer only, no top-level journal entries, etc |
| Stock Rotation Accrual | TTM sales and stock rotation claims by customer; latest "Arecont Model (2017-2020)" in data room | 2016 Report Arecont Stock Rotation Analysis.xlsx; Arecont Model 2017 – 2020 FCST 04.20.18 vExternal.xlsx | Figure used was an estimate presuming 30% of inventory in the field, actual calculation described in preceding table |
| Stock Rotation Claims Filed | Daily report of stock rotation claims | End-of-Day Report (m-dd-yyyy).xlsx | Figure used was from 5/3/18 report |
| Ship & Debit Claims Filed | Daily report of ship & debit claims | End-of-Day Report (m-dd-yyyy).xlsx | Figure used was from 5/3/18 report, grossed up 20% to reflect growing sales through July |
| **Inventory** | Fishbowl detail exports "Type A", "Type B", "In Transit" | Inventory Class "A" – AGING REPORT LOCATION 400.xlsx, Inventory Class "B" – REPORT B-STOCK.xlsx, manual tabulation of receivers in Fishbowl | Apply 60% to Type B values to reflect G/L carrying value |
| Less | | | |
| Discontinued/EOL | Fishbowl detail exports "Type A", as annotated by E Faust for discontinued/EOL as of 5/8/18 | Inventory Class "A" – AGING REPORT LOCATION 400.xlsx, E Faust "DIS" annotations included | Sum all values for parts/goods on E Faust list; list to remain unchanged from 5/8/18 |
| B Stock | Inventory "Type B" detail export from Fishbowl | Inventory "Type B" – REPORT B-STOCK.xlsx | Apply 60% to reflect G/L carrying value |
| Excess | Inventory Months-On-Hand analysis | CO400 INVENTORY 05-08-18 3X6M REPORT.xlsx, top excess calc.xlsx | Sum values in excess of 13 months on hand by part/good, based on monthly average usage over last six months; include parts/goods listed as "active" but not used over last six months, except new products |
| **Accounts Payable** | | | |
| Pre-Petition | AP aging export from QuickBooks | A-P Aging (yyyy-mmm-dd).xlsx | Figure used was an estimate |
| Pre-Petition Accrued | Accrued Expenses-Inventory from QuickBooks, including any reconciling entries | Accrued Expenses 3-31-18.xlsx | Figure used came from annotation by E Derousseaux |
| Post-Petition | AP aging export from QuickBooks | A-P Aging (yyyy-mmm-dd).xlsx | Figure used was an estimate |
| Post-Petition Accrued | Accrued Expenses-Inventory from QuickBooks, including any reconciling entries | Accrued Expenses (mm-dd-yy).xlsx | Figure used was an estimate |

Schedule 1.6

WEST\281884727.4

**EXHIBITS A – F**

**[To Be Attached]**

Exhibits A - F

Arecont Vision, LLC
**APA Schedule 1.1(b) - Contracts**
Contracts entered into by the Seller

| Count | Name | Category | Material | Executory | Contract found |
|---|---|---|---|---|---|
| 1 | Harco Group | International Reps | Y | Y | Y |
| 2 | VPATA | International Reps | Y | Y | Y |
| 3 | PAWBAN | International Reps | Y | Y | Y |
| 4 | Triborg Solutions | International Reps | Y | Y | Y |
| 5 | Erik Oudenijk | International Reps | Y | Y | Y |
| 6 | Henrik Andersson (SA Consulting AB) | International Reps | Y | Y | Y |
| 7 | Nicola Noviello | International Reps | Y | Y | Y |
| 8 | Ahmed Kalafy | International Reps | Y | Y | Y |
| 9 | Hikam Vision | International Reps | Y | Y | Y |
| 10 | Badger Reps | Domestic Reps | Y | Y | Y |
| 11 | SMC (Security Marketing Consultants) | Domestic Reps | Y | Y | Y |
| 12 | SESP | Domestic Reps | Y | Y | Y |
| 13 | PAR Products | Domestic Reps | Y | Y | Y |
| 14 | Paladin Sales | Domestic Reps | Y | Y | Y |
| 15 | OCOM Sales Inc. | Domestic Reps | Y | Y | Y |
| 16 | Genesis Agency Inc. | Domestic Reps | Y | Y | Y |
| 17 | Dave Nalezny | Domestic Reps | N | Y | Y |
| 18 | Alex Zanga | Consultant - International | Y | Y | Y |
| 19 | Chris Lee | Consultant - International | Y | Y | Y |
| 20 | Jack Lim | Consultant - International | Y | Y | Y |
| 21 | Johan Crause | Consultant - International | Y | Y | Y |
| 22 | Paul Tagger | Consultant - International | Y | Y | Y |
| 23 | Sanjit Bardhan | Consultant - International | Y | Y | Y |
| 24 | Vineet Panwar | Consultant - International | Y | Y | Y |
| 25 | Vishesh Warikoo | Consultant - International | Y | Y | Y |
| 26 | Waldemar Gollan | Consultant - International | Y | Y | Y |
| 27 | Edmond Deravanessian | Employee | Y | Y | Y |
| 28 | John Bujarski | Employee | Y | Y | Y |
| 29 | Mitchell Fagundas | Employee | Y | Y | Y |
| 30 | Kyle Parker | Employee | Y | Y | Y |
| 31 | Jeffrey Whitney | Employee | Y | Y | Y |
| 32 | Sandee Jenkins | Employee | Y | Y | Y |
| 33 | Alexander Krul | Employee | Y | Y | Y |
| 34 | Silviu Popescu | Employee | Y | Y | Y |
| 35 | Bradley Donaldson | Employee | Y | Y | Y |
| 36 | Raul Calderon | Employee | Y | Y | Y |
| 37 | Carl Petersen | Employee | Y | Y | Y |
| 38 | Erik Faust | Employee | Y | Y | Y |
| 39 | Anna Galvan | Employee | Y | Y | Y |
| 40 | Steven Roberts | Employee | Y | Y | Y |
| 41 | Express Logic | Supplier | N | Y | Y |
| 42 | Nexcom Mechanical Design and Tooling (Contera) | Supplier | Y | Y | Y |
| 43 | OPEN EYE OEM | Supplier | Y | Y | Y |
| 44 | Shurcon Manufacturing Company | Supplier | N | Y | Y |
| 45 | Techital | Supplier | Y | Y | Y |
| 46 | C-Pro Electronics Co Ltd. | Supplier | N | Y | Y |
| 47 | TopView Optronics Corp. Technologies Inc. | Supplier | N | Y | Y |
| 48 | SAE Electronic Co.Ltd | Supplier | N | Y | Y |
| 49 | Lenel | Supplier | N | Y | Y |
| 50 | BSREP Southern California Office LA LLC | Lease (Office) | Y | Y | Y |
| 51 | Security Search & Consulting | Employment agency | Y | Y | N |
| 52 | CyberCoders Inc | Employment agency | Y | Y | N |
| 53 | Thinkingahead Inc | Employment Agency | N | Y | N |
| 54 | Allen Deravanessian | Temporary Labor | N | Y | N |
| 55 | Emmie Martirossian | Temporary Labor | N | Y | N |
| 56 | Mary Knauf | Temporary Labor | N | Y | N |
| 57 | Accountemps | Temporary Labor | Y | Y | N |
| 58 | Act-1 Personnel Services | Temporary Labor | Y | Y | Y |
| 59 | AEROTEK INC | Temporary Labor | Y | Y | N |
| 60 | AppleOne Employment Services | Temporary Labor | Y | Y | Y |
| 61 | Volt Funding Corporation | Temporary Labor | Y | Y | N |
| 62 | TechTeam UG | Temporary Labor | Y | Y | Y |
| 63 | Anthem Blue Cross | Benefits | Y | Y | N |
| 64 | John Hancock Life Insurance Co. | Benefits | Y | Y | N |
| 65 | TASC | Benefits | Y | Y | Y |
| 66 | Linode.com | IT | N | Y | N |
| 67 | Birch Communications Inc | IT | Y | Y | N |
| 68 | Amazon web Services | IT | Y | Y | N |
| 69 | Acts93 Inc | IT | Y | Y | N |
| 70 | SPS Commerce | IT | Y | Y | Y |

| | | | | | |
|---|---|---|---|---|---|
| 71 | LogMeIn USA, Inc. | IT | Y | Y | N |
| 72 | Monoprice, Inc. | IT | N | Y | N |
| 73 | Efax Services | IT | N | Y | N |
| 74 | Sine Wave | Maintenance | N | Y | N |
| 75 | Andersen Commercial Plumbing Inc | Maintenance | N | Y | N |
| 76 | West Coast Air Conditioning | Maintenance | N | Y | N |
| 77 | A.T. Electric | Maintenance | N | Y | N |
| 78 | Archer's Lock & Security Inc | Maintenance | N | Y | N |
| 79 | CM Forklift Inc. | Maintenance | N | Y | N |
| 80 | Innovative Door Solutions | Maintenance | N | Y | N |
| 81 | Laura Cambran Perez | Maintenance | N | Y | N |
| 82 | Pairavi Law P. C. Client Trust Account | Professional Services | N | Y | N |
| 83 | Jones & Malhotra, CPA | Professional Services | N | Y | N |
| 84 | Gordon & Rees LLP | Professional Services | Y | Y | N |
| 85 | Anna Hovhannisyan | Professional Services | N | Y | N |
| 86 | Boon Jat Yong | Professional Services | Y | Y | N |
| 87 | Contegix | Professional Services | N | Y | N |
| 88 | Emin Yavuz Bakioglu | Professional Services | N | Y | N |
| 89 | ONVIF Inc | Professional Services | N | Y | N |
| 90 | TecTeam UG | Professional Services | Y | Y | Y |
| 91 | Vitaly Telishevsky | Professional Services | Y | Y | Y |
| 92 | Holthouse Carlin Van Trigt LLP | Professional Services | Y | Y | N |
| 93 | Law Office of Victoria J.Suh | Professional Services | N | Y | N |
| 94 | Law Offices of Kevin J. Keenan | Professional Services | Y | Y | N |
| 95 | Lewis Roca Rothgerber Christie | Professional Services | Y | Y | N |
| 96 | Moore Stephens Consultants | Professional Services | N | Y | N |
| 97 | Steinberg Law Firm | Professional Services | N | Y | N |
| 98 | Bailey Strategic Human Resources | Professional Services | N | Y | N |
| 99 | EKU Kalinowski | Storage | N | Y | N |
| 100 | ACH Public Storage Glendale | Storage | N | Y | N |
| 101 | 1 ST PRIORITY LLC | Customer | N | N | Y |
| 102 | 2D Electronics LLC | Customer | N | N | Y |
| 103 | 3xLogic USA | Customer | N | N | Y |
| 104 | Absolute Communications | Customer | N | N | N |
| 105 | Access And Beyond LTD | Customer | N | N | Y |
| 106 | Accu-Tech Corp. | Customer | N | N | Y |
| 107 | AD.TEK | Customer | N | N | N |
| 108 | ADAWLIAH Electronics Appliances | Customer | N | N | N |
| 109 | Adder Digital | Customer | N | N | Y |
| 110 | ADI Canada/ADI Burtek | Customer | N | N | Y |
| 111 | ADI Gardiner France | Customer | N | N | Y |
| 112 | ADI Gardiner Limited | Customer | N | N | Y |
| 113 | ADI Gardiner Netherlands B.V. | Customer | N | N | Y |
| 114 | ADI Global Distribution Africa | Customer | N | N | Y |
| 115 | ADI India | Customer | N | N | Y |
| 116 | ADI-Alarmsystem a/s | Customer | N | N | Y |
| 117 | ADISES SA DE CV | Customer | N | N | Y |
| 118 | Advance Technology | Customer | N | N | N |
| 119 | Advance Technology System & Solution Co. | Customer | N | N | Y |
| 120 | Advent Systems, Inc. | Customer | N | N | N |
| 121 | AFIINTRA TECHNOLOGIES SDN.BHD. | Customer | N | N | N |
| 122 | AICON International | Customer | N | N | Y |
| 123 | Alarm Engineering | Customer | N | N | N |
| 124 | Alarm Products Distributors | Customer | N | N | Y |
| 125 | Alarmas AAA | Customer | N | N | Y |
| 126 | Alarmtech | Customer | N | N | N |
| 127 | Alava Ingeieros Telecom SLU | Customer | N | N | Y |
| 128 | Allied Fire and Security | Customer | N | N | N |
| 129 | Allnet GmbH | Customer | N | N | Y |
| 130 | Allnet.Italia s.r.l. | Customer | N | N | Y |
| 131 | Altinova Elektronik | Customer | N | N | Y |
| 132 | Amalgamated Security Services Limited | Customer | N | N | Y |
| 133 | Amano Mcgann Inc | Customer | N | N | N |
| 134 | Amcorp Security Group North America, LLC | Customer | N | N | Y |
| 135 | American Digital Security | Customer | N | N | Y |
| 136 | American Electronics S.A. | Customer | N | N | Y |
| 137 | Ametras Vision GmbH | Customer | N | N | N |
| 138 | Anixter Australia Pty LTD | Customer | N | N | Y |
| 139 | Anixter Canada | Customer | N | N | Y |
| 140 | Anixter LTD ( VAT# DE282643386) | Customer | N | N | Y |
| 141 | ANIXTER LTD (SE502071273201) Sweden | Customer | N | N | Y |
| 142 | ANIXTER LTD (VAT BE0845884639) ( Belgium) | Customer | N | N | Y |
| 143 | ANIXTER LTD ESN8262745F)(SPAIN) | Customer | N | N | Y |

| 144 | ANIXTER LTD (VAT IE9826425R) IRELAND | Customer | N | N | Y |
| 145 | ANIXTER LTD (VAT IT00148349996)(ITALY) | Customer | N | N | Y |
| 146 | ANIXTER LTD(GB685161322) UK | Customer | N | N | Y |
| 147 | Anixter Middle East FZE | Customer | N | N | Y |
| 148 | Anixter Puerto Rico Sales | Customer | N | N | N |
| 149 | Anixter Singapore | Customer | N | N | Y |
| 150 | Anixter Singapore Pte Ltd | Customer | N | N | Y |
| 151 | Anixter South America | Customer | N | N | N |
| 152 | Anixter, Inc | Customer | N | N | Y |
| 153 | Anteco LTD | Customer | N | N | Y |
| 154 | Arnel Limited | Customer | N | N | Y |
| 155 | Aronson Security Group | Customer | N | N | Y |
| 156 | ATECO | Customer | N | N | Y |
| 157 | Audio Innovations Of Fresno, LLC | Customer | N | N | Y |
| 158 | AVTEL Ltd. | Customer | N | N | N |
| 159 | Bacom Internetwork Co., Ltd. | Customer | N | N | Y |
| 160 | Balton CP Ltd. | Customer | N | N | Y |
| 161 | Baud Telecommunication Networks | Customer | N | N | Y |
| 162 | Bet Systems Limited | Customer | N | N | N |
| 163 | Bizplanet Solution Pte Ltd | Customer | N | N | N |
| 164 | BLUEIT CO. LTD | Customer | N | N | N |
| 165 | BORINATO SECURITY SRL | Customer | N | N | Y |
| 166 | Bridge Trading USA LLC | Customer | N | N | Y |
| 167 | Brooklyn Low Voltage Supply | Customer | N | N | N |
| 168 | Brownsburg Community School Corporation | Customer | N | N | N |
| 169 | Business Technology Partners | Customer | N | N | Y |
| 170 | C&C Partners Sp. z o.o | Customer | N | N | Y |
| 171 | CAMART SDN BHD | Customer | N | N | N |
| 172 | CAMERA CORNER/ CONNECTING POINT | Customer | N | N | N |
| 173 | Cassidy Technologies | Customer | N | N | Y |
| 174 | CBE | Customer | N | N | Y |
| 175 | CCF- COMPTOIR DES COURANTS FAIBLES | Customer | N | N | Y |
| 176 | CCTV | Customer | N | N | Y |
| 177 | CCTV Center S.L. | Customer | N | N | Y |
| 178 | CITEK CORPORATION | Customer | N | N | Y |
| 179 | CJSC Arecont Vision | Customer | N | N | N |
| 180 | CM3 Building Solutions, Inc. | Customer | N | N | Y |
| 181 | Communications Supply Corp | Customer | N | N | Y |
| 182 | Computec Korea CO., Ltd | Customer | N | N | N |
| 183 | Computer Gross Italia S.p.A. | Customer | N | N | N |
| 184 | Comtel Systems Technology, Inc. | Customer | N | N | N |
| 185 | Convergint Technologies | Customer | N | N | Y |
| 186 | Coting d.o.o. | Customer | N | N | Y |
| 187 | CS Media Inc | Customer | N | N | N |
| 188 | CUSTOM COMMUNICATIONS, INC. | Customer | N | N | N |
| 189 | Custom Electronic Supply | Customer | N | N | Y |
| 190 | Custos bvba | Customer | N | N | Y |
| 191 | DATA LAB Sas | Customer | N | N | Y |
| 192 | DataLink Interactive Inc. | Customer | N | N | N |
| 193 | DC Adonay | Customer | N | N | Y |
| 194 | DEMA SA | Customer | N | N | Y |
| 195 | Detec AS | Customer | N | N | Y |
| 196 | Digital Media For Security  Systems. | Customer | N | N | N |
| 197 | Digitalcom Co.,Ltd. | Customer | N | N | N |
| 198 | Digitalwatch Guard | Customer | N | N | Y |
| 199 | Distrotech AB | Customer | N | N | Y |
| 200 | Divis | Customer | N | N | Y |
| 201 | Dunk Fire & Security | Customer | N | N | N |
| 202 | E-Arion SA | Customer | N | N | N |
| 203 | Earl Bolanos. | Customer | N | N | N |
| 204 | Edist | Customer | N | N | Y |
| 205 | EDNETICS | Customer | N | N | N |
| 206 | EDSLAN SRL | Customer | N | N | Y |
| 207 | Electro-Systems Ind. Corp | Customer | N | N | N |
| 208 | ENNTE VISION AS | Customer | N | N | Y |
| 209 | Entech - Dallas | Customer | N | N | Y |
| 210 | EQUIPOS DE SEGURIDAD MAGOCAD, S.A. DE C.V | Customer | N | N | N |
| 211 | ESCO Communications | Customer | N | N | N |
| 212 | Esentia Systems, Inc. | Customer | N | N | Y |
| 213 | Esprinet S.P.A. | Customer | N | N | Y |
| 214 | E-Tech Systems | Customer | N | N | N |
| 215 | Euroalarm | Customer | N | N | Y |
| 216 | Euroma Telecom | Customer | N | N | Y |

| 217 | European Security Trading | Customer | N | N | N |
| 218 | EYEP Solutions | Customer | N | N | N |
| 219 | Fares for Networks & IT Solutions | Customer | N | N | Y |
| 220 | Fast Forward Electronics | Customer | N | N | N |
| 221 | Federal Protection, Inc. | Customer | N | N | Y |
| 222 | Full Protection | Customer | N | N | Y |
| 223 | Futurehome Systems & Design Inc. | Customer | N | N | Y |
| 224 | G4S. | Customer | N | N | N |
| 225 | Getterson/Centennial | Customer | N | N | Y |
| 226 | Geutebrueck Australia | Customer | N | N | Y |
| 227 | Global Surveillance Associates | Customer | N | N | N |
| 228 | Global Surveillance System, Inc | Customer | N | N | Y |
| 229 | Graybar | Customer | N | N | Y |
| 230 | Graybar Electric Company, Inc. | Customer | N | N | Y |
| 231 | Gric Aktiv | Customer | N | N | Y |
| 232 | Guangzhou IsSec Security Technology Co. | Customer | N | N | N |
| 233 | Gulf Business Machines LLC | Customer | N | N | Y |
| 234 | Hamilton Safe Company | Customer | N | N | Y |
| 235 | Harco Group Sa/NV | Customer | N | N | Y |
| 236 | Hills Limited | Customer | N | N | Y |
| 237 | Honeywell Security Espana S.L. | Customer | N | N | N |
| 238 | Honeywell Security Italia S.r.l. | Customer | N | N | Y |
| 239 | Honeywell Security Italy SpA | Customer | N | N | Y |
| 240 | Honeywell, spol. s r. o. | Customer | N | N | N |
| 241 | ICD Security Solutions (HK) Ltd | Customer | N | N | Y |
| 242 | ICD Security Solutions G.K. | Customer | N | N | Y |
| 243 | Icetronica Ehf. | Customer | N | N | Y |
| 244 | Industrial Video & Control | Customer | N | N | Y |
| 245 | Infinity Distribution | Customer | N | N | N |
| 246 | INFOBUS, SRL | Customer | N | N | Y |
| 247 | INFOCAST | Customer | N | N | N |
| 248 | INFRASOUL TECHSERVE PVT.LTD | Customer | N | N | Y |
| 249 | Ingenieria de Proteccion SRL | Customer | N | N | Y |
| 250 | Innovative Security Systems, Inc. | Customer | N | N | N |
| 251 | Innowave IT Infrastructures Ltd. | Customer | N | N | Y |
| 252 | Integrators Australia Pty Ltd | Customer | N | N | Y |
| 253 | International Security & Trading Corp | Customer | N | N | Y |
| 254 | IPTECNO VIDEOVIGILANCIA S.L. | Customer | N | N | Y |
| 255 | ISS INTEGRAL SECURITY SYSTEMS, S.A. | Customer | N | N | Y |
| 256 | ISTC de Chile S.A. | Customer | N | N | Y |
| 257 | ISTC de Mexico Sa De CV | Customer | N | N | N |
| 258 | ITESA | Customer | N | N | N |
| 259 | ITWORKS LLC , DUBAI | Customer | N | N | Y |
| 260 | JK-Handelsonderneming | Customer | N | N | Y |
| 261 | JMG Security Systems | Customer | N | N | N |
| 262 | JSJ Rodriguez, Inc | Customer | N | N | N |
| 263 | Koving doo | Customer | N | N | Y |
| 264 | La Estrella Solitaria S.A | Customer | N | N | Y |
| 265 | Linear Tech SA de CV | Customer | N | N | Y |
| 266 | LMKT Private Ltd | Customer | N | N | Y |
| 267 | Logen Sa de CV | Customer | N | N | Y |
| 268 | LOOP SKUPINA D.O.O. | Customer | N | N | Y |
| 269 | M.A. TECH | Customer | N | N | N |
| 270 | Madwave Ltd. | Customer | N | N | N |
| 271 | Marinequip AS | Customer | N | N | Y |
| 272 | Martco | Customer | N | N | Y |
| 273 | Matt J. McCoy | Customer | N | N | N |
| 274 | Max Tech / Johan Crause | Customer | N | N | N |
| 275 | Maxtec Peripherals (PTY) LTD | Customer | N | N | Y |
| 276 | MCW Solutions | Customer | N | N | N |
| 277 | MG WORLDWIDE  DISTRIBUTORS,LLC | Customer | N | N | N |
| 278 | MGTS. | Customer | N | N | Y |
| 279 | Micro Integration | Customer | N | N | N |
| 280 | Microbiz Security Company | Customer | N | N | N |
| 281 | Midco Inc. | Customer | N | N | N |
| 282 | Middle Point | Customer | N | N | Y |
| 283 | Midwest Digital Systems, LLC | Customer | N | N | N |
| 284 | Minuteman Security Tech., Inc | Customer | N | N | N |
| 285 | Nantze Electric Company Inc. | Customer | N | N | N |
| 286 | National Fire and Security Ltd | Customer | N | N | Y |
| 287 | NAVCO Security Systems | Customer | N | N | N |
| 288 | Neural Integrated Systems Pvt Ltd | Customer | N | N | Y |
| 289 | NEXTLAN s.r.o. | Customer | N | N | Y |

| 290 | Norbain SD Limited UK | Customer | N | N | Y |
|---|---|---|---|---|---|
| 291 | Norelco Safecam | Customer | N | N | Y |
| 292 | North American Video, Inc. | Customer | N | N | Y |
| 293 | NorthStar Security, Inc. | Customer | N | N | N |
| 294 | Novatron Sec Distribution SA | Customer | N | N | Y |
| 295 | Octopuss SA | Customer | N | N | Y |
| 296 | Office Pro Technologies dba OPTECH | Customer | N | N | N |
| 297 | One Source Security | Customer | N | N | N |
| 298 | Optima Networks Bvba | Customer | N | N | Y |
| 299 | Pacific Communications | Customer | N | N | Y |
| 300 | Parthex, Inc. | Customer | N | N | N |
| 301 | Patararungroj Ltd. | Customer | N | N | Y |
| 302 | Pekin Public Schools District 108 | Customer | N | N | N |
| 303 | Petards | Customer | N | N | N |
| 304 | Photoscan System Co., Ltd | Customer | N | N | Y |
| 305 | Phu Ha Limited Company | Customer | N | N | Y |
| 306 | Pillar Innovations, LLC | Customer | N | N | N |
| 307 | PKE Electronics AG | Customer | N | N | Y |
| 308 | Plan B Networks | Customer | N | N | N |
| 309 | Platt Electric Supply | Customer | N | N | N |
| 310 | Post Browning | Customer | N | N | N |
| 311 | Prism One Group LLC | Customer | N | N | N |
| 312 | Prisma Bytes Sdn Bhd | Customer | N | N | Y |
| 313 | PSA | Customer | N | N | N |
| 314 | PT Data Global Komumatama | Customer | N | N | N |
| 315 | PT Golden Solutions Indonesia | Customer | N | N | Y |
| 316 | PT. 3D Network Indonestia | Customer | N | N | Y |
| 317 | PT. 3D Networks Indonesia | Customer | N | N | Y |
| 318 | Q Security Systems | Customer | N | N | Y |
| 319 | Quang Dung Technology Distribution Co.LTD | Customer | N | N | N |
| 320 | Quartz Matrix | Customer | N | N | Y |
| 321 | Quemic Mauritius | Customer | N | N | Y |
| 322 | REDYCOM | Customer | N | N | Y |
| 323 | Relyco Resources, Inc | Customer | N | N | N |
| 324 | S3 Integration | Customer | N | N | N |
| 325 | SAC Seguridad Automatizacion Y Control SA | Customer | N | N | Y |
| 326 | San Ramon Valley Unified School District | Customer | N | N | N |
| 327 | Scan Source | Customer | N | N | Y |
| 328 | Scansource Latin America Inc. | Customer | N | N | N |
| 329 | Scope LTD Corp | Customer | N | N | N |
| 330 | Sectron | Customer | N | N | Y |
| 331 | Securadyne Systems | Customer | N | N | N |
| 332 | SecureWatch24 LLC | Customer | N | N | N |
| 333 | Securitec One Inc. | Customer | N | N | Y |
| 334 | Securitech Systems Limited | Customer | N | N | Y |
| 335 | Securitronics | Customer | N | N | N |
| 336 | Security 101 | Customer | N | N | N |
| 337 | Security Data Supply, LLC | Customer | N | N | Y |
| 338 | Security Equipment, Inc. | Customer | N | N | N |
| 339 | Security Integration Group, Inc. | Customer | N | N | N |
| 340 | SEICO Inc. | Customer | N | N | N |
| 341 | Sekunet S.A. | Customer | N | N | N |
| 342 | SensorLink Holdings Sdn Bhd | Customer | N | N | Y |
| 343 | Shanghai North Crown Co. Ltd | Customer | N | N | Y |
| 344 | Shiba | Customer | N | N | Y |
| 345 | SI Technologies, Inc. | Customer | N | N | N |
| 346 | Siel Invest S.R.L | Customer | N | N | Y |
| 347 | Siemens LLC UAE | Customer | N | N | Y |
| 348 | Silmar Electronics | Customer | N | N | Y |
| 349 | SimplexGrinnell LP | Customer | N | N | Y |
| 350 | SIRIUS SPA ( Compass ) Dist | Customer | N | N | Y |
| 351 | Sistemas Y Servicios de Comunicacion, S.A | Customer | N | N | Y |
| 352 | SKY TECHNOLOGIES D.O.O. | Customer | N | N | N |
| 353 | Sonitrol Security | Customer | N | N | N |
| 354 | Sonivision S.A. | Customer | N | N | Y |
| 355 | Sound Inc. | Customer | N | N | N |
| 356 | Sound Inc. | Customer | N | N | N |
| 357 | Space Exploration Technologies Corp. | Customer | N | N | N |
| 358 | SPS ELECTRONICS | Customer | N | N | N |
| 359 | STA Tehniks | Customer | N | N | Y |
| 360 | Stanley Convergent Security Solutions | Customer | N | N | N |
| 361 | Steehold Company Limited | Customer | N | N | N |
| 362 | STEVE McGLASSON- C | Customer | N | N | N |

| 363 | SVD France | Customer | N | N | Y |
| 364 | SystemK Corporation | Customer | N | N | N |
| 365 | Systems Distributors, Inc. | Customer | N | N | Y |
| 366 | Takachiho Koheki | Customer | N | N | Y |
| 367 | TCK Technology CO LTD | Customer | N | N | Y |
| 368 | Tech Domain | Customer | N | N | Y |
| 369 | Tech Electronics | Customer | N | N | N |
| 370 | Techno Q for Security Systems | Customer | N | N | N |
| 371 | Teeya Master Systems CO. LTD | Customer | N | N | N |
| 372 | Telenet VoIP, Inc. | Customer | N | N | N |
| 373 | Tenco Supplies Inc. | Customer | N | N | Y |
| 374 | The Security Group Corp | Customer | N | N | Y |
| 375 | Trans Audio Video SRL | Customer | N | N | Y |
| 376 | Transworld Limitada | Customer | N | N | N |
| 377 | Trident Seafoods Corporation | Customer | N | N | N |
| 378 | Tri-Ed/ Northern Video Distribution | Customer | N | N | Y |
| 379 | TRL Systems, Inc. | Customer | N | N | N |
| 380 | TSE Australia | Customer | N | N | Y |
| 381 | Ultrak Security Systems Sp. z.o.o. | Customer | N | N | Y |
| 382 | Unisol International Corp | Customer | N | N | Y |
| 383 | United Technology Group DWC LLC | Customer | N | N | Y |
| 384 | Vegas Valley Locking Systems | Customer | N | N | N |
| 385 | Vicon Industries | Customer | N | N | Y |
| 386 | Vicon Norway | Customer | N | N | Y |
| 387 | Video Guard B.V. | Customer | N | N | N |
| 388 | Vido Electronic | Customer | N | N | Y |
| 389 | Viewrun | Customer | N | N | Y |
| 390 | Volutone Dist.(Simi Valey, CA) | Customer | N | N | N |
| 391 | Voxtel Smart Security Solutions LLC | Customer | N | N | N |
| 392 | Walters Wholesale Electronic Co. | Customer | N | N | Y |
| 393 | Westec Supplies | Customer | N | N | Y |
| 394 | Will Electronics | Customer | N | N | N |
| 395 | Worcester County Sheriff's Office | Customer | N | N | N |

Arecont Vision, LLC
**APA Schedule 1.2 - Other Assets**

Not Applicable

Arecont Vision, LLC
**APA Schedule 1.6 - Net Working Capital**

Provided separately

Arecont Vision, LLC
**APA Schedule 2.3 - Litigation**

*Arecont Vision Holdings, LLC v. Wonder Vision Inc., et al.* , pending under Case No. 2017-0741-JRS in the Court of Chancery of the State of Delaware.  Litigation against former prospective buyer of the Company's assets for breach of contract and related claims.

*Axis Communications AB, Petitioner, v.  Arecont Vision, LLC,  Patent Owner* , Case P GR2017-00031, Patent 9,438,782, pending before Patent Trial and Appeal Board of the U.S. Patent and Trademark Office.  Challenge to validity of patent.

Arecont Vision, LLC
**APA Schedule 2.4 - Taxes**

| Tax | Description | Amount | Due |
|-----|-------------|--------|-----|
| Unsecured Property Tax Bill | County of Los Angeles | $ 7,575.04 | 8/31/2018 |

Arecont Vision, LLC
**APA Schedule 2.5 - Titles and Liens**

Not Applicable

Arecont Vision, LLC
**APA Schedule 2.6(a) - Owned Intellectual Property**

**Registered Trademarks**

| Trademark | Country | Registration Number | Owner/Assignee | Date of Registration / Filing |
|---|---|---|---|---|
| ARECONT VISION | U.S. | 4,459,316 | Arecont Vision, LLC | 12/31/2013 |
| MICRODOME | U.S. | 4,454,263 | Arecont Vision, LLC | 12/24/2013 |
| MEGADYNAMIC | U.S. | 4,312,684 | Arecont Vision, LLC | 4/2/2013 |
| MEGABALL | U.S. | 4,312,683 | Arecont Vision, LLC | 4/2/2013 |
| MEGALAB | U.S. | 4,017,316 | Arecont Vision, LLC | 8/23/2011 |
| MEGAVIDEO | U.S. | 3,053,481 | Arecont Vision, LLC | 1/31/2006 |
| SURROUNDVIDEO | U.S. | 3,014,256 | Arecont Vision, LLC | 11/8/2005 |
| MEGAVIEW | U.S. | 4,070,958 | Arecont Vision, LLC | 12/13/2011 |
| MEGADOME | U.S. | 3,815,229 | Arecont Vision, LLC | 7/6/2010 |
| STELLAR | U.S. | | Arecont Vision, LLC | 11/23/2013 |

**Issued Patents**

| Patent Registration No. | Title / Description | Owner / Assignee | Issue / Filing Date | Country |
|---|---|---|---|---|
| 7492391 | WIDE DYNAMIC RANGE NETWORK CAMERA | Arecont Vision, LLC | 2/17/2009 | U.S. |
| 7492390 | DUAL SPECTRAL BAND NETWORK CAMERA | Arecont Vision, LLC | 2/17/2009 | U.S. |
| 4763351 | MULTI-SENSOR PANORAMIC NETWORK CAMERA | Arecont Vision, LLC | 6/17/2011 | Japan |
| 7680192 | MULTI-SENSOR PANORAMIC NETWORK CAMERA | Arecont Vision, LLC | 3/16/2010 | U.S. |
| 7623152 | HIGH RESOLUTION NETWORK CAMERA WITH AUTOMATIC BANDWIDTH CONTROL | Arecont Vision, LLC | 11/24/2009 | U.S. |
| 4694913 | HIGH RESOLUTION NETWORK VIDEO CAMERA WITH MASSIVELY PARALLEL IMPLEMENTATION OF IMAGE PROCESSING, COMPRESSION AND NETWORK SERVER | Arecont Vision, LLC | 3/4/2011 | Japan |
| 7548258 | HIGH RESOLUTION NETWORK VIDEO CAMERA WITH MASSIVELY PARALLEL IMPLEMENTATION OF IMAGE PROCESSING, COMPRESSION AND NETWORK SERVER | Arecont Vision, LLC | 6/16/2009 | U.S. |
| 7543327 | VIDEO SURVEILLANCE SYSTEM BASED ON HIGH RESOLUTION NETWORK CAMERAS CAPABLE OF CONCURRENT TRANSMISSION OF MULTIPLE IMAGE FORMATS AT VIDEO RATES | Arecont Vision, LLC | 6/2/2009 | U.S. |

| | | | | |
|---|---|---|---|---|
| 7599550 | METHOD FOR ACCURATE REAL- TIME COMPENSATION FOR CHANGING ILLUMINATION SPECTRA IN DIGITAL VIDEO CAMERAS | Arecont Vision, LLC | 10/6/2009 | U.S. |
| 7903871 | SYSTEM AND METHOD FOR IMAGE PROCESSING OF MULTI-SENSOR NETWORK CAMERAS | Arecont Vision, LLC | 3/8/2011 | U.S. |
| 8175161 | SYSTEM AND METHOD FOR MOTION ESTIMATION | Arecont Vision, LLC | 5/8/2012 | U.S. |
| 8265152 | SYSTEM AND METHOD FOR LOW- LATENCY PROCESSING OF INTRA-FRAME VIDEO PIXEL BLOCK PREDICTION | Arecont Vision, LLC | 9/11/2012 | U.S. |
| 8921964 | DUAL LAYER PIXEL LENS FOR LOW LIGHT CAMERAS | Arecont Vision, LLC | 12/30/2014 | U.S. |
| 9135683 | SYSTEM AND METHOD FOR TEMPORAL VIDEO IMAGE ENHANCEMENT | Arecont Vision, LLC | 9/15/2015 | U.S. |
| 9071764 | SYSTEM AND METHOD FOR COLOR IMAGING UNDER LOW LIGHT | Arecont Vision, LLC | 6/30/2015 | U.S. |
| 9183616 | SYSTEM AND METHOD FOR OBTAINING SUPER IMAGE RESOLUTION THROUGH OPTICAL IMAGE TRANSLATION | Arecont Vision, LLC | 11/10/2015 | U.S. |
| 9202263 | SYSTEM AND METHOD FOR SPATIO VIDEO IMAGE ENHANCEMENT | Arecont Vision, LLC | 12/1/2015 | U.S. |
| 9262811 | SYSTEM AND METHOD FOR SPATIO TEMPORAL VIDEO IMAGE ENHANCEMENT | Arecont Vision, LLC | 2/16/2016 | U.S. |
| 9319597 | SYSTEM AND METHOD FOR COLOR IMAGING UNDER LOW LIGHT | Arecont Vision, LLC | 4/19/2016 | U.S. |
| D793464 | COVER FOR MULTI-SENSOR CAMERA HOUSING | Arecont Vision, LLC | 8/1/2017 | U.S. |
| 9690172 | OMNIDIRECTIONAL USER CONFIGURABLE MULTI- CAMERA HOUSING | Arecont Vision, LLC | 6/27/2017 | U.S. |

**Pending Trademarks**

September 2017:
    Contera
    ConteraCloud
    ConteraIP
    ConteraHD
    ConteraMP
    ConteraMS
    ConteraNVR
    ConteraVMS
    ConteraVideo

December 2017:
    ConteraCMR

ConteraWS

January 2018
　　　ConteraMobile

March 2018
　　　Arecont Vision Mega

Arecont Vision, LLC
**APA Schedule 2.6(b) -Intellectual Property Rights Licensed From Others**

License from Third Party

Product License Agreement – Royalty dated June 12, 2015, by and between Express Logic, Inc. and Arecont Vision, LLC. Inbound software license.

| Product | License Count | License Used | Status | Expiration Date | Renewal Amount |
|---|---|---|---|---|---|
| Adobe Pro DC / Creative Cloud | 10 | 10 | Active | Monthly | $ 640 |
| AXIBFM | 1 | 1 | Active | Annual | Free |
| Contegix / Jira(Online ticketing system) | 50 | 30 | Active | Monthly | $ 1,463 |
| Doc Locator Web Tools | 5 | 5 | Active | 4/30/2019 | $ 640 |
| Doc Locator Web View | 4 | 4 | Active | 4/30/2019 | $ 184 |
| Document Locator DL CAL | 15 | 101 | Active | 4/30/2019 | $ 1,515 |
| Exchange Server Cals - Per User | 150 | 150 | Active | 9/30/2019 | $ 3,000 |
| Exchange Server Enterprise 2016 | 1 | 1 | Active | 9/30/2019 | $ 950 |
| Fishbowl | 40 | 40 | Active | 8/31/2018 | $ 8,193 |
| GoToAssist | 9 | 9 | Active | Monthly | $ 522 |
| GoToWebinarPro, GoToMeeting 25, GoToTraining 200, Open Voice | 60 | 51 | Active | Monthly | $ 2,100 |
| Linux RedHat Enterprise | 2 | 2 | Active | 10/15/2018 | $ 1,601 |
| LucidCharts | 15 | 10 | Active | 3/24/2019 | $ 1,500 |
| Mentor PADs - Designer | 1 | 1 | Active | 10/29/2018 | $ 308 |
| Mentor PADs - Standard | 1 | 1 | Active | 10/29/2018 | $ 2,175 |
| Mentor PADs - Trace HSD | 1 | 1 | Active | 1/18/2019 | $ 1,096 |
| MS DYN 365 OP | 1 | 1 | Active | 12/31/2019 | $ 1,471 |
| MS DYN 365 OP Sales | 35 | 35 | Active | 12/31/2019 | $ 17,185 |
| MS DYN 365 OP Sales CALS | 10 | 10 | Active | 12/31/2019 | $ 3,030 |
| Office 365 | 15 | 15 | Active | Monthly | $ 1,485 |
| QuickBooks Enterprise | 30 | 30 | Active | 9/1/2018 | $ 7,300 |
| SolidWorks PDM | 1 | 1 | Active | 3/31/2019 | $ 795 |
| SolidWorks Premium | 1 | 1 | Active | 3/31/2019 | $ 1,995 |
| SQL Server 2016 Standard | 2 | 2 | Active | 9/30/2019 | $ 1,700 |
| TeamViewer | 1 | 1 | Active | 2/20/2019 | $ 1,446 |
| Visual Studio Professional 2015 | 2 | 2 | Active | 9/30/2019 | $ 350 |
| Vivado | 1 | 1 | Active | Annual | Free |
| Vmware vCenter 6.5 | 1 | 1 | Active | 6/8/2018 | $ 500 |
| Vmware vSphere 6.5 | 1 | 1 | Active | 6/8/2018 | Free |
| Windows Server 2012 R2 Standard  - Windo | 2 | 2 | Active | 9/30/2019 | $ 430 |
| Windows Server Cals - Per User | 150 | 150 | Active | 9/30/2019 | $ 1,350 |

Arecont Vision, LLC
**APA Schedule 2.6(c) -Infringement**

Not Applicable

Arecont Vision, LLC
**APA Schedule 2.7 - Real Property**

Lease of nonresidential real estate located at 425 E. Colorado St., 7th Floor Glendale, CA 91205.

See Attached - 8th and 9th amendment

Arecont Vision, LLC
**APA Schedule  2.9 - Material Contracts ( >$50K - last 16 months)**

| Count | Name | Category | Material |
|---|---|---|---|
| 1 | Harco Group | International Reps | Y |
| 2 | VPATA | International Reps | Y |
| 3 | PAWBAN | International Reps | Y |
| 4 | Triborg Solutions | International Reps | Y |
| 5 | Erik Oudenjik | International Reps | Y |
| 6 | Henrik Andersson (SA Consulting AB) | International Reps | Y |
| 7 | Nicola Noviello | International Reps | Y |
| 8 | Ahmed Kafaly | International Reps | Y |
| 9 | Hikam Vision | International Reps | Y |
| 10 | Badger Reps | Domestic Reps | Y |
| 11 | SMC (Security Marketing Consultants) | Domestic Reps | Y |
| 12 | SESP | Domestic Reps | Y |
| 13 | PAR Products | Domestic Reps | Y |
| 14 | Paladin Sales | Domestic Reps | Y |
| 15 | OCOM Sales Inc. | Domestic Reps | Y |
| 16 | Genesis Agency Inc. | Domestic Reps | Y |
| 17 | Alex Zanga | Consultant - International | Y |
| 18 | Chris Lee | Consultant - International | Y |
| 19 | Jack Lim | Consultant - International | Y |
| 20 | Johan Crause | Consultant - International | Y |
| 21 | Paul Tagger | Consultant - International | Y |
| 22 | Sanjit Bardhan | Consultant - International | Y |
| 23 | Vineet Panwar | Consultant - International | Y |
| 24 | Vishesh Warikoo | Consultant - International | Y |
| 25 | Waldemar Gollan | Consultant - International | Y |
| 26 | Nexcom Mechanical Design and Tooling (Contera) | Supplier | Y |
| 27 | OPEN EYE OEM | Supplier | Y |
| 28 | Techital | Supplier | Y |
| 29 | BSREP Southern California Office LA LLC | Lease (Office) | Y |
| 30 | Security Search & Consulting | Employment agency | Y |
| 31 | CyberCoders Inc | Employment agency | Y |
| 32 | Accountemps | Temporary Labor | Y |
| 33 | Act-1 Personnel Services | Temporary Labor | Y |
| 34 | AEROTEK INC | Temporary Labor | Y |
| 35 | AppleOne Employment Services | Temporary Labor | Y |
| 36 | Volt Funding Corporation | Temporary Labor | Y |
| 37 | Paladin Sales Group | Temporary Labor | Y |
| 38 | TechTeam UG | Temporary Labor | Y |
| 39 | Anthem Blue Cross | Benefits | Y |
| 40 | John Hancock Life Insurance Co. | Benefits | Y |
| 41 | TASC | Benefits | Y |
| 42 | Birch Communications Inc | IT | Y |
| 43 | Amazon web Services | IT | Y |
| 44 | Acts93 Inc | IT | Y |
| 45 | SPS Commerce | IT | Y |
| 46 | LogMeIn USA, Inc. | IT | Y |
| 47 | Gordon & Rees LLP | Professional Services | Y |
| 48 | Boon Jat Yong | Professional Services | Y |
| 49 | TecTeam UG | Professional Services | Y |
| 50 | Vitaly Telishevsky | Professional Services | Y |
| 51 | Holthouse Carlin Van Trigt LLP | Professional Services | Y |

| 52 | Law Offices of Kevin J. Keenan | Professional Services | Y |
| 53 | Lewis Roca Rothgerber Christie | Professional Services | Y |

Arecont Vision, LLC
**APA Schedule  2.12 - Labor Matters**

Not Applicable

Arecont Vision, LLC
## APA Schedule  2.12(f) - Labor Matters
*\*\* The following are existing employments between Seller and various individuals as of the date hereof \*\**

| Count | Name | Category |
|---|---|---|
| 1 | Alexander Krul | Employee |
| 2 | Anna Galvan | Employee |
| 3 | Bradley Donaldson | Employee |
| 4 | Carl Petersen | Employee |
| 5 | Edmond Deravanessian | Employee |
| 6 | Erik Faust | Employee |
| 7 | Jeffrey Whitney | Employee |
| 8 | John Bujarski | Employee |
| 9 | Kyle Parker | Employee |
| 10 | Mitchell Fagundas | Employee |
| 11 | Raul Calderon | Employee |
| 12 | Sandee Jenkins | Employee |
| 13 | Silviu Popescu | Employee |
| 14 | Steven Roberts | Employee |

Arecont Vision, LLC
**APA Schedule 2.19 - Insurance and Bonds**

| Named Insured | Type of Insurance | Insurer |
|---|---|---|
| Arecont Vision Holdings, LLC DBA Arecont Vision, LLC | Property | Federal Insurance Company |
| Arecont Vision Holdings, LLC DBA Arecont Vision, LLC | General Liability | Federal Insurance Company |
| Arecont Vision Holdings, LLC DBA Arecont Vision, LLC | Auto | Federal Insurance Company |
| Arecont Vision Holdings, LLC DBA Arecont Vision, LLC | Workers Compensation | Federal Insurance Company |
| Arecont Vision Holdings, LLC DBA Arecont Vision, LLC | Umbrella | Federal Insurance Company |
| Arecont Vision Holdings, LLC DBA Arecont Vision, LLC | Foreign Package | Federal Insurance Company |
| Arecont Vision Holdings, LLC DBA Arecont Vision, LLC | Executive Protection – Cyber | Travelers Casualty and Surety Company of America |
| Arecont Vision Holdings, LLC DBA Arecont Vision, LLC | Executive Protection – Crime | Travelers Casualty and Surety Company of America |
| Arecont Vision, LLC | Directors and Officers Liability – Side A | Starr Indemnity & Liability Company |
| Arecont Vision Holdings, LLC DBA Arecont Vision, LLC | D&O Tail | Travelers Casualty and Surety Company of America |

Arecont Vision, LLC
**APA Schedule  2.20 - Affiliate Transactions**

| Count | Company Name | Description of Transactions |
|---|---|---|
| 1 | Arecont IC Disc | Transfer of funds used for tax and income recategorization |
| 2 | GMBH | Transfer of funds to pay salary and expenses to German employee |
| 3 | Edmond Deravanessian | T-Mobile - Cell phone for Sanjit (Dubai Consultant) |
| 4 | Edmond Deravanessian | Public Storage does not offer corporate account. Currently stores old paper files (vendor, payables, customer files, etc.) |
| 5 | Sanjit Bardhan | Entity is owned by Sanjit (Consultant) for the purpose of receiving work visa for Sanjit and Vishesh to reside and work in Dubai. Arecont Vision Dubai |

Arecont Vision, LLC
**APA Schedule  4.1(b) - Conduct of Business**

Not Applicable

Arecont Vision, LLC
**APA Schedule 4.8 - Books & Records; Access to Personnel -- Employees and Consultants**
Headcount as of 5/16

| Count | Department | Name | Type | Title | Hire Date |
|---|---|---|---|---|---|
| 1 | 100-Admin | Edmond Deravanessian | Salaried | CFO | 10/20/2008 |
| 2 | 100-Admin | Ester Stepanian | Salaried | Payroll & Personell | 5/5/2008 |
| 3 | 100-Admin | Ester Ansuryan | Hourly | Staff Accountant | 1/4/2011 |
| 4 | 100-Admin | Anik Khochou | Hourly | Staff Accountant | 9/19/2016 |
| 5 | 100-Admin | Nersessian Armond | Hourly | Staff Accountant | 6/8/2009 |
| 6 | 100-Admin | Tina Ter-Stepanian | Hourly | Staff Accountant | 8/24/2015 |
| 7 | 210-Sales | Benjamin Barry | Salaried | Director of Sales - NA Central | 4/14/2014 |
| 8 | 210-Sales | John Bujarski | Salaried | Director of Sales - NA East | 10/13/2008 |
| 9 | 210-Sales | Gregory Collier | Salaried | Regional Sales Specialist - Bay Area | 7/24/2017 |
| 10 | 210-Sales | Mitchell Fagundas | Salaried | Vice President Strategic Accounts | 1/31/2011 |
| 11 | 210-Sales | Eric LaValley | Salaried | Regional Sales Manager - MI, IN, KY, WV W. PA | 4/1/2013 |
| 12 | 210-Sales | Matthew McCoy | Salaried | Director Strategic Accounts | 12/2/2013 |
| 13 | 210-Sales | Stephen McGlasson | Salaried | Director fo Sales - NA Southwest | 6/5/2017 |
| 14 | 210-Sales | David Musko | Salaried | Regional Sales Manager - NC, SC, E. TN | 9/9/2016 |
| 15 | 210-Sales | Kyle Parker | Salaried | VP North America Sales | 8/19/2013 |
| 16 | 210-Sales | Randy Vitovitz | Salaried | Regional Sales Manager - WA, OR, MT, ID | 8/1/2017 |
| 17 | 210-Sales | Laura Freeny | Salaried | A&E Program Manager | 9/14/2015 |
| 18 | 220-Intl Sales | Fellipe Arguello | Salaried | Regional Sales Director - Latin America | 5/1/2016 |
| 19 | 230-Sales Spprt | Diana Cooper | Salaried | Senior Manager Sales Operations/Inside Sales | 4/1/2015 |
| 20 | 230-Sales Spprt | Ernie Velayo | Salaried | Regional Sales Manager - Southwest | 10/28/2014 |
| 21 | 230-Sales Spprt | Jefferson Liao | Hourly | Inside Sales | 4/1/2013 |
| 22 | 230-Sales Spprt | Nina Sylvester | Hourly | Inside Sales | 9/15/2014 |
| 23 | 230-Sales Spprt | Christine Cheng | Hourly | Inside Sales | 1/1/2018 |
| 24 | 230-Sales Spprt | Nidia Salas | Hourly | Inside Sales | 1/1/2018 |
| 25 | 250-Marketing | Jeffrey Whitney | Salaried | VP Marketing | 6/23/2014 |
| 26 | 250-Marketing | Morgan Zerries | Salaried | Marketing Operations Manager | 1/21/2013 |
| 27 | 250-Marketing | Esteban Gallego | Hourly | Web Developer | 1/4/2016 |
| 28 | 250-Marketing | Jason Haniuk | Hourly | Graphic Designer | 1/21/2013 |
| 29 | 300-Engineering | Dhanashree Bora | Salaried | Firmware Engineer | 1/5/2009 |
| 30 | 300-Engineering | Phillip Fanous | Salaried | Software Engineer | 4/20/2011 |
| 31 | 300-Engineering | Sandee Jenkins | Salaried | Senior Hardware Engineer | 6/29/2009 |
| 32 | 300-Engineering | Alexander Krul | Salaried | Senior Firmware Engineer | 6/3/2014 |
| 33 | 300-Engineering | Mariusz Luczywek | Salaried | Firmware Engineer | 11/9/2015 |
| 34 | 300-Engineering | Silviu Popescu | Salaried | Director of Firmware Engineering | 3/21/2011 |
| 35 | 300-Engineering | Tuan Tran | Salaried | Product Engineer | 8/28/2017 |
| 36 | 300-Engineering | Chuangming Wu | Salaried | Senior Firmware Engineer | 5/11/2015 |
| 37 | 300-Engineering | William Avalos | Hourly | Electronic Technician | 3/6/2017 |
| 38 | 300-Engineering | Henry Trinh | Hourly | Electronic Technician | 10/12/2009 |
| 39 | 301-QA | Irina Areshina | Salaried | QA Engineer | 4/1/2016 |
| 40 | 301-QA | Alireza Kavyani | Salaried | QA Manager | 5/23/2016 |
| 41 | 301-QA | Anthony Moro | Salaried | QA Engineer | 3/10/2010 |
| 42 | 301-QA | Chatchai Seehatecho | Hourly | QA Tester | 1/30/2017 |
| 43 | 302-Product Dev. | Bradley Donaldson | Salaried | VP of Product Development | 5/29/2012 |
| 44 | 302-Product Dev. | Ming Che Yu | Salaried | Sr. Product Manager | 5/19/2014 |
| 45 | 400-Operation | Raul Calderon | Salaried | COO and GM | 7/16/2007 |
| 46 | 401-Tech Spprt | Theodore Brahams | Salaried | Director of Customer Support Services | 6/21/2010 |
| 47 | 401-Tech Spprt | Richard Kennedy | Salaried | Field Applications Engineer | 4/28/2014 |
| 48 | 401-Tech Spprt | Amaro Leon | Salaried | Technical Support Manager | 2/27/2008 |
| 49 | 401-Tech Spprt | Terry Stimson | Salaried | Field Applications Engineer | 6/23/2017 |
| 50 | 401-Tech Spprt | Christian Brunk | Hourly | Technical Support | 5/1/2017 |
| 51 | 401-Tech Spprt | John White | Hourly | Technical Support | 3/1/2018 |
| 52 | 402-Shipping | Carl Petersen | Salaried | Director of Logistics | 2/21/2005 |
| 53 | 402-Shipping | Elizabeth Beas | Hourly | Shipping Clerk | 6/16/2017 |
| 54 | 402-Shipping | Carlos Chavez | Hourly | Shipping Clerk | 6/12/2017 |
| 55 | 402-Shipping | Richard Romero | Hourly | Shipping Clerk | 11/5/2007 |
| 56 | 402-Packing | Daniel Foster | Hourly | Packing Worker | 6/12/2017 |
| 57 | 402-Packing | Orlando Gonzales | Hourly | Packing Supervisor | 12/1/2010 |

| 58 | 402-Packing | Anthony Lao | Hourly | Packing Worker | 4/18/2011 |
|----|-------------|-------------|--------|----------------|-----------|
| 59 | 402-Packing | Rodrigo Roque | Hourly | Packing Worker | 9/4/2012 |
| 60 | 500-Prod-Mini | Arnovigen Ghadimi | Hourly | Production Worker | 1/27/2014 |
| 61 | 500-Prod-Mini | Gene Lee | Hourly | Production Worker | 6/22/2009 |
| 62 | 500-Prod-Mini | Bao Vuong | Hourly | Production Worker | 10/3/2016 |
| 63 | 500-Prod-Pano | James Huynh | Hourly | Production Worker | 7/15/2013 |
| 64 | 500-Prod-Pano | Binh Dat Luong | Hourly | Production Worker | 7/16/2008 |
| 65 | 500-Prod-Pano | Hung Ly | Hourly | Production Worker | 5/2/2016 |
| 66 | 500-Prod-Pano | Ling Wang | Hourly | Production Worker | 5/2/2016 |
| 67 | 500-Prod-Mega | Eleazar Alingogan | Hourly | Production Worker | 9/1/2010 |
| 68 | 500-Prod-Mega | Cheuk Ming Chan | Hourly | Production Worker | 8/24/2009 |
| 69 | 500-Prod-Mega | Xuong Diep | Hourly | Production Worker | 8/18/2008 |
| 70 | 500-Prod-Mega | Zhuoha Zhu | Hourly | Production Worker | 5/1/2009 |
| 71 | 500-Prod-Mega | Wilson Luc | Hourly | Production Worker | 10/7/2014 |
| 72 | 500-Prod-Mega | Chanh Luong | Hourly | Production Supervisor | 7/16/2008 |
| 73 | 500-Prod-Mega | Justin Miller | Hourly | Production Worker | 4/28/2010 |
| 74 | 500-Prod-Mega | Kimberly Sin | Hourly | Production Worker | 11/2/2015 |
| 75 | 500-Prod-Mega | Dien Tang | Hourly | Production Worker | 2/9/2015 |
| 76 | 500-Prod-Mega | Bouthanome Sayvongsa | Hourly | Production Worker | 5/2/2016 |
| 77 | 500-RMA | Pavel Danielyan | Hourly | RMA Worker | 10/21/2009 |
| 78 | 500-RMA | Shukhrat Gafurjanov | Hourly | RMA Worker | 5/27/2008 |
| 79 | 500-RMA | Eric Gunawan | Hourly | RMA Worker | 3/26/2008 |
| 80 | 500-RMA | Egor Kireev | Hourly | RMA Supervisor | 11/20/2008 |
| 81 | 500-RMA | Vatsana Nijthaworn | Hourly | RMA Worker | 12/1/2010 |
| 82 | 504-QC | Chantala Phommasaysay | Hourly | QC Supervisor | 2/14/2011 |
| 83 | 504-QC | Mok Hanvijid | Hourly | QC Worker | 2/9/2015 |
| 84 | 504-QC | Amanda Douangpanya | Hourly | QC Worker | 5/2/2016 |
| 85 | 504-QC | Khanunghet Kuakul | Hourly | QC Worker | 10/3/2016 |
| 86 | 501-Receiving | Jesus Becerra | Hourly | Reveiving Supervisor | 11/2/2015 |
| 87 | 501-Receiving | Miguel Gonzales | Hourly | Receiving Clerk | 6/12/2017 |
| 88 | 502-Purchasing/Planning | Erik Faust | Salaried | Sr. Director of Operation | 2/20/2012 |
| 89 | 502-Purchasing/Planning | Anna Galvan | Salaried | Planning Manager | 1/3/2012 |
| 90 | 502-Purchasing/Planning | Gina Ponce | Salaried | Sr. Buyer | 3/26/2018 |
| 91 | 503-Mnfg Mgmt | Steven Roberts | Salaried | Director of Manufacturing | 9/7/2010 |
| 92 | EU - GmbH Employee | Evan Boyd | Salaried | German | 9/17/2012 |
| 93 | **Consultant | Alex Zanga | Fee | Consultant | 5/1/2018 |
| 94 | **Consultant | Chris Lee | Fee | Consultant | 4/7/2015 |
| 95 | **Consultant | Jack Lim | Fee | Consultant | 8/3/2015 |
| 96 | **Consultant | Johan Crause | Fee | Consultant | 4/1/2018 |
| 97 | **Consultant | Paul Tagger | Fee | Consultant | 5/1/2012 |
| 98 | **Consultant | Sanjit Bardhan | Fee | Consultant | 5/1/2011 |
| 99 | **Consultant | Vineet Panwar | Fee | Consultant | 10/1/2015 |
| 100 | **Consultant | Vishesh Warikoo | Fee | Consultant | 4/1/2018 |
| 101 | **Consultant | Waldemar Gollan | Fee | Consultant | 12/1/2010 |

** Consultants are compensate with a fixed fee, commission and PTO

Arecont Vision, LLC
APA Schedule  4.10(a) - Executory Contract / Cure Costs

| Count | Name | Category | Executory | Cure Cost Amount |
|---|---|---|---|---|
| 1 | Harco Group | International Reps | Y | $       - |
| 2 | VPATA | International Reps | Y | $       - |
| 3 | PAWBAN | International Reps | Y | $       - |
| 4 | Triborg Solutions | International Reps | Y | $       - |
| 5 | Erik Oudenjik | International Reps | Y | $       - |
| 6 | Henrik Andersson (SA Consulting AB) | International Reps | Y | $       - |
| 7 | Nicola Noviello | International Reps | Y | $       - |
| 8 | Ahmed Kafafy | International Reps | Y | $       - |
| 9 | Hikam Vision | International Reps | Y | $       - |
| 10 | Badger Reps | Domestic Reps | Y | $       - |
| 11 | SMC (Security Marketing Consultants) | Domestic Reps | Y | $       - |
| 12 | SESP | Domestic Reps | Y | $       - |
| 13 | PAR Products | Domestic Reps | Y | $       - |
| 14 | Paladin Sales | Domestic Reps | Y | $       - |
| 15 | OLOM Sales Inc. | Domestic Reps | Y | $       - |
| 16 | Genesis Agency Inc. | Domestic Reps | Y | $       - |
| 17 | Dave Nalezny | Domestic Reps | Y | $       - |
| 18 | Alex Zanga | Consultant - International | Y | $   2,348 |
| 19 | Chris Lee | Consultant - International | Y | $       - |
| 20 | Jack Lim | Consultant - International | Y | $       - |
| 21 | Johan Crause | Consultant - International | Y | $       - |
| 22 | Paul Tagger | Consultant - International | Y | $       - |
| 23 | Sanjit Bardhan | Consultant - International | Y | $       - |
| 24 | Vineet Panwar | Consultant - International | Y | $       - |
| 25 | Vishesh Wankoo | Consultant - International | Y | $       - |
| 26 | Waldemar Gollan | Consultant - International | Y | $       - |
| 27 | Edmond Deravanessian | Employee | Y | $       - |
| 28 | John Bujarski | Employee | Y | $       - |
| 29 | Mitchell Fagundas | Employee | Y | $       - |
| 30 | Kyle Parker | Employee | Y | $       - |
| 31 | Jeffrey Whitney | Employee | Y | $       - |
| 32 | Sandee Jenkins | Employee | Y | $       - |
| 33 | Alexander Krul | Employee | Y | $       - |
| 34 | Silviu Popescu | Employee | Y | $       - |
| 35 | Bradley Donaldson | Employee | Y | $       - |
| 36 | Raul Calderon | Employee | Y | $       - |
| 37 | Carl Petersen | Employee | Y | $       - |
| 38 | Erik Faust | Employee | Y | $       - |
| 39 | Anna Galvan | Employee | Y | $       - |
| 40 | Steven Roberts | Employee | Y | $       - |
| 41 | Express Logic | Supplier | Y | $       - |
| 42 | Nexcom Mechanical Design and Tooling (Contera) | Supplier | Y | $       - |
| 43 | OPEN EYE OEM | Supplier | Y | $       - |
| 44 | Shurcon Manufacturing Company | Supplier | Y | $       - |
| 45 | Techital | Supplier | Y | $       - |
| 46 | C-Pro Electronics Co Ltd. | Supplier | Y | |
| 47 | TopView Optronics Corp. Technologies Inc. | Supplier | Y | |
| 48 | SAE Electronic Co.Ltd | Supplier | Y | |
| 49 | Lenel | Supplier | Y | |
| 50 | BSREP Southern California Office LA LLC | Lease (Office) | Y | $   103,542 |
| 51 | Security Search & Consulting | Employment agency | Y | $       - |
| 52 | CyberCoders Inc | Employment agency | Y | $       - |
| 53 | Thinkingahead Inc | Employment Agency | Y | $       - |
| 54 | Allen Deravanessian | Temporary Labor | Y | $       - |
| 55 | Emmie Martirossian | Temporary Labor | Y | $       - |
| 56 | Mary Knauf | Temporary Labor | Y | $       - |
| 57 | Accountemps | Temporary Labor | Y | $       - |
| 58 | Act-1 Personnel Services | Temporary Labor | Y | $       - |
| 59 | AEROTEK INC | Temporary Labor | Y | $       - |
| 60 | AppleOne Employment Services | Temporary Labor | Y | $       - |
| 61 | Volt Funding Corporation | Temporary Labor | Y | $   2,530 |
| 62 | TechTeam UG | Temporary Labor | Y | $   19,907 |
| 63 | Anthem Blue Cross | Benefits | Y | $       - |
| 64 | John Hancock Life Insurance Co. | Benefits | Y | $       - |
| 65 | TASC | Benefits | Y | $       - |
| 66 | Linode.com | IT | Y | $       - |
| 67 | Birch Communications Inc | IT | Y | $       - |
| 68 | Amazon web Services | IT | Y | $       - |
| 69 | Acts93 Inc | IT | Y | $       - |
| 70 | SPS Commerce | IT | Y | $       - |

| 71 | LogMeIn USA, Inc. | IT | Y | $ - |
| 72 | Monoprice, Inc. | IT | Y | $ - |
| 73 | Efax Services | IT | Y | $ - |
| 74 | Sine Wave | Maintenance | Y | $ - |
| 75 | Andersen Commercial Plumbing Inc | Maintenance | Y | $ - |
| 76 | West Coast Air Conditioning | Maintenance | Y | $ - |
| 77 | A.T. Electric | Maintenance | Y | $ - |
| 78 | Archer's Lock & Security Inc | Maintenance | Y | $ 85 |
| 79 | CM Forklift Inc. | Maintenance | Y | $ - |
| 80 | Innovative Door Solutions | Maintenance | Y | $ - |
| 81 | Laura Cambran Perez | Maintenance | Y | $ - |
| 82 | Pairavi Law P. C. Client Trust Account | Professional Services | Y | $ - |
| 83 | Jones & Malhotra, CPA | Professional Services | Y | $ - |
| 84 | Gordon & Rees LLP | Professional Services | Y | $ - |
| 85 | Anna Hovhannisyan | Professional Services | Y | $ - |
| 86 | Boon Jat Yong | Professional Services | Y | $ - |
| 87 | Contegix | Professional Services | Y | $ 2,904 |
| 88 | Emin Yavuz Bakioglu | Professional Services | Y | $ 930 |
| 89 | ONVIF Inc | Professional Services | Y | $ - |
| 90 | TecTeam UG | Professional Services | Y | $ - |
| 91 | Vitaly Telichevsky | Professional Services | Y | $ 720 |
| 92 | Holthouse Carlin Van Trigt LLP | Professional Services | Y | $ - |
| 93 | Law Office of Victoria J.Suh | Professional Services | Y | $ - |
| 94 | Law Offices of Kevin J. Keenan | Professional Services | Y | $ - |
| 95 | Lewis Roca Rothgerber Christie | Professional Services | Y | $ - |
| 96 | Moore Stephens Consultants | Professional Services | Y | $ - |
| 97 | Steinberg Law Firm | Professional Services | Y | $ - |
| 98 | Bailey Strategic Human Resources | Professional Services | Y | $ - |
| 99 | EKU Kalinowski | Storage | Y | $ - |
| 100 | ACH Public Storage Glendale | Storage | Y | $ - |
| 101 | 1 ST PRIORITY LLC | Customer | N | $ - |
| 102 | 2D Electronics LLC | Customer | N | $ - |
| 103 | 3xLogic USA | Customer | N | $ - |
| 104 | Absolute Communications | Customer | N | $ - |
| 105 | Access And Beyond LTD | Customer | N | $ - |
| 106 | Accu-Tech Corp. | Customer | N | $ - |
| 107 | AD.TEK | Customer | N | $ - |
| 108 | ADAWLIAH Electronics Appliances | Customer | N | $ - |
| 109 | Adder Digital | Customer | N | $ - |
| 110 | ADI Canada/ADI Burtek | Customer | N | $ - |
| 111 | ADI Gardiner France | Customer | N | $ - |
| 112 | ADI Gardiner Limited | Customer | N | $ - |
| 113 | ADI Gardiner Netherlands B.V. | Customer | N | $ - |
| 114 | ADI Global Distribution Africa | Customer | N | $ - |
| 115 | ADI India | Customer | N | $ - |
| 116 | ADI-Alarmsystem a/s | Customer | N | $ - |
| 117 | ADISES SA DE CV | Customer | N | $ - |
| 118 | Advance Technology | Customer | N | $ - |
| 119 | Advance Technology System & Solution Co. | Customer | N | $ - |
| 120 | Advent Systems, Inc. | Customer | N | $ - |
| 121 | AFIINTRA TECHNOLOGIES SDN.BHD. | Customer | N | $ - |
| 122 | AICON International | Customer | N | $ - |
| 123 | Alarm Engineering | Customer | N | $ - |
| 124 | Alarm Products Distributors | Customer | N | $ - |
| 125 | Alarmas AAA | Customer | N | $ - |
| 126 | Alarmtech | Customer | N | $ - |
| 127 | Alava Ingeieros Telecom SLU | Customer | N | $ - |
| 128 | Allied Fire and Security | Customer | N | $ - |
| 129 | Allnet GmbH | Customer | N | $ - |
| 130 | Allnet.Italia s.r.l. | Customer | N | $ - |
| 131 | Altinova Elektronik | Customer | N | $ - |
| 132 | Amalgamated Security Services Limited | Customer | N | $ - |
| 133 | Amano Mcgann Inc | Customer | N | $ - |
| 134 | Amcorp Security Group North America, LLC | Customer | N | $ - |
| 135 | American Digital Security | Customer | N | $ - |
| 136 | American Electronics S.A. | Customer | N | $ - |
| 137 | Ametras Vision GmbH | Customer | N | $ - |
| 138 | Anixter Australia Pty LTD | Customer | N | $ - |
| 139 | Anixter Canada | Customer | N | $ - |
| 140 | Anixter LTD ( VAT# DE282648386) | Customer | N | $ - |
| 141 | ANIXTER LTD (SE502071273201) Sweden | Customer | N | $ - |
| 142 | ANIXTER LTD (VAT BE0845884639) ( Belgium) | Customer | N | $ - |
| 143 | ANIXTER LTD (VAT ESN8262745F)(SPAIN) | Customer | N | $ - |

| 144 | ANIXTER LTD (VAT IE9826425R) IRELAND | Customer | N | $ | - |
|-----|---------------------------------------|----------|---|---|---|
| 145 | ANIXTER LTD (VAT IT00148349996)(ITALY) | Customer | N | $ | - |
| 146 | ANIXTER LTD(GB685161322) UK | Customer | N | $ | - |
| 147 | Anixter Middle East FZE | Customer | N | $ | - |
| 148 | Anixter Puerto Rico Sales | Customer | N | $ | - |
| 149 | Anixter Singapore | Customer | N | $ | - |
| 150 | Anixter Singapore Pte Ltd | Customer | N | $ | - |
| 151 | Anixter South America | Customer | N | $ | - |
| 152 | Anixter, Inc | Customer | N | $ | - |
| 153 | Anteco LTD | Customer | N | $ | - |
| 154 | Arnel Limited | Customer | N | $ | - |
| 155 | Aronson Security Group | Customer | N | $ | - |
| 156 | ATECO | Customer | N | $ | - |
| 157 | Audio Innovations Of Fresno, LLC | Customer | N | $ | - |
| 158 | AVTEL Ltd. | Customer | N | $ | - |
| 159 | Bacom Internetwork Co., Ltd. | Customer | N | $ | - |
| 160 | Balton CP Ltd. | Customer | N | $ | - |
| 161 | Baud Telecommunication Networks | Customer | N | $ | - |
| 162 | Bet Systems Limited | Customer | N | $ | - |
| 163 | Bizplanet Solution Pte Ltd | Customer | N | $ | - |
| 164 | BLUEIT CO. LTD | Customer | N | $ | - |
| 165 | BORINATO SECURITY SRL | Customer | N | $ | - |
| 166 | Bridge Trading USA LLC | Customer | N | $ | - |
| 167 | Brooklyn Low Voltage Supply | Customer | N | $ | - |
| 168 | Brownsburg Community School Corporation | Customer | N | $ | - |
| 169 | Business Technology Partners | Customer | N | $ | - |
| 170 | C&C Partners Sp. z o.o | Customer | N | $ | - |
| 171 | CAMART SDN BHD | Customer | N | $ | - |
| 172 | CAMERA CORNER/ CONNECTING POINT | Customer | N | $ | - |
| 173 | Cassidy Technologies | Customer | N | $ | - |
| 174 | CBE | Customer | N | $ | - |
| 175 | CCF- COMPTOIR DES COURANTS FAIBLES | Customer | N | $ | - |
| 176 | CCTV | Customer | N | $ | - |
| 177 | CCTV Center S.L. | Customer | N | $ | - |
| 178 | CITEK CORPORATION | Customer | N | $ | - |
| 179 | CJSC Arecont Vision | Customer | N | $ | - |
| 180 | CM3 Building Solutions, Inc. | Customer | N | $ | - |
| 181 | Communications Supply Corp | Customer | N | $ | - |
| 182 | Computec Korea CO., Ltd | Customer | N | $ | - |
| 183 | Computer Gross Italia S.P.A. | Customer | N | $ | - |
| 184 | Comtel Systems Technology, Inc. | Customer | N | $ | - |
| 185 | Convergint Technologies | Customer | N | $ | - |
| 186 | Coting d.o.o. | Customer | N | $ | - |
| 187 | CS Media Inc | Customer | N | $ | - |
| 188 | CUSTOM COMMUNICATIONS, INC. | Customer | N | $ | - |
| 189 | Custom Electronic Supply | Customer | N | $ | - |
| 190 | Custos bvba | Customer | N | $ | - |
| 191 | DATA LAB Sas | Customer | N | $ | - |
| 192 | DataLink Interactive Inc. | Customer | N | $ | - |
| 193 | DC Adonay | Customer | N | $ | - |
| 194 | DEMA SA | Customer | N | $ | - |
| 195 | Detec AS | Customer | N | $ | - |
| 196 | Digital Media For Security  Systems. | Customer | N | $ | - |
| 197 | Digitalcom Co.,Ltd. | Customer | N | $ | - |
| 198 | Digitalwatch Guard | Customer | N | $ | - |
| 199 | Distrotech AB | Customer | N | $ | - |
| 200 | Divis | Customer | N | $ | - |
| 201 | Dunk Fire & Security | Customer | N | $ | - |
| 202 | E-Arion SA | Customer | N | $ | - |
| 203 | Earl Bolanos. | Customer | N | $ | - |
| 204 | Edist | Customer | N | $ | - |
| 205 | EDNETICS | Customer | N | $ | - |
| 206 | EDSLAN SRL | Customer | N | $ | - |
| 207 | Electro-Systems Ind. Corp | Customer | N | $ | - |
| 208 | ENNTE VISION AS | Customer | N | $ | - |
| 209 | Entech - Dallas | Customer | N | $ | - |
| 210 | EQUIPOS DE SEGURIDAD MAGOCAD, S.A. DE C.V | Customer | N | $ | - |
| 211 | ESCO Communications | Customer | N | $ | - |
| 212 | Esentia Systems, Inc. | Customer | N | $ | - |
| 213 | Esprinet S.P.A. | Customer | N | $ | - |
| 214 | E-Tech Systems | Customer | N | $ | - |
| 215 | Euroalarm | Customer | N | $ | - |
| 216 | Euroma Telecom | Customer | N | $ | - |

| 217 | European Security Trading | Customer | N | $ | - |
|-----|---------------------------|----------|---|---|---|
| 218 | EYEP Solutions | Customer | N | $ | - |
| 219 | Fares For Networks & IT Solutions | Customer | N | $ | - |
| 220 | Fast Forward Electronics | Customer | N | $ | - |
| 221 | Federal Protection, Inc. | Customer | N | $ | - |
| 222 | Full Protection | Customer | N | $ | - |
| 223 | Futurehome Systems & Design Inc. | Customer | N | $ | - |
| 224 | G4S. | Customer | N | $ | - |
| 225 | Getterson/Centennial | Customer | N | $ | - |
| 226 | Geutebrueck Australia | Customer | N | $ | - |
| 227 | Global Surveillance Associates | Customer | N | $ | - |
| 228 | Global Surveillance System, Inc | Customer | N | $ | - |
| 229 | Graybar | Customer | N | $ | - |
| 230 | Graybar Electric Company, Inc. | Customer | N | $ | - |
| 231 | Gric Aktiv | Customer | N | $ | - |
| 232 | Guangzhou isSec Security Technology Co. | Customer | N | $ | - |
| 233 | Gulf Business Machines LLC | Customer | N | $ | - |
| 234 | Hamilton Safe Company | Customer | N | $ | - |
| 235 | Harco Group Sa/NV | Customer | N | $ | - |
| 236 | Hilis Limited | Customer | N | $ | - |
| 237 | Honeywell Security Espana S.L. | Customer | N | $ | - |
| 238 | Honeywell Security Italia S.r.l. | Customer | N | $ | - |
| 239 | Honeywell Security Italy SpA | Customer | N | $ | - |
| 240 | Honeywell, spol. s r .o. | Customer | N | $ | - |
| 241 | ICD Security Solutions (HK) Ltd | Customer | N | $ | - |
| 242 | ICD Security Solutions G.K. | Customer | N | $ | - |
| 243 | Icetronica Ehf. | Customer | N | $ | - |
| 244 | Industrial Video & Control | Customer | N | $ | - |
| 245 | Infinity Distribution | Customer | N | $ | - |
| 246 | INFOBUS, SRL | Customer | N | $ | - |
| 247 | INFOCAST | Customer | N | $ | - |
| 248 | INFRASOUL TECHSERVE PVT.LTD | Customer | N | $ | - |
| 249 | Ingenieria de Proteccion SRL | Customer | N | $ | - |
| 250 | Innovative Security Systems, Inc. | Customer | N | $ | - |
| 251 | Innowave IT Infrastructures Ltd. | Customer | N | $ | - |
| 252 | Integrators Australia Pty Ltd | Customer | N | $ | - |
| 253 | International Security & Trading Corp | Customer | N | $ | - |
| 254 | IPTECNO VIDEOVIGILANCIA S.L. | Customer | N | $ | - |
| 255 | ISS INTEGRAL SECURITY SYSTEMS, S.A. | Customer | N | $ | - |
| 256 | ISTC de Chile S.A. | Customer | N | $ | - |
| 257 | ISTC de Mexico Sa De CV | Customer | N | $ | - |
| 258 | ITESA | Customer | N | $ | - |
| 259 | ITWORKS LLC , DUBAI | Customer | N | $ | - |
| 260 | JK-Handelsonderneming | Customer | N | $ | - |
| 261 | JMG Security Systems | Customer | N | $ | - |
| 262 | JSJ Rodriguez, Inc | Customer | N | $ | - |
| 263 | Koving doo | Customer | N | $ | - |
| 264 | La Estrella Solitaria S.A | Customer | N | $ | - |
| 265 | Linear Tech SA de CV | Customer | N | $ | - |
| 266 | LMKT Private Ltd | Customer | N | $ | - |
| 267 | Logen Sa de CV | Customer | N | $ | - |
| 268 | LOOP SKUPINA D.O.O. | Customer | N | $ | - |
| 269 | M.A. TECH | Customer | N | $ | - |
| 270 | Madwave Ltd. | Customer | N | $ | - |
| 271 | Marinequip AS | Customer | N | $ | - |
| 272 | Martco | Customer | N | $ | - |
| 273 | Matt J. McCoy | Customer | N | $ | - |
| 274 | Max Tech / Johan Crause | Customer | N | $ | - |
| 275 | Maxtec Peripherals (PTY) LTD | Customer | N | $ | - |
| 276 | MCW Solutions | Customer | N | $ | - |
| 277 | MG WORLDWIDE DISTRIBUTORS,LLC | Customer | N | $ | - |
| 278 | MGTS. | Customer | N | $ | - |
| 279 | Micro Integration | Customer | N | $ | - |
| 280 | Microbiz Security Company | Customer | N | $ | - |
| 281 | Midco Inc. | Customer | N | $ | - |
| 282 | Middle Point | Customer | N | $ | - |
| 283 | Midwest Digital Systems, LLC | Customer | N | $ | - |
| 284 | Minuteman Security Tech., Inc | Customer | N | $ | - |
| 285 | Nantze Electric Company Inc. | Customer | N | $ | - |
| 286 | National Fire and Security Ltd | Customer | N | $ | - |
| 287 | NAVCO Security Systems | Customer | N | $ | - |
| 288 | Neural Integrated Systems Pvt Ltd | Customer | N | $ | - |
| 289 | NEXTLAN s.r.o. | Customer | N | $ | - |

| 290 | Norbain SD Limited UK | Customer | N | $ | - |
|-----|-----------------------|----------|---|---|---|
| 291 | Norefco Safecam | Customer | N | $ | - |
| 292 | North American Video, Inc. | Customer | N | $ | - |
| 293 | NorthStar Security, Inc. | Customer | N | $ | - |
| 294 | Novatron Sec Distribution SA | Customer | N | $ | - |
| 295 | Octopuss SA | Customer | N | $ | - |
| 296 | Office Pro Technologies dba OPTECH | Customer | N | $ | - |
| 297 | One Source Security | Customer | N | $ | - |
| 298 | Optima Networks Bvba | Customer | N | $ | - |
| 299 | Pacific Communications | Customer | N | $ | - |
| 300 | Parthex, Inc. | Customer | N | $ | - |
| 301 | Patararungroj Ltd. | Customer | N | $ | - |
| 302 | Pekin Public Schools District 108 | Customer | N | $ | - |
| 303 | Petards | Customer | N | $ | - |
| 304 | Photoscan System Co., Ltd | Customer | N | $ | - |
| 305 | Phu Ha Limited Company | Customer | N | $ | - |
| 306 | Pillar Innovations, LLC | Customer | N | $ | - |
| 307 | PKE Electronics AG | Customer | N | $ | - |
| 308 | Plan B Networks | Customer | N | $ | - |
| 309 | Platt Electric Supply | Customer | N | $ | - |
| 310 | Post Browning | Customer | N | $ | - |
| 311 | Prism One Group LLC | Customer | N | $ | - |
| 312 | Prisma Bytes Sdn Bhd | Customer | N | $ | - |
| 313 | PSA | Customer | N | $ | - |
| 314 | PT Data Global Komumatama | Customer | N | $ | - |
| 315 | PT Golden Solutions Indonesia | Customer | N | $ | - |
| 316 | PT. 3D Network Indonestia | Customer | N | $ | - |
| 317 | PT. 3D Networks Indonesia | Customer | N | $ | - |
| 318 | Q Security Systems | Customer | N | $ | - |
| 319 | Quang Dung Technology Distribution Co.LTD | Customer | N | $ | - |
| 320 | Quartz Matrix | Customer | N | $ | - |
| 321 | Quemic Mauritius | Customer | N | $ | - |
| 322 | REDYCOM | Customer | N | $ | - |
| 323 | Relyco Resources, Inc | Customer | N | $ | - |
| 324 | S3 Integration | Customer | N | $ | - |
| 325 | SAC Seguridad Automatizacion Y Control SA | Customer | N | $ | - |
| 326 | San Ramon Valley Unified School District | Customer | N | $ | - |
| 327 | Scan Source | Customer | N | $ | - |
| 328 | Scansource Latin America Inc. | Customer | N | $ | - |
| 329 | Scope LTD Corp | Customer | N | $ | - |
| 330 | Sectron | Customer | N | $ | - |
| 331 | Securadyne Systems | Customer | N | $ | - |
| 332 | SecureWatch24 LLC | Customer | N | $ | - |
| 333 | Securitec One Inc. | Customer | N | $ | - |
| 334 | Securitech Systems Limited | Customer | N | $ | - |
| 335 | Securitronics | Customer | N | $ | - |
| 336 | Security 101 | Customer | N | $ | - |
| 337 | Security Data Supply, LLC | Customer | N | $ | - |
| 338 | Security Equipment, Inc. | Customer | N | $ | - |
| 339 | Security Integration Group, Inc. | Customer | N | $ | - |
| 340 | SEICO Inc. | Customer | N | $ | - |
| 341 | Sekunet S.A. | Customer | N | $ | - |
| 342 | SensorLink Holdings Sdn Bhd | Customer | N | $ | - |
| 343 | Shanghai North Crown Co. Ltd | Customer | N | $ | - |
| 344 | Shiba | Customer | N | $ | - |
| 345 | SI Technologies, Inc. | Customer | N | $ | - |
| 346 | Siel Invest S.R.L | Customer | N | $ | - |
| 347 | Siemens LLC UAE | Customer | N | $ | - |
| 348 | Silmar Electronics | Customer | N | $ | - |
| 349 | SimplexGrinnell LP | Customer | N | $ | - |
| 350 | SIRIUS SPA ( Compass ) Dist | Customer | N | $ | - |
| 351 | Sistemas Y Servicios de Comunicacion, S.A | Customer | N | $ | - |
| 352 | SKY TECHNOLOGIES D.O.O. | Customer | N | $ | - |
| 353 | Sonitrol Security | Customer | N | $ | - |
| 354 | Sonivision S.A. | Customer | N | $ | - |
| 355 | Sound Inc. | Customer | N | $ | - |
| 356 | Sound Inc. | Customer | N | $ | - |
| 357 | Space Exploration Technologies Corp. | Customer | N | $ | - |
| 358 | SPS ELECTRONICS | Customer | N | $ | - |
| 359 | STA Tehniks | Customer | N | $ | - |
| 360 | Stanley Convergent Security Solutions | Customer | N | $ | - |
| 361 | Steehold Company Limited | Customer | N | $ | - |
| 362 | STEVE McGLASSON- C | Customer | N | $ | - |

| 363 | SVD France | Customer | N | $ - |
| 364 | SystemK Corporation | Customer | N | $ - |
| 365 | Systems Distributors, Inc. | Customer | N | $ - |
| 366 | Takachiho Koheki | Customer | N | $ - |
| 367 | TCK Technology CO LTD | Customer | N | $ - |
| 368 | Tech Domain | Customer | N | $ - |
| 369 | Tech Electronics | Customer | N | $ - |
| 370 | Techno Q for Security Systems | Customer | N | $ - |
| 371 | Teeya Master Systems CO. LTD | Customer | N | $ - |
| 372 | Telenet VoIP, Inc. | Customer | N | $ - |
| 373 | Tenco Supplies Inc. | Customer | N | $ - |
| 374 | The Security Group Corp | Customer | N | $ - |
| 375 | Trans Audio Video SRL | Customer | N | $ - |
| 376 | Transworld Limitada | Customer | N | $ - |
| 377 | Trident Seafoods Corporation | Customer | N | $ - |
| 378 | Tri-Ed/ Northern Video Distribution | Customer | N | $ - |
| 379 | TRL Systems, Inc. | Customer | N | $ - |
| 380 | TSE Australia | Customer | N | $ - |
| 381 | Ultrak Security Systems Sp. z.o.o. | Customer | N | $ - |
| 382 | Unisol International Corp | Customer | N | $ - |
| 383 | United Technology Group DWC LLC | Customer | N | $ - |
| 384 | Vegas Valley Locking Systems | Customer | N | $ - |
| 385 | Vicon Industries | Customer | N | $ - |
| 386 | Vicon Norway | Customer | N | $ - |
| 387 | Video Guard B.V. | Customer | N | $ - |
| 388 | Vido Electronic | Customer | N | $ - |
| 389 | Viewrun | Customer | N | $ - |
| 390 | Volutone Dist.(Simi Valey, CA) | Customer | N | $ - |
| 391 | Voxtel Smart Security Solutions LLC | Customer | N | $ - |
| 392 | Walters Wholesale Electronic Co. | Customer | N | $ - |
| 393 | Westec Supplies | Customer | N | $ - |
| 394 | Will Electronics | Customer | N | $ - |
| 395 | Worcester County Sheriff's Office | Customer | N | $ - |

Arecont Vision, LLC
APA Schedule 4.10(b) - Executory Contract Assumed/Rejected

| Count | Name | Category | Executory | Cure Cost Amount | Accept / Reject |
|---|---|---|---|---|---|
| 1 | Harco Group | International Reps | Y | $ - | Assume |
| 2 | VPATA | International Reps | Y | $ - | Assume |
| 3 | PAWBAN | International Reps | Y | $ - | Assume |
| 4 | Triborg Solutions | International Reps | Y | $ - | Assume |
| 5 | Erik Oudenrijn | International Reps | Y | $ - | Assume |
| 6 | Henrik Andersson (SA Consulting AB) | International Reps | Y | $ - | Assume |
| 7 | Nicola Novitello | International Reps | Y | $ - | Assume |
| 8 | Ahmed Kalafy | International Reps | Y | $ - | Assume |
| 9 | Hikam Vision | International Reps | Y | $ - | Assume |
| 10 | Badger Reps | Domestic Reps | Y | $ - | Assume |
| 11 | SMC (Security Marketing Consultants) | Domestic Reps | Y | $ - | Assume |
| 12 | SESP | Domestic Reps | Y | $ - | Assume |
| 13 | PAR Products | Domestic Reps | Y | $ - | Assume |
| 14 | Paladin Sales | Domestic Reps | Y | $ - | Assume |
| 15 | OCOM Sales Inc. | Domestic Reps | Y | $ - | Assume |
| 16 | Genesis Agency Inc. | Domestic Reps | Y | $ - | Assume |
| 17 | Dave Nalezny | Domestic Reps | Y | $ - | Assume |
| 18 | Alex Zanga | Consultant - International | Y | $ 2,348 | Assume |
| 19 | Chris Lee | Consultant - International | Y | $ - | Assume |
| 20 | Jack Lim | Consultant - International | Y | $ - | Assume |
| 21 | Johan Crause | Consultant - International | Y | $ - | Assume |
| 22 | Paul Tagger | Consultant - International | Y | $ - | Assume |
| 23 | Sanjit Bardhan | Consultant - International | Y | $ - | Assume |
| 24 | Vineet Panwar | Consultant - International | Y | $ - | Assume |
| 25 | Vishesh Wankoo | Consultant - International | Y | $ - | Assume |
| 26 | Waldemar Gollan | Consultant - International | Y | $ - | Assume |
| 27 | Edmond Deravanessian | Employee | Y | $ - | Assume |
| 28 | John Bujarski | Employee | Y | $ - | Assume |
| 29 | Mitchell Fagundas | Employee | Y | $ - | Assume |
| 30 | Kyle Parker | Employee | Y | $ - | Assume |
| 31 | Jeffrey Whitney | Employee | Y | $ - | Assume |
| 32 | Sandee Jenkins | Employee | Y | $ - | Assume |
| 33 | Alexander Krul | Employee | Y | $ - | Assume |
| 34 | Silviu Popescu | Employee | Y | $ - | Assume |
| 35 | Bradley Donaldson | Employee | Y | $ - | Assume |
| 36 | Raul Calderon | Employee | Y | $ - | Assume |
| 37 | Carl Petersen | Employee | Y | $ - | Assume |
| 38 | Erik Faust | Employee | Y | $ - | Assume |
| 39 | Anna Galvan | Employee | Y | $ - | Assume |
| 40 | Steven Roberts | Employee | Y | $ - | Assume |
| 41 | Express Logic | Supplier | Y | $ - | Assume |
| 42 | Nexcom Mechanical Design and Tooling | Customer | Y | $ - | Assume |
| 43 | OPEN EYE OEM | Supplier | Y | $ - | Assume |
| 44 | Shurcon Manufacturing Company | Supplier | Y | $ - | Assume |
| 45 | Techital | Supplier | Y | $ - | Assume |
| 46 | C-Pro Electronics Co Ltd. | Supplier | Y | $ - | Assume |
| 47 | TopView Optronics Corp. Technologies In | Supplier | Y | $ - | Assume |
| 48 | SAE Electronic Co.,Ltd | Supplier | Y | $ - | Assume |
| 49 | Lenel | Supplier | Y | $ - | Assume |
| 50 | BSREP Southern Californa Office 1A LLC | Lease (Office) | Y | $ 103,542 | Reject |
| 51 | Security Search & Consulting | Employment agency | Y | $ - | Assume |
| 52 | CyberCoders Inc | Employment agency | Y | $ - | Assume |
| 53 | Thinkingahead Inc | Employment agency | Y | $ - | Assume |
| 54 | Allen Deravanessian | Temporary Labor | Y | $ - | Assume |
| 55 | Emmie Martirossian | Temporary Labor | Y | $ - | Assume |
| 56 | Mary Knauf | Temporary Labor | Y | $ - | Assume |
| 57 | Accountemps | Temporary Labor | Y | $ - | Assume |
| 58 | Act-1 Personnel Services | Temporary Labor | Y | $ - | Assume |
| 59 | AEROTEK INC | Temporary Labor | Y | $ - | Assume |
| 60 | AppleOne Employment Services | Temporary Labor | Y | $ - | Assume |
| 61 | Volt Funding Corporation | Temporary Labor | Y | $ 2,530 | Assume |
| 62 | TechTeam UG | Temporary Labor | Y | $ 39,907 | Assume |
| 63 | Anthem Blue Cross | Benefits | Y | $ - | Assume |
| 64 | John Hancock Life Insurance Co. | Benefits | Y | $ - | Assume |
| 65 | TASC | Benefits | Y | $ - | Assume |
| 66 | Linode.com | IT | Y | $ - | Assume |
| 67 | Birch Communications Inc | IT | Y | $ - | Assume |
| 68 | Amazon web Services | IT | Y | $ - | Assume |
| 69 | Acts55 Inc | IT | Y | $ - | Assume |
| 70 | SPS Commerce | IT | Y | $ - | Assume |
| 71 | LogMeln USA, Inc. | IT | Y | $ - | Assume |
| 72 | Monoprice, Inc. | IT | Y | $ - | Assume |
| 73 | Efax Services | IT | Y | $ - | Assume |
| 74 | Sine Wave | Maintenance | Y | $ - | Assume |
| 75 | Andersen Commercial Plumbing Inc | Maintenance | Y | $ - | Assume |
| 76 | West Coast Air Conditioning | Maintenance | Y | $ - | Assume |
| 77 | A.L. Electric | Maintenance | Y | $ - | Assume |
| 78 | Archer's Lock & Security Inc | Maintenance | Y | $ 85 | Assume |
| 79 | CM Forklift Inc. | Maintenance | Y | $ - | Assume |

| # | Name | Category | | $ | | Action |
|---|---|---|---|---|---|---|
| 80 | Innovative Door Solutions | Maintenance | Y | $ | - | Assume |
| 81 | Laura Cambron Perez | Maintenance | Y | $ | - | Assume |
| 82 | Pairavi Law F., C. Client Trust Account | Professional Services | Y | $ | - | Reject |
| 83 | Jones & Malhotra, CPA | Professional Services | Y | $ | - | Reject |
| 84 | Gordon & Rees LLP | Professional Services | Y | $ | - | Reject |
| 85 | Anna Hovhannisyan | Professional Services | Y | $ | - | Reject |
| 86 | Boon Jat Yong | Professional Services | Y | $ | - | Reject |
| 87 | Contegix | Professional Services | Y | $ | 2,904 | Reject |
| 88 | Emin Yavuz Bakioglu | Professional Services | Y | $ | 930 | Reject |
| 89 | ONVIF Inc | Professional Services | Y | $ | - | Reject |
| 90 | TecTeam UG | Professional Services | Y | $ | - | Reject |
| 91 | Vitaly Telshevsky | Professional Services | Y | $ | 720 | Reject |
| 92 | Holthouse Carlin Van Trigt LLP | Professional Services | Y | $ | - | Reject |
| 93 | Law Office of Victoria J.Suh | Professional Services | Y | $ | - | Reject |
| 94 | Law Offices of Kevin J. Keenan | Professional Services | Y | $ | - | Reject |
| 95 | Lewis Roca Rothgerber Christie | Professional Services | Y | $ | - | Reject |
| 96 | Moore Stephens Consultants | Professional Services | Y | $ | - | Assume |
| 97 | Steinberg Law Firm | Professional Services | Y | $ | - | Assume |
| 98 | Bailey Strategic Human Resources | Professional Services | Y | $ | - | Assume |
| 99 | EKU Kalinowski | Storage | Y | $ | - | Assume |
| 100 | ACH Public Storage Glendale | Storage | Y | $ | - | Assume |
| 101 | 1 ST PRIORITY LLC | Customer | N | $ | - | Assume |
| 102 | 2D Electronics LLC | Customer | N | $ | - | Assume |
| 103 | 3xLogic USA | Customer | N | $ | - | Assume |
| 104 | Absolute Communications | Customer | N | $ | - | Assume |
| 105 | Access And Beyond LTD | Customer | N | $ | - | Assume |
| 106 | Accu-Tech Corp. | Customer | N | $ | - | Assume |
| 107 | AD.TEK | Customer | N | $ | - | Assume |
| 108 | ADAWLIAH Electronics Appliances | Customer | N | $ | - | Assume |
| 109 | Adder Digital | Customer | N | $ | - | Assume |
| 110 | ADI Canada/ADI Burtek | Customer | N | $ | - | Assume |
| 111 | ADI Gardiner France | Customer | N | $ | - | Assume |
| 112 | ADI Gardiner Limited | Customer | N | $ | - | Assume |
| 113 | ADI Gardiner Netherlands B.V. | Customer | N | $ | - | Assume |
| 114 | ADI Global Distribution Africa | Customer | N | $ | - | Assume |
| 115 | ADI India | Customer | N | $ | - | Assume |
| 116 | ADI-Alarmsystem a/s | Customer | N | $ | - | Assume |
| 117 | ADISES SA DE CV | Customer | N | $ | - | Assume |
| 118 | Advance Technology | Customer | N | $ | - | Assume |
| 119 | Advance Technology System & Solution C | Customer | N | $ | - | Assume |
| 120 | Advent Systems, Inc. | Customer | N | $ | - | Assume |
| 121 | AFFINTRA TECHNOLOGIES SDN.BHD. | Customer | N | $ | - | Assume |
| 122 | AICON International | Customer | N | $ | - | Assume |
| 123 | Alarm Engineering | Customer | N | $ | - | Assume |
| 124 | Alarm Products Distributors | Customer | N | $ | - | Assume |
| 125 | Alarmas AAA | Customer | N | $ | - | Assume |
| 126 | Alarmtesh | Customer | N | $ | - | Assume |
| 127 | Alava Ingenieros Telecom SLU | Customer | N | $ | - | Assume |
| 128 | Allied Fire and Security | Customer | N | $ | - | Assume |
| 129 | Allnet GmbH | Customer | N | $ | - | Assume |
| 130 | Allnet.ita ia s.r.l. | Customer | N | $ | - | Assume |
| 131 | Altinova Elektronik | Customer | N | $ | - | Assume |
| 132 | Amalgamated Security Services Limited | Customer | N | $ | - | Assume |
| 133 | Amano-Megann Inc | Customer | N | $ | - | Assume |
| 134 | Amcorp Security Group North America, L | Customer | N | $ | - | Assume |
| 135 | American Digital Security | Customer | N | $ | - | Assume |
| 136 | American Electronics S.A. | Customer | N | $ | - | Assume |
| 137 | Ametras Vision GmbH | Customer | N | $ | - | Assume |
| 138 | Anixter Australia Pty LTD | Customer | N | $ | - | Assume |
| 139 | Anixter Canada | Customer | N | $ | - | Assume |
| 140 | Anixter LTD ( VAT# DE282643385) | Customer | N | $ | - | Assume |
| 141 | ANIXTER LTD (SE500371273201) Sweden | Customer | N | $ | - | Assume |
| 142 | ANIXTER LTD (VAT BE0845886639) (Belgium) | Customer | N | $ | - | Assume |
| 143 | ANIXTER LTD (VAT ESN82627458)(SPAIN) | Customer | N | $ | - | Assume |
| 144 | ANIXTER LTD (VAT IE582642258) IRELAND | Customer | N | $ | - | Assume |
| 145 | ANIXTER LTD IT00148349996)(ITALY) | Customer | N | $ | - | Assume |
| 146 | ANIXTER LTD(GB685163322) UK | Customer | N | $ | - | Assume |
| 147 | Anixter Middle East FZE | Customer | N | $ | - | Assume |
| 148 | Anixter Puerto Rico Sales | Customer | N | $ | - | Assume |
| 149 | Anixter Singapore | Customer | N | $ | - | Assume |
| 150 | Anixter Singapore Pte Ltd | Customer | N | $ | - | Assume |
| 151 | Anixter South America | Customer | N | $ | - | Assume |
| 152 | Anixter, Inc | Customer | N | $ | - | Assume |
| 153 | Anteco LTD | Customer | N | $ | - | Assume |
| 154 | Arnell Limited | Customer | N | $ | - | Assume |
| 155 | Aronson Security Group | Customer | N | $ | - | Assume |
| 156 | ATECO | Customer | N | $ | - | Assume |
| 157 | Audio Innovations Of Fresno, LLC | Customer | N | $ | - | Assume |
| 158 | AVTEL Ltd. | Customer | N | $ | - | Assume |
| 159 | Baicom Internetwork Co., Ltd. | Customer | N | $ | - | Assume |
| 160 | Balton CP Ltd. | Customer | N | $ | - | Assume |
| 161 | Baud Telecommunication Networks | Customer | N | $ | - | Assume |
| 162 | Birt Systems Limited | Customer | N | $ | - | Assume |
| 163 | Bizplanet Solution Pte Ltd | Customer | N | $ | - | Assume |
| 164 | BLUEIT CO. LTD | Customer | N | $ | - | Assume |

| | | | | | | |
|---|---|---|---|---|---|---|
| 165 | BORMATO SECURITY SRL | Customer | N | $ | - | Assume |
| 166 | Bridge Trading USA LLC | Customer | N | $ | - | Assume |
| 167 | Brooklyn Low Voltage Supply | Customer | N | $ | - | Assume |
| 168 | Brownsburg Community School Corporation | Customer | N | $ | - | Assume |
| 169 | Business Technology Partners | Customer | N | $ | - | Assume |
| 170 | C&C Partners Sp. z o.o | Customer | N | $ | - | Assume |
| 171 | CAMART SDN BHD | Customer | N | $ | - | Assume |
| 172 | CAMERA COBNES / CONNECTING POINT | Customer | N | $ | - | Assume |
| 173 | Cassidy Technologies | Customer | N | $ | - | Assume |
| 174 | CBE | Customer | N | $ | - | Assume |
| 175 | CCF- COMPTOIR DES COURANTS FABLES | Customer | N | $ | - | Assume |
| 176 | CCTV | Customer | N | $ | - | Assume |
| 177 | CCTV Center S.L. | Customer | N | $ | - | Assume |
| 178 | CITEX CORPORATION | Customer | N | $ | - | Assume |
| 179 | CJSC Arecont Vision | Customer | N | $ | - | Assume |
| 180 | CM3 Building Solutions, Inc. | Customer | N | $ | - | Assume |
| 181 | Communications Supply Corp | Customer | N | $ | - | Assume |
| 182 | Computec Korea CO., Ltd | Customer | N | $ | - | Assume |
| 183 | Computer Gross Italia S.p.A. | Customer | N | $ | - | Assume |
| 184 | Comtel Systems Technology, Inc. | Customer | N | $ | - | Assume |
| 185 | Convergint Technologies | Customer | N | $ | - | Assume |
| 186 | Coring d.o.o. | Customer | N | $ | - | Assume |
| 187 | CS Media Inc | Customer | N | $ | - | Assume |
| 188 | CUSTOM COMMUNICATIONS, INC. | Customer | N | $ | - | Assume |
| 189 | Custom Electronic Supply | Customer | N | $ | - | Assume |
| 190 | Custos bvba | Customer | N | $ | - | Assume |
| 191 | DATA LAB Sas | Customer | N | $ | - | Assume |
| 192 | DataLink Interactive Inc. | Customer | N | $ | - | Assume |
| 193 | DC Adonay | Customer | N | $ | - | Assume |
| 194 | DEMA SA | Customer | N | $ | - | Assume |
| 195 | Detex AS | Customer | N | $ | - | Assume |
| 196 | Digital Media For Security Systems. | Customer | N | $ | - | Assume |
| 197 | Digitalcom Co.,Ltd. | Customer | N | $ | - | Assume |
| 198 | Digitalwatch Guard | Customer | N | $ | - | Assume |
| 199 | Distrotech AB | Customer | N | $ | - | Assume |
| 200 | Divis | Customer | N | $ | - | Assume |
| 201 | Dunk Fire & Security | Customer | N | $ | - | Assume |
| 202 | E-Arlon SA | Customer | N | $ | - | Assume |
| 203 | Earl Bola nos. | Customer | N | $ | - | Assume |
| 204 | Edist | Customer | N | $ | - | Assume |
| 205 | EDNETICS | Customer | N | $ | - | Assume |
| 206 | EDSLAN SRL | Customer | N | $ | - | Assume |
| 207 | Electro-Systems Ind. Corp | Customer | N | $ | - | Assume |
| 208 | ENNTE VISION AS | Customer | N | $ | - | Assume |
| 209 | Entech - Dallas | Customer | N | $ | - | Assume |
| 210 | EQUIPOS DE SEGURIDAD MAGOCAD, S.A. | Customer | N | $ | - | Assume |
| 211 | ESCO Communications | Customer | N | $ | - | Assume |
| 212 | Essenia Systems, Inc. | Customer | N | $ | - | Assume |
| 213 | Esprinet S.P.A. | Customer | N | $ | - | Assume |
| 214 | E-Tech Systems | Customer | N | $ | - | Assume |
| 215 | Eurealarm | Customer | N | $ | - | Assume |
| 216 | Euronic Telecom | Customer | N | $ | - | Assume |
| 217 | European Security Trading | Customer | N | $ | - | Assume |
| 218 | EYEP Solutions | Customer | N | $ | - | Assume |
| 219 | Fares For Networks & IT Solutions | Customer | N | $ | - | Assume |
| 220 | Fast Forward Electronics | Customer | N | $ | - | Assume |
| 221 | Federal Protection, Inc. | Customer | N | $ | - | Assume |
| 222 | Full Protection | Customer | N | $ | - | Assume |
| 223 | Futurehome Systems & Design Inc. | Customer | N | $ | - | Assume |
| 224 | G4S. | Customer | N | $ | - | Assume |
| 225 | Getterson/Centennial | Customer | N | $ | - | Assume |
| 226 | Geutxbrueck Australia | Customer | N | $ | - | Assume |
| 227 | Global Surveillance Associates | Customer | N | $ | - | Assume |
| 228 | Global Surveillance System, Inc. | Customer | N | $ | - | Assume |
| 229 | Graybar | Customer | N | $ | - | Assume |
| 230 | Graybar Electric Company, Inc. | Customer | N | $ | - | Assume |
| 231 | Gric Aktiv | Customer | N | $ | - | Assume |
| 732 | Guangzhou InSec Security Technology Co. | Customer | N | $ | - | Assume |
| 233 | Gulf Business Machines LLC | Customer | N | $ | - | Assume |
| 234 | Hamilton Safe Company | Customer | N | $ | - | Assume |
| 235 | Harco Group Sa/NV | Customer | N | $ | - | Assume |
| 236 | Hi-Is Limited | Customer | N | $ | - | Assume |
| 237 | Honeywell Security Espana S.L. | Customer | N | $ | - | Assume |
| 238 | Honeywell Security Italia S.r.l. | Customer | N | $ | - | Assume |
| 239 | Honeywell Security Italy SpA | Customer | N | $ | - | Assume |
| 240 | Honeywell, spol. s r. o. | Customer | N | $ | - | Assume |
| 241 | ICD Security Solutions (HK) Ltd | Customer | N | $ | - | Assume |
| 242 | ICD Security Solutions G.K. | Customer | N | $ | - | Assume |
| 243 | Icetronica EM. | Customer | N | $ | - | Assume |
| 244 | Industrial Video & Control | Customer | N | $ | - | Assume |
| 245 | Infinity Distribution | Customer | N | $ | - | Assume |
| 246 | INFOBUS, SRL | Customer | N | $ | - | Assume |
| 247 | INFOCAST | Customer | N | $ | - | Assume |
| 248 | INFRASOUL TECHSERVE PVT.LTD | Customer | N | $ | - | Assume |
| 249 | Ingenieria de Proteccion SRL | Customer | N | $ | - | Assume |

| 250 | Innovative Security Systems, Inc. | Customer | N | $ | - | Assume |
|---|---|---|---|---|---|---|
| 251 | Innowave IT Infrastructures Ltd. | Customer | N | $ | - | Assume |
| 252 | Integrators Australia Pty Ltd | Customer | N | $ | - | Assume |
| 253 | International Security & Trading Corp | Customer | N | $ | - | Assume |
| 254 | IPTECNO VIDEOVIGILANCIA S.L. | Customer | N | $ | - | Assure |
| 255 | ISS INTEGRAL SECURITY SYSTEMS, S.A. | Customer | N | $ | - | Assume |
| 256 | ISTC de Chile S.A. | Customer | N | $ | - | Assume |
| 257 | ISTC de Mexico Sa De CV | Customer | N | $ | - | Assume |
| 258 | ITESA | Customer | N | $ | - | Assume |
| 259 | iTWORKS LLC , DUBAI | Customer | N | $ | - | Assume |
| 260 | JK-Handelsonderneming | Customer | N | $ | - | Assume |
| 261 | JMG Security Systems | Customer | N | $ | - | Assume |
| 262 | JSI Rodriguez, Inc | Customer | N | $ | - | Assume |
| 263 | Kcving doo | Customer | N | $ | - | Assume |
| 264 | La Estrella Solitaria S.A | Customer | N | $ | - | Assume |
| 265 | Linear Tech SA de CV | Customer | N | $ | - | Assume |
| 266 | LMKT Private Ltd | Customer | N | $ | - | Assume |
| 267 | Logan Sa de CV | Customer | N | $ | - | Assume |
| 268 | LOOP SKUPINA D.O.O. | Customer | N | $ | - | Assume |
| 269 | M.A. TECH | Customer | N | $ | - | Assume |
| 270 | Madwave Ltd. | Customer | N | $ | - | Assume |
| 271 | Marinequip AS | Customer | N | $ | - | Assume |
| 272 | Martco | Customer | N | $ | - | Assume |
| 273 | Matt J. McCoy | Customer | N | $ | - | Assume |
| 274 | Max Tech / Johan Crause | Customer | N | $ | - | Assume |
| 275 | Maxtec Peripherals (PTY) LTD | Customer | N | $ | - | Assume |
| 276 | MCW Solution | Customer | N | $ | - | Assume |
| 277 | MG WORLDWIDE DISTRIBUTORS,LLC | Customer | N | $ | - | Assume |
| 278 | MGTS. | Customer | N | $ | - | Assume |
| 279 | Micro Integration | Customer | N | $ | - | Assume |
| 280 | Microbiz Security Company | Customer | N | $ | - | Assume |
| 281 | Midco Inc. | Customer | N | $ | - | Assume |
| 282 | Middle Point | Customer | N | $ | - | Assume |
| 283 | Midwest Digital Systems, LLC | Customer | N | $ | - | Assume |
| 284 | Minuteman Security Tech., Inc | Customer | N | $ | - | Assume |
| 285 | Nantze Electric Company Inc. | Customer | N | $ | - | Assure |
| 286 | National Fire and Security Ltd | Customer | N | $ | - | Assume |
| 287 | NAVCO Security Systems | Customer | N | $ | - | Assume |
| 288 | Neural Integrated Systems Pvt Ltd | Customer | N | $ | - | Assume |
| 289 | NEXTLAN s.r.o. | Customer | N | $ | - | Assume |
| 290 | Norbain SD Limited UK | Customer | N | $ | - | Assume |
| 291 | Norelco Safecam | Customer | N | $ | - | Assume |
| 292 | North American Video, Inc. | Customer | N | $ | - | Assume |
| 293 | NorthStar Security, Inc. | Customer | N | $ | - | Assure |
| 294 | Novatrom Sec Distribution SA | Customer | N | $ | - | Assume |
| 295 | Octopuss SA | Customer | N | $ | - | Assume |
| 296 | Office Pro Technologies dba OPTECH | Customer | N | $ | - | Assume |
| 297 | One Source Security | Customer | N | $ | - | Assume |
| 298 | Optima Networks Bvba | Customer | N | $ | - | Assume |
| 299 | Pacific Communications | Customer | N | $ | - | Assume |
| 300 | Panthex, Inc. | Customer | N | $ | - | Assume |
| 301 | Pataraurgroj Ltd. | Customer | N | $ | - | Assume |
| 302 | Pekin Pubic Schools District 108 | Customer | N | $ | - | Assume |
| 303 | Petards | Customer | N | $ | - | Assume |
| 304 | Photocam System Co., Ltd | Customer | N | $ | - | Assume |
| 305 | Phu Ha Limited Company | Customer | N | $ | - | Assume |
| 306 | Pillar Innovations, LLC | Customer | N | $ | - | Assume |
| 307 | PKE Electronics AG | Customer | N | $ | - | Assume |
| 308 | Plan B Networks | Customer | N | $ | - | Assume |
| 309 | Platt Electric Supply | Customer | N | $ | - | Assume |
| 310 | Post Browning | Customer | N | $ | - | Assume |
| 311 | Prism One Group LLC | Customer | N | $ | - | Assume |
| 312 | Prisma Bytes Sdn Bhd | Customer | N | $ | - | Assume |
| 313 | PSA | Customer | N | $ | - | Assume |
| 314 | PT Data Global Komunatama | Customer | N | $ | - | Assume |
| 315 | PT Golden Solusions Indonesia | Customer | N | $ | - | Assume |
| 316 | PT. 3D Network Indonestia | Customer | N | $ | - | Assume |
| 317 | PT. 3D Networks Indonesia | Customer | N | $ | - | Assume |
| 318 | Q Security Systems | Customer | N | $ | - | Assume |
| 319 | Quang Dung Technology Distribution Co. | Customer | N | $ | - | Assume |
| 320 | Quartz Matrix | Customer | N | $ | - | Assure |
| 321 | Qxmic Mauritius | Customer | N | $ | - | Assume |
| 322 | REDYCOM | Customer | N | $ | - | Assume |
| 323 | Relyco Resources, Inc | Customer | N | $ | - | Assume |
| 324 | S3 Integration | Customer | N | $ | - | Assume |
| 325 | SAC Seguridad Automatizacion Y Control | Customer | N | $ | - | Assure |
| 326 | San Ramon Valley Unified School District | Customer | N | $ | - | Assume |
| 327 | Scan Source | Customer | N | $ | - | Assume |
| 328 | Scansource Latin America Inc. | Customer | N | $ | - | Assume |
| 329 | Scope LTD Corp | Customer | N | $ | - | Assume |
| 330 | Sectron | Customer | N | $ | - | Assume |
| 331 | Securadyne Systems | Customer | N | $ | - | Assume |
| 332 | SecureWatch24 LLC | Customer | N | $ | - | Assume |
| 333 | Securitec One Inc. | Customer | N | $ | - | Assume |
| 334 | Securitech Systems Limited | Customer | N | $ | - | Assume |

| 335 | Securitronics | Customer | N | $ | - | Assume |
|---|---|---|---|---|---|---|
| 336 | Security 101 | Customer | N | $ | - | Assume |
| 337 | Security Data Supply, LLC | Customer | N | $ | - | Assume |
| 338 | Security Equipment, Inc. | Customer | N | $ | - | Assume |
| 339 | Security Integration Group, Inc. | Customer | N | $ | - | Assume |
| 340 | SEICO Inc. | Customer | N | $ | - | Assume |
| 341 | Sekunet S.A. | Customer | N | $ | - | Assume |
| 342 | Sensonlink Holdings Sdn Bhd | Customer | N | $ | - | Assume |
| 343 | Shanghai North Crown Co. Ltd | Customer | N | $ | - | Assume |
| 344 | Shiba | Customer | N | $ | - | Assume |
| 345 | SI Technologies, Inc. | Customer | N | $ | - | Assume |
| 346 | Siel Invest S.R.L | Customer | N | $ | - | Assume |
| 347 | Siemens LLC UAE | Customer | N | $ | - | Assume |
| 348 | Silmar Electronics | Customer | N | $ | - | Assume |
| 349 | SimplexGrinnell LP | Customer | N | $ | - | Assume |
| 350 | SIRIUS SPA ( Compass ) Dist | Customer | N | $ | - | Assume |
| 351 | Sistemas Y Servicios de Comunicacion, S. | Customer | N | $ | - | Assume |
| 352 | SKY TECHNOLOGIES D.O.O. | Customer | N | $ | - | Assume |
| 353 | Sonitrol Security | Customer | N | $ | - | Assume |
| 354 | Sonivision S.A. | Customer | N | $ | - | Assume |
| 355 | Sound Inc. | Customer | N | $ | - | Assume |
| 356 | Sound Inc. | Customer | N | $ | - | Assume |
| 357 | Space Exploration Technologies Corp. | Customer | N | $ | - | Assume |
| 358 | SPS ELECTRONICS | Customer | N | $ | - | Assume |
| 359 | STA Tehniks | Customer | N | $ | - | Assume |
| 360 | Stanley Convergent Security Solutions | Customer | N | $ | - | Assume |
| 361 | Steehold Company Limited | Customer | N | $ | - | Assume |
| 362 | STEVE McGLASSON- C | Customer | N | $ | - | Assume |
| 363 | SVD France | Customer | N | $ | - | Assume |
| 364 | SystemX Corporation | Customer | N | $ | - | Assume |
| 365 | Systems Distributors, Inc. | Customer | N | $ | - | Assume |
| 366 | Takachiho Koheki | Customer | N | $ | - | Assume |
| 367 | TCK Technology CO LTD | Customer | N | $ | - | Assume |
| 368 | Tech Domain | Customer | N | $ | - | Assume |
| 369 | Tech Electronics | Customer | N | $ | - | Assume |
| 370 | Techno Q for Security Systems | Customer | N | $ | - | Assume |
| 371 | Teeya Master Systems CO. LTD | Customer | N | $ | - | Assume |
| 372 | Telenet VoIP, Inc. | Customer | N | $ | - | Assume |
| 373 | Tenco Supplies Inc. | Customer | N | $ | - | Assume |
| 374 | The Security Group Corp | Customer | N | $ | - | Assume |
| 375 | Trans Audio Video SRL | Customer | N | $ | - | Assume |
| 376 | Transworld Limitada | Customer | N | $ | - | Assume |
| 377 | Trident Seafoods Corporation | Customer | N | $ | - | Assume |
| 378 | Tri-Ed/ Northern Video Distribution | Customer | N | $ | - | Assume |
| 379 | TRL Systems, Inc. | Customer | N | $ | - | Assume |
| 380 | TSE Australia | Customer | N | $ | - | Assume |
| 381 | Ultrak Security Systems Sp. z o.o. | Customer | N | $ | - | Assume |
| 382 | Unisol International Corp | Customer | N | $ | - | Assume |
| 383 | United Technology Group DWC LLC | Customer | N | $ | - | Assume |
| 384 | Vegas Valley Locking Systems | Customer | N | $ | - | Assume |
| 385 | Vicon Industries | Customer | N | $ | - | Assume |
| 386 | Vicon Norway | Customer | N | $ | - | Assume |
| 387 | Video Guard B.V. | Customer | N | $ | - | Assume |
| 388 | Vido Electronic | Customer | N | $ | - | Assume |
| 389 | Viewrun | Customer | N | $ | - | Assume |
| 390 | Volutone Dist.(Simi Valey, CA) | Customer | N | $ | - | Assume |
| 391 | Voxtel Smart Security Solutions LLC | Customer | N | $ | - | Assume |
| 392 | Walters Wholesale Electronic Co. | Customer | N | $ | - | Assume |
| 393 | Westec Supplies | Customer | N | $ | - | Assume |
| 394 | WIB Electronics | Customer | N | $ | - | Assume |
| 395 | Worcester County Sheriff's Office | Customer | N | $ | - | Assume |

## Exhibit 1A

**First Amendment to Purchase Agreement**

FIRST AMENDMENT TO ASSET PURCHASE AGREEMENT

This First Amendment to Asset Purchase Agreement dated as of July 9, 2018 (the "Amendment"), is entered into by and between Arecont Vision, LLC, a Delaware limited liability company ("Seller"), a debtor-in-possession in a pending Chapter 11 Case in the United States Bankruptcy Court for the District of Delaware under Case No. 18-11142, on the one hand, and Arecont Vision Costar LLC, a Delaware limited liability company ("Purchaser"), and an affiliate of Costar Technologies, Inc., a Delaware corporation, and Costar Video Systems, LLC, a Delaware limited liability company (collectively, "Original Purchaser" and, together with Seller and Purchaser, sometimes collectively referred to herein as the "Parties") on the other hand, with respect to the following facts and circumstances.

A.  Reference is made to that certain Asset Purchase Agreement dated as of June 29, 2018 (the "Agreement"), by and between Seller and Purchaser.

B.  Capitalized terms used but not defined in this Amendment shall have the meanings ascribed to them in the Agreement.

C.  Original Purchaser has assigned its rights under the Agreement to Purchaser, provided that Purchaser has not been relieved of any of its obligations under the Agreement as a result of such assignment.

D.  Seller and Purchaser wish to modify and amend certain provisions of the Agreement as a result of an auction of Seller's assets and to properly reflect the mutual understanding of the Parties.

NOW, THEREFORE, for good valuable consideration, the receipt and sufficiency of which each hereby acknowledges, Purchaser and Seller hereby modify and amend the Agreement as follows:

1.      The Purchase Price referenced in Section 1.5(a)(ii) of the Agreement is increased from Eleven Million Two Hundred Fifty Thousand Dollars ($11,250,000) to Thirteen Million Eight Hundred Seventy-Five Thousand Dollars ($13,875,000) plus the amount of the Assumed Liabilities, subject to the working capital adjustment set forth in Section 1.6.

2.      Deletion and Restatement of Section 1.6 of the Agreement. Section 1.6 and Schedule 1.6 of the Agreement are hereby deleted in their entirety and the following provision is substituted in place and stead of Section 1.6:

"The Parties agree that the working capital adjustment shall be fixed at the amount of $2,227,930 as of the Closing Date (the "Final Working Capital Adjustment"), which amount includes certain pre-paid inventory as set forth in the working capital schedule provided to Purchaser by Buyer on July 8, 2018. The Purchase Price payable by Purchaser to Seller shall be reduced by the Final Working Capital Adjustment, provided

1

that (i) Seller provides evidence to Buyer at Closing of the payment of not less than $400,000 of post-petition accounts payable during the period July 9, 2018 through Closing and (ii) to the extent Seller's cash collections exceed $385,000 during the period July 9, 2018 through Closing, all such excess collections shall be credited against the Purchase Price."

3.      Deletion and Restatement of Section 4.8 of the Agreement. Section 4.8 of the Agreement is hereby deleted in its entirety and the following provision is substituted in its place and stead:

"4.8    Books and Records; Access to Personnel.

Purchaser agrees that it shall preserve and keep all Books and Records in the Purchaser's possession for a period of at least five (5) years from the Closing Date. Until a final decree is entered closing the Bankruptcy Case, Purchaser shall also make available to Seller and its representatives (i) access at reasonable times, and free of charge to those individuals listed on Schedule 4.8 to this Agreement (to the extent such individuals are in Purchaser's or an Affiliate's employ at the time of request and to the extent that the same does not unreasonably interfere with Purchaser's operation of the Business) for reasonable consultation regarding matters related to the Business prior to the Closing, and (ii) the opportunity, upon reasonable notice and during normal business hours to examine, inspect and, at Seller's cost and expense, copy such Books and Records as they relate to periods prior to the Closing, in each case in clauses (i) and (ii) in connection with matters relating to the administration (including, without limitation, the conduct of any litigation to which Seller or its successors may be a party) and wind down of the Bankruptcy Case. Without limiting the generality of the foregoing, Purchaser also agrees to preserve and keep, and provide to Seller upon reasonable notice and during normal business hours, the opportunity to examine, inspect and, at Seller's cost and expense, copy any documents that may be responsive to discovery in connection with that certain litigation styled as "Arecont Vision Holdings, LLC v. Wonder Vision Inc., et al," pending under Case No. 2017-0741-JRS in the Chancery Court of the State of Delaware (the "Deposit Litigation") or that are the subject to a litigation hold notice in connection therewith (the "Discovery File") until the earlier to occur of (a) the date the Deposit Litigation has been closed, and (b) such time as the contents of the Discovery File (or copies thereof) have been transferred to Seller. For purposes of this Section 4.8, the term Seller shall include any successor or assign of Seller, including any liquidating or litigation trust."

4.      Miscellaneous.

This Amendment may be amended, superseded, canceled, renewed or extended, and the terms hereof may be waived, only by a written instrument signed by Purchaser, Seller, and Original Purchaser or, in the case of a waiver, by the party waiving compliance. No delay on the part of any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any waiver on the part of any party of any such right, power or privilege, nor any single or partial exercise of any such right, power or privilege, preclude any further exercise thereof or the exercise of any other such right, power or privilege. All references herein to Articles and Sections shall be deemed

2

references to such parts of the Agreement or this Amendment, unless the context shall otherwise require. The Article and Section headings in this Amendment are for reference only and shall not affect the interpretation of the Agreement. This Amendment may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts together shall constitute one and the same instrument. Each counterpart may consist of a number of copies hereof each signed by less than all, but together signed by all, of the parties hereto. No provision of this Amendment is intended to, or shall, confer any third party beneficiary or other rights or remedies upon any Person other than the Parties hereto. To the extent of any inconsistency between the terms and provisions of this Amendment and the Agreement, this Amendment shall govern and control. Except to such extent, the Agreement shall be unchanged and shall remain in full force and effect.

[BALANCE OF PAGE INTENTIONALLY LEFT BLANK]

DOCS_DE:220229.3 05062/002

IN WITNESS WHEREOF, Seller, Purchaser, and Original Purchaser have executed this Amendment as of the date first written above.

PURCHASER:

Arecont Vision Costar LLC, a Delaware limited liability company

By: _____
     Name:  Scott Switzer
     Title:  CFO

ORIGINAL PURCHASER:

Costar Technologies, Inc., a Delaware corporation

By: _____
     Name:  Scott Switzer
     Title:  CFO

Costar Video Systems, LLC, a Delaware limited liability company

By: _____
     Name:  Scott Switzer
     Title:  CFO

SELLER:

Arecont Vision, LLC, a Delaware limited liability company

By: _____
     Name: T. Scott Avila
     Title: Chief Restructuring Officer

DOCS_DE:220229.3 05062/002